**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HILARY REMIJAS, on behalf of herself and all others similarly situated, | ) | |
| | ) | No. |
| Plaintiff, | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| THE NEIMAN MARCUS GROUP, LLC, a Delaware limited liability company, | ) | |
| Defendant. | ) | |

**CLASS ACTION COMPLAINT**

Plaintiff Hilary Remijas ("Plaintiff") brings this Class Action Complaint against Defendant The Neiman Marcus Group, LLC ("Defendant" or "Neiman Marcus"), individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## I. NATURE OF THE ACTION

1. Plaintiff brings this class action against Neiman Marcus for its failure to secure and safeguard its customers' personal financial data, including credit and debit card information.

2. On January 10, 2014, Neiman Marcus disclosed a data breach involving the theft of customers' credit-card and debit-card data with an unknown number of compromised customer accounts. The breach occurred when hackers infiltrated Neiman Marcus' flawed payment security system with malicious software (the "Security Breach").

3. However, Neiman Marcus knew well before it notified consumers that there had been a data breach: Neiman Marcus was informed in mid-December 2013 about potentially

unauthorized payment activity. On January 1, 2014, a forensics firm confirmed that Neiman Marcus was a victim of a cybersecurity intrusion.[1] However, it was not until January 10, 2014, that Neiman Marcus revealed the data breach to consumers.

4. On January 22, 2014, Neiman Marcus revealed additional details of the breach, stating that between July 16 and October 30, 2013, the malicious software ("Malware") attempted to collect payment card data and that 1,100,000 customer payment cards could have been visible to the Malware. Furthermore, Discover, MasterCard, and Visa informed Neiman Marcus that 2,400 payment cards used in-store have been subsequently used fraudulently.[2]

5. Thereafter, on February 21, 2014, Neiman Marcus updated its notice to customers, lowering the total of potentially affected customers to approximately 350,000, but increasing the number of fraudulently used cards to approximately 9,200.[3] As such, the number of fraudulently used cards nearly quadrupled in the span of only a month. It also remains unclear whether the breach only affected cards used during the July to October time frame, or if the breach is even larger.

6. Neiman Marcus' security failures enabled the hackers to steal financial data from within Neiman Marcus' stores and, on information and belief, subsequently make unauthorized purchases on customers' credit cards and otherwise put Class members' financial information at serious and ongoing risk. The hackers continue to use the information they obtained as a result of Neiman Marcus' inadequate security to exploit and injure Class members across the United States.

---

[1] Anne D'Innocenzio, *Neiman Marcus offers update on credit card breach*, Seattle PI (Jan. 16, 2014, 12:47 PM), http://www.seattlepi.com/business/article/Neiman-Marcus-offers-update-on-credit-card-breach-5149704.php.

[2] Karen Katz, *To our loyal Neiman Marcus Group customers*, Neiman Marcus Group (Jan. 22, 2014), http://www.neimanmarcus.com/NM/Security-Info/cat49570732/c.cat?navid=redirect:security.

[3] Karen Katz, *To our loyal Neiman Marcus Group customers*, Neiman Marcus Group (Feb. 21, 2014), http://www.neimanmarcus.com/NM/Security-Info/cat49570732/c.cat?icid=topPromo_hmpg_ticker_SecurityInfo_0114.

7. The Security Breach was caused and enabled by Neiman Marcus' knowing violation of its obligations to abide by best practices and industry standards in protecting customers' personal information. Neiman Marcus grossly failed to comply with security standards and allowed their customers' financial information to be compromised, all in an effort to save money by cutting corners on security measures that could have prevented or mitigated the Security Breach that occurred.

8. Neiman Marcus has failed to disclose the full extent of the Security Breach and notify its affected customers in a timely manner. Neiman Marcus failed to take other reasonable steps to clearly and conspicuously inform its customers of the nature and extent of the Security Breach. By failing to provide adequate notice, Neiman Marcus prevented (and continues to prevent) Class members from protecting themselves from the Security Breach.

9. Accordingly, Plaintiff, on behalf of herself and other members of the Class, asserts claims for breach of implied contract and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*., and seeks injunctive relief, declaratory relief, monetary damages, statutory damages, and all other relief as authorized in equity or by law.

## II. JURISDICTION AND VENUE

10. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). In the aggregate, Plaintiff's claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interest and costs, and there are numerous class members who are citizens of States other than Neiman Marcus' State of citizenship.

11. This Court has personal jurisdiction over Neiman Marcus because Neiman Marcus is registered with the Illinois Secretary of State to conduct business in the State of

Illinois, and does conduct substantial business in the State of Illinois, such that Neiman Marcus has significant continuous and pervasive contacts with the State of Illinois. Neiman Marcus also maintains numerous stores and employees in the State of Illinois, including multiple stores compromised in the Security Breach.

12. Venue is proper in this District pursuant to 28 U.S.C. §§ 1301(a)(2), 1391(b)(2), and 1391(c)(2) as: a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this District, and Neiman Marcus conducts substantial business in this District.

## III. PARTIES

***Plaintiff***

13. Hilary Remijas is a citizen of Illinois and is domiciled in Cook County, Illinois. Remijas shopped at a Neiman Marcus retail location in Oak Brook, Illinois on August 7, 2013 and December 21, 2013. Remijas paid with her Neiman Marcus card. As a result, Remijas entered into an implied contract with Neiman Marcus for the adequate protection of her card information and had her sensitive financial information exposed as a result of Neiman Marcus' inadequate security.

***Defendant Neiman Marcus***

14. The Neiman Marcus Group, LLC is a Delaware limited liability company with its principal place of business in Dallas, Texas. Accordingly, Neiman Marcus is a citizen of both Texas and Delaware. Neiman Marcus owns and operates retail stores offering, among other things, fashion apparel, jewelry, beauty and home decorating products.

## IV. FACTUAL BACKGROUND

***The Data Breach***

15. Neiman Marcus operates approximately 79 retail locations in the United States, and reported total sales of approximately $1.1 billion in the most recent quarter.[4] Like many other retailers, Neiman Marcus processes in-store debit and credit card payments.

16. On information and belief, an untold number consumers became the victims of a data breach when their personal information was taken from Neiman Marcus' payment card information systems as a result of malicious software. According to their February 21, 2014 press release, Neiman Marcus' investigation is ongoing, indicating that the full extent of this Security Breach is yet unknown.

17. At the least, from July 16 to October 30, 2013, 350,000 customers' personal information was potentially visible to hackers who installed Malware on Neiman Marcus' system. Neiman Marcus has previously reported a potential of 1.1 *million* affected customers. To date, 9,200 cards have already been reported as used fraudulently.

18. Neiman Marcus's failure to comply with reasonable security standards provided Neiman Marcus with short-term and fleeting benefits in the form of saving on the costs of compliance, but at the expense and to the severe detriment of Neiman Marcus' own customers – including Class members here – who have been subject to the Security Breach or otherwise have had their financial information placed at serious and ongoing risk.

19. Neiman Marcus allowed widespread and systematic theft of its customers' financial information. Defendant's actions did not come close to meeting the standards of commercially reasonable steps that should be taken to protect customers' financial information.

[4] Hayley Tsukayama, *Neiman Marcus: 'We deeply regret' data breach*, The Washington Post (Jan. 16, 2014, 2:36 PM), http://www.washingtonpost.com/business/technology/neiman-marcus-we-deeply-regret-data-breach/2014/01/16/7bd54b30-7ee8-11e3-93c1-0e888170b723_story.html.

***Neiman Marcus Fails to Provide Sufficient Notice of the Data Breach to Class Members***

20. Neiman Marcus' customers are subject to continuing damage from having their personal information compromised due to Neiman Marcus' inadequate security. Neiman Marcus' customers were and are entitled to clear, conspicuous, and prompt notification about the data breach to help them mitigate the harm and avoid additional instances of fraud as alleged herein. Neiman Marcus, however, has failed to take reasonable steps to notify its customers that their information has been compromised.

21. According to Neiman Marcus' website, in mid-December, Neiman Marcus' merchant processor informed the company that potentially unauthorized payment card activity had occurred following customer purchases at Neiman Marcus stores.

22. On January 1, 2014, a forensics firm confirmed that the company had become the victim of a cyber-security intrusion and that some customers' cards were possibly compromised as a result.

23. On January 10, 2014, potentially 26 days after first receiving notice of the breach, Neiman Marcus finally notified consumers that a data breach had occurred.

24. Furthermore, approximately ***6 months*** passed from the first known attempt to collect information (reported as July 16, 2013) to Neiman Marcus' disclosure of the breach to its customers.

25. Rather than take responsibility for its security failures that resulted in the Security Breach, Neiman Marcus has placed the burden on aggrieved customers like Plaintiff and the other members of the Class, either to monitor their accounts and credit reports for years to come, or to spend time and money on fraud alerts or credit-report security freezes in addition to Neiman Marcus' offer of a year of credit monitoring.

***Security Breaches Lead to Identity Theft***

26. The United States Government Accountability Office noted in a June 2007 report on Data Breaches ("GAO Report") that identity thieves use personal identifying data to open financial accounts, receive government benefits and incur charges and credit in a person's name.[5] As the GAO Report states, this type of identity theft is the most harmful because it may take some time for the victim to become aware of the theft and can adversely impact the victim's credit rating. In addition, the GAO Report states that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."

27. According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumer's finances, credit history and reputation and can take time, money and patience to resolve.[6] Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[7]

28. A person whose personal information has been compromised may not see any signs of identity theft for *years*. According to the GAO Report:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

[5] *See* http:///www.gao.gov/new.items/d07737.pdf.

[6] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (2012), http://www.consumer.ftc.gov/articles/pdf-0009-taking-charge.pdf (last visited Dec. 19. 2013).

[7] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id*.

29. Personal identifying information ("PII") – like the Neiman Marcus' customer names combined with their credit or debit card information that were stolen in the Security Breach at issue in this action– is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for a number of years.[8] As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen credit card numbers, and other PII directly on various Internet websites making the information publicly available.

***The Monetary Value of Privacy Protections***

30. At a Federal Trade Commission ("FTC") public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information as follows:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[9]

31. Though Commissioner's Swindle's remarks are more than a decade old, they are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 billion per year online advertising industry in the United States.[10]

[8] Companies, in fact, also recognize PII as an extremely valuable commodity akin to a form of personal property. For example, Symantec Corporation's Norton brand has created a software application that values a person's identity on the black market. Risk Assessment Tool, Norton 2010, www.everyclickmatters.com/victim/assessment-tool.html. *See also* T. Soma, ET AL, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009).

[9] *The Information Marketplace: Merging and Exchanging Consumer Data*, http://www.ftc.gov/bcp/workshops/infomktplace/transcript.htm (last visited Dec. 20, 2013).

[10] *See Web's Hot New Commodity: Privacy*, http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Dec. 20, 2013).

32. The FTC has also recognized that consumer data is a new – and valuable – form of currency. In a recent FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point by observing:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[11]

33. Recognizing the high value that consumers place on their PII, many companies now offer consumers an opportunity to sell this information to advertisers and other third parties. The idea is to give consumers more power and control over the type of information that they share – and who ultimately receives that information. And by making the transaction transparent, consumers will make a profit from the surrender of their PII.[12] This business has created a new market for the sale and purchase of this valuable data.[13]

34. Consumers place a high value not only on their PII, but also on the *privacy* of that data. Researchers have already begun to shed light on how much consumers value their data privacy – and the amount is considerable. Indeed, studies confirm that "when [retailers'] privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[14]

---

[11] *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited Dec. 20, 2013).

[12] *You Want My Personal Data? Reward Me for It*, http://www.nytimes.com/2010/07/18/business/18unboxed.html (last visited Dec. 20, 2013).

[13] *See Web's Hot New Commodity: Privacy*, http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Dec. 20, 2013).

[14] Hann *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at 2, *available at* http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (emphasis added) (last visited Dec. 20, 2013); Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (June 2011).

35. When consumers were surveyed as to how much they valued their personal data in terms of its protection against improper access and unauthorized secondary use – two concerns at issue here – they valued the restriction of improper access to their data at between $11.33 and $16.58 per website, and prohibiting secondary use to between $7.98 and $11.68 per website.[15]

36. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Damages Sustained By Plaintiff and the Class***

37. A portion of the services purchased from Neiman Marcus by Plaintiff and the Class necessarily included compliance with industry-standard measures with respect to the collection and safeguarding of PII, including their credit card information. Because Plaintiff and the Class were denied privacy protections that they paid for and were entitled to receive, Plaintiff and the Class incurred actual monetary damages in that they overpaid for the products purchased from Neiman Marcus.

38. Plaintiff and the Class have suffered additional injury in fact and actual damages including monetary losses arising from unauthorized bank account withdrawals and/or related bank fees charged to their accounts.

39. Plaintiff and the Class suffered additional damages arising from the costs associated with identity theft and the increased risk of identity theft caused by Neiman Marcus' wrongful conduct, particularly given the incidents of actual misappropriation from Class members' financial accounts, as detailed above.

40. Plaintiff and the Class suffered additional damages based on the opportunity cost and value of time that Plaintiff and the Class have been forced to expend to monitor their financial

[15] *Id.*

and bank accounts as a result of the Security Breach. Such damages also include the cost of obtaining replacement credit and debit cards.

## V. CLASS ACTION ALLEGATIONS

41. Plaintiff brings Count I as set forth below, on behalf of herself and as a class action, pursuant to the provisions of Rule 23 of the Federal Rule of Civil Procedure on behalf of a class defined as:

> All persons residing in the United States who made an in-store purchase at a Neiman Marcus store using a debit or credit card at any time from July 16, 2013 through October 30, 2013 (the "National Class").

Excluded from the National Class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

42. Plaintiff brings Count II, as set forth below, on behalf of herself and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All persons residing in one of the Consumer Fraud States[16] who made an in-store purchase at a Neiman Marcus store using a debit

[16] The States that have similar consumer fraud laws based on the facts of this case are: Arkansas (Ark. Code § 4-88-101, *et seq.*); California (Cal. Bus. & Prof. Code §17200, *et seq.* and Cal. Civil Code § 1750, *et seq.*); Colorado (Colo. Rev. Stat. § 6-1-101, *et seq.*); Connecticut (Conn. Gen. Stat. § 42-110, *et seq.*); Delaware (Del. Code tit. 6, § 2511, *et seq.*); District of Columbia (D.C. Code § 28-3901, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Hawaii (Haw. Rev. Stat. § 480-1, *et seq.*); Idaho (Idaho Code § 48-601, *et seq.*); Illinois (815 ICLS § 505/1, *et seq.*); Maine (Me. Rev. Stat. tit. 5 § 205-A, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.* ); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); Montana (Mo. Code. § 30-14-101, *et seq.*); Nebraska (Neb. Rev. Stat. § 59-1601, *et seq.*); Nevada (Nev. Rev. Stat. § 598.0915, *et seq.*); New Hampshire (N.H. Rev. Stat. § 358-A:1, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New Mexico (N.M. Stat. § 57-12-1, *et seq.*); New York (N.Y. Gen. Bus. Law § 349,*et seq.*); North Dakota (N.D. Cent. Code § 51-15-01, *et seq.*); Oklahoma (Okla. Stat. tit. 15, § 751, *et seq.*); Oregon (Or. Rev. Stat. § 646.605, *et seq.*); Rhode Island (R.I. Gen. Laws § 6-13.1-1, *et seq.*); South Dakota (S.D. Code Laws § 37-24-1, *et seq.*); Virginia (VA Code § 59.1-196, *et seq.*); Vermont (Vt. Stat. tit. 9, § 2451, *et seq.*); Washington (Wash. Rev. Code § 19.86.010, *et seq.*); West Virginia (W. Va. Code § 46A-6-101, *et seq.*); and Wisconsin (Wis. Stat. § 100.18, *et seq.*).

> or credit card at any time from July 16, 2013 through October 30, 2013 (the "Consumer Fraud Multistate Class").

Excluded from the Consumer Fraud Multistate Class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

43. In the alternative, Plaintiff brings Count II, as set forth below, on behalf of herself and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All persons residing in the State of Illinois who made an in-store purchase at a Neiman Marcus store using a debit or credit card at any time from from July 16, 2013 through October 30, 2013 (the "Illinois State Class").

Excluded from the Illinois State Class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

44. The National Class, Consumer Fraud Multistate Class, and Illinois State Class are collectively referred to as the "Class," unless specifically indicated otherwise.

45. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

46. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, Class members number in the thousands. The precise number of Class members and their addresses are presently unknown to Plaintiff, but may be ascertained from Neiman Marcus'

books and records. Class members may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

47. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include:

a. Whether Neiman Marcus failed to use reasonable care and commercially reasonable methods to secure and safeguard its customers' sensitive financial information;

b. Whether Neiman Marcus properly implemented its purported security measures to protect customer financial information from unauthorized capture, dissemination, and misuse;

c. Whether Neiman Marcus unreasonably delayed in notifying affected customers of the data breach;

d. Whether Neiman Marcus' conduct violates the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

e. Whether Neiman Marcus' conduct constitutes breach of an implied contract;

f. Whether Plaintiff and the other members of the Class are entitled to damages, injunctive relief, or other equitable relief.

48. Neiman Marcus engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are

involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

49. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other Class members because, among other things, all Class members were comparably injured through Neiman Marcus' uniform misconduct described above and were thus all subject to the Security Breach alleged herein. Further, there are no defenses available to Neiman Marcus that are unique to Plaintiff.

50. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representatives because her interests do not conflict with the interests of the other Class members she seeks to represent; she has retained counsel competent and experienced in complex class action litigation; and Plaintiff will prosecute this action vigorously. The Class' interests will be fairly and adequately protected by Plaintiff and her counsel.

51. **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, members of the Class would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Neiman Marcus. The proposed Class thus satisfies the requirements of Fed. R. Civ. P. 23(b)(1).

52. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Neiman Marcus has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Class as a whole.

53. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Neiman Marcus, so it would be impracticable for Class members to individually seek redress for Neiman Marcus' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI. CLAIMS ALLEGED

### COUNT I
### Breach of Implied Contract
### (On Behalf of the National Class)

54. Plaintiff incorporates paragraphs 1-53 as if fully set forth herein.

55. Neiman Marcus' customers who intended to make in-store purchases with debit or credit cards were required to provide their card's magnetic strip data for payment verification.

56. In providing such financial data, Plaintiff and the other members of the Class entered into an implied contract with Neiman Marcus whereby Neiman Marcus became obligated to reasonably safeguard Plaintiff's and the other Class members' sensitive, non-public, information.

57. Neiman Marcus breached the implied contract with Plaintiff and the other members of the Class by failing to take reasonable measures to safeguard their financial data.

58. Plaintiff and the other Class members suffered and will continue to suffer damages including, but not limited to loss of their financial information, loss of money and costs incurred as a result of increased risk of identity theft, all of which have ascertainable value to be proven at trial.

## COUNT II
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (and Substantially Similar Laws of the Consumer Fraud States[17]) (on Behalf of the Consumer Fraud Multistate Class or, in the alternative, on Behalf of the Illinois Class)**

59. Plaintiff incorporates paragraphs 1-53 as if fully set forth herein.

60. Plaintiff and the other members of the Class were deceived by Neiman Marcus' failure to properly implement adequate, commercially reasonable security measures to protect their private financial information while shopping at Neiman Marcus.

61. Neiman Marcus intended for Plaintiff and the other members of the Class to rely on Neiman Marcus to protect the information furnished to it in connection with their debit and credit card transactions, in such manner that the transactions would be protected, secure, and not susceptible to access from unauthorized third parties.

62. Neiman Marcus instead handled Plaintiff's and the other Class members' personal information in such manner that it was compromised.

[17] The Consumer Fraud States were defined at *supra* note 20.

63. Neiman Marcus failed to follow industry best practices concerning data theft or was negligent in preventing such data theft from occurring.

64. It was foreseeable that Neiman Marcus' willful indifference or negligent course of conduct in handling its customers' personal information would put that information at risk of compromise by data thieves.

65. Neiman Marcus benefited from mishandling its customers' personal information because, by not taking preventative measures that would have prevented the data from being compromised, Neiman Marcus saved on the cost of those security measures.

66. Neiman Marcus' fraudulent and deceptive acts and omissions were intended to induce Plaintiff's and the other Class members' reliance on Neiman Marcus' deception that their financial information was secure and protected when using debit and credit cards to shop at Neiman Marcus.[18]

67. Neiman Marcus violated 815 ILCS 505/2 by failing to properly implement adequate, commercially reasonable security measures to protect Plaintiff's and the other members' private financial information.

68. Neiman Marcus' acts or practice of failing to employ reasonable and appropriate security measures to protect consumers' personal information constitute violations of the Federal Trade Commission Act, 15 U.S.C. § 45(a).

69. Neiman Marcus' conduct constitutes unfair acts or practices as defined in that statute because Neiman Marcus caused substantial injury to Class members that is not offset by countervailing benefits to consumers or competition and is not reasonably avoidable by consumers.

[18] The consumer protection statutes or interpretive law of the Consumer Fraud States have also either: (a) expressly prohibited omissions of material fact, without regard for reliance on the deception, or (b) have not addressed those issues.

70. Neiman Marcus also violated 815 ILCS 505/2 by failing to immediately notify affected customers of the nature and extent of the Security Breach pursuant to the Illinois Personal Information Protection Act, 815 ILCS 530/1, *et seq*., which provides:

> Sec. 10. Notice of Breach.
>
> (a) Any data collector that owns or licenses personal information concerning an Illinois resident shall notify the resident at no charge that there has been a breach of the security of the system data following discovery or notification of the breach. The disclosure notification shall be made in the most expedient time possible and without unreasonable delay, consistent with any measures necessary to determine the scope of the breach and restore the reasonable integrity, security, and confidentiality of the data system.

71. 815 ILCS 530/20 provides that a violation of 815 ILCS 530/10 "constitutes an unlawful practice under the Consumer Fraud and Deceptive Business Practices Act."

72. Plaintiff and the other members have suffered injury in fact and actual damages including lost money and property as a result of Neiman Marcus' violations of 815 ILCS 505/2.

73. Plaintiff and the other Class members' injuries were proximately caused by Neiman Marcus' fraudulent and deceptive behavior, which was conducted with reckless indifference toward the rights of others, such that an award of punitive damages is appropriate.

74. By this conduct, Neiman Marcus violated the substantive consumer protection and unfair deceptive trade practices acts or statutes of the Consumer Fraud States, whose laws do not materially differ from that of Illinois, or conflict with each other for purposes of this action.

## VII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims in this complaint so triable.

## VIII. REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in her favor and against Neiman Marcus, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel for the Class;

B. Ordering Neiman Marcus to pay actual damages to Plaintiff and the other members of the Class;

C. Ordering Neiman Marcus to pay for not less than three years of credit card monitoring services for Plaintiff and the other members of the Class;

D. Ordering Neiman Marcus to pay punitive damages, as allowable by law, to Plaintiff and the other members of the Class;

E. Ordering Neiman Marcus to pay statutory damages, as provided by the Illinois Consumer Fraud and Deceptive Business Practices Act and other applicable State Consumer Fraud Acts, to Plaintiff and the other members of the Class;

F. Ordering Neiman Marcus to disseminate individualized notice of the Security Breach to all Class members and to post notice of the Security Breach in all of its affected stores;

G. Ordering Neiman Marcus to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

H. Ordering Neiman Marcus to pay both pre- and post-judgment interest on any amounts awarded; and

I. Ordering such other and further relief as may be just and proper.

Dated: March 12, 2014

Respectfully submitted,

HILARY REMIJAS, individually and on behalf of all others similarly situated

By:________________________________
Attorneys for Plaintiff
And the Proposed Putative Classes

Joseph J. Siprut
*jsiprut@siprut.com*
Melanie K. Nelson
*mnelson@siprut.com*
Gregg M. Barbakoff
*gbarbakoff@siprut.com*
Gregory W. Jones
*gjones@siprut.com*
**SIPRUT PC**
17 North State Street
Suite 1600
Chicago, Illinois 60602
312.236.0000
Fax: 312.267.1906

4827-0868-7896, v. 1