## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

HILARY REMIJAS, MELISSA FRANK, DEBBIE FARNOUSH, and JOANNE KAO, individually and on behalf of all others similarly situated,

               Plaintiffs,

    v.

THE NEIMAN MARCUS GROUP, LLC, a Delaware limited liability company,

               Defendant.

Case No. 1:14-cv-01735

Hon. Samuel Der-Yeghiayan

## DECLARATION OF TINA WOLFSON IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND AWARD OF ATTORNEYS FEES, COSTS, AND CLASS REPRESENTATIVE SERVICE AWARDS

I, Tina Wolfson, declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am an attorney licensed to practice in all courts in the State of California, and am admitted to practice *pro hac vice* in the Northern District of Illinois in this case.  I am a founding member of the law firm of Ahdoot & Wolfson, PC ("AW").  I submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement. The matters stated herein are true of my own knowledge or, where indicated, I am informed and believe that they are true. If called upon as a witness, I could and would competently testify as follows.

2.      A true and correct copy of the Settlement Agreement and its Exhibits is attached as Exhibit 1 to the Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Certification of Settlement Class, Dkt.145-1.

3.      AW is experienced in litigating and settling class actions, including data breach and privacy lawsuits such as this action. A true and correct copy of our firm CV is attached hereto as **Exhibit A**, which demonstrates that AW, the attorneys who worked on this case, and I are well qualified to serve as Class Counsel in this action.

4.      On January 13, 2014, AW filed the first filed putative class action lawsuit against The Neiman Marcus Group, LLC ("NMG" or "Defendant") related to the Cybersecurity Incident[1], in the United States District Court for the Eastern District of New York.  That action was entitled *Frank v. Neiman Marcus Group*, E.D.N.Y. Case No. 14-cv-00233-ADS-GRB. Before initiating that litigation, plaintiffs' counsel investigated the underlying facts, including by analyzing Defendant's public statements concerning the Cybersecurity Incident.

---

[1]      Unless otherwise defined, Capitalized terms and phrases used herein shall have the same meaning as ascribed to them in the Settlement Agreement filed concurrently herewith in this Action.

5.     Thereafter, a number of other class actions were filed against NMG.  On March 12, 2014, Plaintiff Remijas filed her original Complaint in this action. An action entitled *Clark v. Neiman Marcus Group, Ltd., LLC*, No. 1:14-cv-0236, was filed on January 27, 2014 in the Northern District of Georgia; and *Wong v. The Neiman Marcus Group, LLC*, No. 2:14-cv-00703-SJO-JC, was filed on January 29, 2014 in the Central District of California.  Similar actions followed, including *Chau v. Neiman Marcus Group, Ltd, Inc.*, No. 14-cv-597 (S.D. Cal. filed Mar. 14, 2014), and *Shields v. The Neiman Marcus Group, LLC*, No. 14-cv-752 (S.D. Cal. filed Apr. 1, 2014).

6.     After filing, plaintiffs' counsel's investigation continued.  In this regard, plaintiffs' counsel retained and consulted with experts on data security issues, who helped analyze publicly available information concerning the Incident.  Plaintiffs' counsel fought for early discovery, filing, in the *Frank* case cited above, a motion to expedite discovery and, later, a motion to compel Defendant to participate in a Rule 26 conference so that regular discovery could proceed. (*Frank*, Dkt. Nos. 5, 29.)  AW and co-counsel in the *Frank* action also filed a motion for a protective order seeking to curtail Defendant's communications to the class.  (*Frank*, Dkt. No. 4.) The *Frank* court did not rule upon those motions before the cases were effectively consolidated in this Court.

7.     After these actions were filed, plaintiffs' counsel in all the actions related to NMG's Cybersecurity Incident met and conferred in order to self-organize the cases for the sake of judicial economy and efficiency.

8.     Plaintiffs agreed to consolidate and proceed with their cases in the Northern District of Illinois.

9.      On June 6, 2014, plaintiffs a First Amended Class Action Complaint in this action, alleging negligence, breach of implied contract, unjust enrichment, violation of state unfair business practices statutes, invasion of privacy, and violation of state data breach acts.

10.      On July 2, 2014, Defendants filed a Motion to Dismiss the action, which was granted by the Court on September 16, 2014.

11.      Plaintiffs filed their Notice of Appeal of the September 16, 2014 dismissal on September 25, 2014.  On July 20, 2015, after briefing and oral argument before the United States Court of Appeals for the Seventh Circuit, the order granting Defendant's Motion to Dismiss was reversed and the case was remanded to the District Court.  Thereafter, the Court of Appeals denied NMG's petition for rehearing *en banc* rehearing and remanded the case back to this Court.

12.      On November 12, 2015, NMG renewed its Motion to Dismiss the action and filed supplemental briefing.  After full briefing, the Court denied NMG's motion to dismiss on January 13, 2016.

13.      In December 2015, the parties began discussing possible settlement, which resulted in a long series of arms' length negotiations, including mediation and numerous post-mediation discussions between counsel and the mediator.

14.      The Honorable Judge Wayne R. Andersen (Ret.) of JAMS served as the mediator in two formal all-day mediation sessions, taking place on December 22, 2015 and on March 2, 2016, as well as numerous subsequent telephonic conversations and negotiations.

15.      Judge Andersen is a highly respected and experienced class action mediator, who joined JAMS following more than twenty-six years on the bench, spending the most recent nineteen years as a U.S. District Judge for the Northern District of Illinois.

16.      During the settlement negotiations, Plaintiffs obtained substantial information from Defendant concerning the Incident.  For example, Defendant, *inter alia*, revealed that:

a.      In January 2014, Neiman Marcus announced that it had experienced a cybersecurity intrusion that caused the potential compromise of the Payment Card information of certain of its customers who used Payment Cards to make purchases at certain stores owned by Neiman Marcus ("the Cybersecurity Incident" or "the Incident").

b.      From July 16, 2013 to January 10, 2014, approximately 2,187,773 different Payment Card accounts were used at NMG Stores.  Out of these approximately 2,187,773 different Payment Card accounts, only approximately 370,385 Payment Card accounts were used at a NMG Store during the Malware Period on a date and at a time that the Malware was operating in that store.  The remaining approximately 1,817,388 Payment Card accounts were not exposed to the Malware at any time and could not have been compromised as a result of the Cybersecurity Incident.

c.      Because Neiman Marcus does not possess the full name and billing address of all of the payment cards used at a time and place that malware capable of collecting payment card data was operating, it is possible that claimants who submit only the name and billing address associated with their payment card will have their claims denied due to a lack of information sufficient to determine whether or not that card was used at a time and place that the malware operated.

d.      Since learning of the Cybersecurity Incident and after the initial lawsuit described above was filed, Neiman Marcus took measures to further enhance the security of its customers' data, which remain in effect as of the execution of the Settlement Agreement and include the following:

i.      Neiman Marcus created and filled the position of Chief Information Security Officer (CISO), an executive position with responsibility to coordinate and be

responsible for Neiman Marcus's program(s) to protect the security of customers' personal information;

       ii.     Neiman Marcus created a new organizational unit responsible for information security and has hired employees to fill the organization, including a Director of Security Operations and a Director of Security, Risk Management and Compliance;

       iii.     Neiman Marcus increased the frequency and depth of reporting to its executive team and members of its board of directors about its cybersecurity efforts and the cybersecurity threat landscape;

       iv.     Neiman Marcus equipped all of its stores with devices that allow customers to pay for purchases using payment cards containing embedded computer chips;

       v.     Neiman Marcus expanded its program to educate and train its workforce on methods to protect the privacy and security of its customers' information;

       vi.     Neiman Marcus invested in a new tool to automatically collect and analyze logs generated by Neiman Marcus systems for potential security threats; and

       vii.     Neiman Marcus joined several public-private partnerships that facilitate information sharing concerning cybersecurity and threat awareness.

17.     Plaintiffs expect that Defendant would attempt to present certain materials as evidence and arguments that would seek to demonstrate that: (i) Defendant implemented robust security architecture to protect its systems and customer data, (ii) Plaintiffs' damages were not caused by the Incident or, at least, could have had other causes including other cybersecurity incidents; (iii) Assessments by independent third parties found that Defendant was in compliance with applicable data security standards before, during, and after the Incident; (iv) there was no evidence that the payment card information collected by the Malware in the Cybersecurity Incident was actually exfiltrated; (v) transactions on Defendant's websites and at Defendant's

restaurants were not compromised; and (vi) PIN data was not compromised. Defendant would also likely attempt to present evidence in an effort to establish that they sent written notice of the Incident to consumers with an offer of free credit monitoring for one year.

18.     Before initiating action against NMG, AW investigated the underlying facts and analyzed the veracity of the claims.  These efforts included evaluation of the relevant law, facts, and allegations to assess the merits of the claims and potential claims and to determine the strength of anticipated defenses in the action.  AW continued these efforts after filing the action and before entering into the Settlement Agreement, and conducted a thorough examination, investigation, and evaluation of the relevant law and facts to assess the merits of the claims and defenses.

19.     In connection with the mediation, Plaintiffs requested information from NMG. NMG provided information sufficient to permit Plaintiffs and Class Counsel to evaluate the claims and potential defenses and to meaningfully conduct informed settlement discussions.

20.     The parties then began to memorialize the full Settlement, which generated numerous additional rounds of negotiations.  The parties extensively negotiated each specific aspect of the Settlement, including each of its eight (8) exhibits.  For example, counsel negotiated and meticulously refined the final Notice program and each document comprising the Notice (the Class Notice, Summary Settlement Notice, and Claim Form), with the assistance of Angeion, a company that specializes in developing class action notice plans, to ensure that the information disseminated to Settlement Class Members is clear and concise.  The Class Representatives expended time and effort in the litigation of this matter.  They reviewed case documents, stayed in regular contact with Class Counsel, and responded to all inquiries they were called to answer.

## ATTORNEYS' FEES AND EXPENSES

21.     To date, Plaintiffs' Counsel have received no compensation for their efforts to investigate, bring, and prosecute this action since its inception in 2015, and has received no reimbursement for the expenses they have incurred.  Plaintiffs' Counsel oversaw the litigation and settlement of this action in an efficient and streamlined manner in an attempt to avoid duplication of work and employ effective collaboration.

22.     Like the other Plaintiffs' firms involved in this action, we took on this representation on a purely contingent basis, and informed our clients from inception that the action would be litigated as a class action with no prediction regarding the outcome or the percentage fee that our firm might expect to recover from any common fund.  Moreover, in litigating this case, AW focused on the prosecution of this case forgoing other potentially more lucrative cases.

23.     Prior to preparing this declaration, I reviewed the billing rates of the attorneys working on this matter at AW.  I did so to ensure that the rates reflected in the lodestar report were reasonable and reflective of the rates charged in similar matters both by my colleagues and by attorneys at other Los Angeles, California firms.  The attorneys (both partners and associates) bill out at a variety of rates, depending upon the particular engagement.  For the files where I am the originating and the billing partner, I set the hourly rates based upon a variety of factors including the type of engagement and client.

24.     I believe that my firm's rates are fully commensurate with the hourly rates of other nationally prominent firms performing similar work for both plaintiffs and defendants.  After considering all of these data points, I have determined that the rates set forth in my lodestar report are reasonable for each of the professionals who worked on this matter.  Of course, should the Court have any questions about the rate for any of the professionals who worked on this matter, I

am available to answer them and provide examples where other Federal Courts have awarded fees to AW.

25.     A detailed summary indicating the amount of time expended by the partners, associates, and professional support staff of my firm who were involved in this litigation is set forth below:

| Attorney | Position | Hours | Rate/Hour | Amount |
|---|---|---|---|---|
| Theodore Maya | Partner | 217.9 | $655 | $142,724.50 |
| Robert Ahdoot | Senior Partner | 132.3 | $850 | $112,455.00 |
| Diana Kiem | Paralegal | 2.7 | $200 | $540.00 |
| Tina Wolfson | Senior Partner | 197.8 | $850 | $168,130.00 |
| Bradley King | Associate | 33.5 | $450 | $15,075.00 |
| Keith Custis | Of Counsel | 65.1 | $717 | $46,676.70 |
| TOTALS: | | 649.3 | | $485,601.20 |

26.     The summary was prepared from contemporaneous, daily time records regularly prepared and maintained by my firm.

27.     As the chart shows, AW expended a total of 649.3 hours in this litigation since inception.

28.     AW also has incurred some $25,759.93 in un-reimbursed expenses that were necessarily incurred in connection with the prosecution and resolution of this litigation.  The majority of the $25,759.93 in expenses consists of the mediator's fees, travel costs (frequently between California and Chicago), and expert witness fees, in addition to less expensive items such as research and filing fees. AW made two payments of $5,000 each in December 2015 and in February 2016 to JAMS for mediation services, in addition to a variety of payments for the mediator's time.  AW retained an expert to analyze technical issued concerning the data breach at issued in this case, and AW attorneys, including myself, traveled to Chicago for hearings

(including oral argument at the Seventh Circuit, which was performed by AW attorney Theodore Maya) and for mediation repeatedly.

29.     The foregoing expenses were incurred solely in connection with this litigation. These expenses are reflected in the books and records of my firm, which are kept in the ordinary course and prepared from expense vouchers, check records, and other documents. These expenses do not include in-house electronic research fees, copies, telephone, postage, *etc.*

30.     AW's customary current rates, which were used for purposes of calculating the lodestar here, are consistent with prevailing rates in Los Angeles, California and have repeatedly been approved by federal courts in California and other Circuits. *See, e.g., Brazil v. Dell Inc.*, 2012 U.S. Dist. LEXIS 47986 (N.D. Cal. Apr. 4, 2012); *In re Bank of America Credit Protection Marketing & Sales Practices Litig.*, No. 11-md-2269 THE (Dkt. 96) (N.D. Cal. Jan. 16, 2013); *Nwabueze v. AT&T Inc.,* 2014 U.S. Dist. LEXIS 11766 (N.D. Cal. Jan. 29, 2014); *Fleming v. Kemper Nat. Services, Inc.*, 373 F. Supp. 2d 1000, 1012 (N.D. Cal. 2005); *Grays Harbor Adventist Church Sch. v. Carrier Corp.*, 2008 WL 1901988, at *3 (W.D. Wash. Apr. 24, 2008); *Pelletz v. Weyerhaeuser Co.*, 2009 U.S. Dist. LEXIS 1803, at *7 (W.D. Wash. Jan. 9, 2009); *Berger v. Property ID Corporation*, CV 05-5373-GHK (Cwx) (C.D. Cal.); *Lonardo v. Travelers Indem. Co.*, 2010 WL 1416698, at *22-23 (N.D. Ohio Mar. 31, 2010); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, No. Civ.A. 99-20593, MDL No. 1203, 2003 WL 21641958, at *9 (E.D. Pa. May 15, 2003).

31.     AW sets its hourly rates according to prevailing market rates in Los Angeles, California, bills its hourly paying clients according to those rates, and has been awarded fees according to those rates. AW primarily represents clients on a contingent fee basis, both in class and individual cases. However, AW also represents clients on an hourly basis and is paid according to its then-current hourly rates. AW is currently is retained at the hourly rates used to

calculate its lodestar in this matter. The client representation agreements between Plaintiffs and their counsel provide for legal services to be provided on a contingent basis to be determined by the Court without generally specifying a specific percentage for payment of attorneys' fees.

32.     Courts have recently awarded these AW attorneys' fees at the rates sought here. *See, e.g. Williamson, et al. vs. McAfee, Inc.*, Case No. 5:14-cv-00158-EJD (N.D. Cal. Feb. 15, 2017) (Dkt. 118; $85 Million settlement in deceptive auto renewal case), *Smith v. Floor & Decor Outlets of Am., Inc.*, Case No. l:15-cv-04316-ELR, (N.D. Ga. Jan. 10, 2017) (Dkt. No. 69; $14.5 Million product liability settlement re: laminate flooring); *Chimeno-Buzzi v. Hollister Co.*, Case No. 1:14-cv-23120-MGC (S.D. Fla. April 11, 2016) (Dkt. No. 155; $10 Million TCPA Settlement); *West v. ExamSoft Worldwide Inc.*, Case No. 1:14-cv-22950-UU (S.D. Fla. October 9, 2015) (Dkt. No. 62; $2.1 Millon Settlement in Bar Exam Testing case).

33.     Based on my experience, the rates of attorneys in my firm reflected here are in line with, or lower than, rates charged by other class action litigators with similar experienced based in Los Angeles. Robert Ahdoot and Tina Wolfson, for example, each have over twenty years of experience in complex and class action litigation, and Theodore W. Maya over fourteen.

34.     Further, I performed a detailed analysis of the work performed by each professional at AW and the time spent on each particular task. To the extent that I believe any professional at AW spent too much time on a particular task, I have made appropriate reductions. As such, based upon my analysis of the rates charged, and the time spent on this complex matter, I believe that the total lodestar by AW incurred in a matter of complexity and magnitude is reasonable and appropriate. Also, based upon my experience with other class actions and complex matters, I believe that the time expended by AW in connection with this litigation was reasonable in amount and contributed to the ultimate result achieved for the class.

35.     Throughout this action, I have sought to reach consensus with my co-counsel to manage the administration and work division in this case in a systematic and efficient manner, coordinating work assignments through conference calls, working to avoid duplication of efforts or unnecessary work undertaken by any of the counsel for the Class in this case, and ensuring that the skills and talents of counsel were put to use in an efficient and effective manner that maximized what each firm and attorney could contribute in a non-redundant way.

36.     Other Plaintiffs' counsel in this action have reported to AW their time and expenses incurred on this litigation, which I am informed are as follows.

37.     Siprut PC, Liaison Counsel in this action, provided the following summary of its attorney fees in this litigation:

| Name | Position | Hourly Rate | Cumulative Hours | Cumulative Lodestar |
|------|----------|-------------|------------------|---------------------|
| Joseph Siprut | Partner | $775.00 | 186 | $144,150.00 |
| Greg Jones | Attorney | $375.00 | 67.8 | $25,425.00 |
| Gregg Barbakoff | Attorney | $375.00 | 44.1 | $16,537.50 |
| **TOTAL** | | | **297.9** | **$186,112.50** |

38.     In addition, Siprut PC reports that it incurred $1,039.24 in expenses.

39.     The Law Offices of Wendy Stein, which partnered with AW in filing the earliest of the actions against Defendant involving the data breach at issue, *Frank v. Neiman Marcus Group*, E.D.N.Y. Case No. 14-cv-00233-ADS-GRB, provided the following summary of attorney fees in this litigation:

| Name | Time Period | Hourly Rate | Cumulative Hours | Cumulative Lodestar |
|------|-------------|-------------|------------------|---------------------|
| Wendy Stein | January 2014 | $250.00 | 39.9 | $9,975.00 |
| Wendy Stein | February 2014 | $250.00 | 56.1 | $14,025.00 |
| Wendy Stein | March 2014 | $250.00 | 39.3 | $9,825.00 |
| Wendy Stein | April 2014 | $250.00 | 40.8 | $10,200.00 |
| **TOTAL** | | | **176.1** | **$44,025.00** |

40.    Heninger Garrison Davis, LLC, which filed the second of the actions against

Defendant involving the data breach at issue, *Clark v. Neiman Marcus Group, Ltd., LLC*, No.

1:14-cv-0236, provided the following summary of attorney fees in this litigation:

| Attorney | Hours | Rate | Amount |
|---|---|---|---|
| Lew Garrison | 10 | $600.00 | $6,000.00 |
| Chris Hood | 25 | $375.00 | $9,375.00 |
| Taylor Bartlett | 25 | $250.00 | $6,250.00 |
| Jim McDonough | 5 | $300.00 | $1,500.00 |
| **TOTAL** | **65** | | **$24,645.00** |

41.    In addition, Heninger Garrison Davis, LLC reports that it incurred $1,520.00 in

expenses.

42.    The total hours are necessarily incomplete as much work remains to be done

including preparing for and presenting arguments at the final approval hearing, and the figures do

not include all of the time spent preparing the present briefing.  The time expended and reported

herein does not include time expended by AW's paralegals, law clerks, and staff.

43.    With the other Plaintiffs' counsel involved, I have consistently endeavored to

prevent duplication of effort by the attorneys working on this matter, and believe that the hours

expended litigating it were expended as efficiently as reasonably possible under such

circumstances.

44.    The settlement achieved in this litigation is the product of the initiative,

investigation, and hard work of skilled counsel.  Because of Plaintiffs' Counsel's efforts,

assuming the Court approves the settlement, the Class will receive significant benefits.

## CONCLUSION

45.    Based upon AW's investigation, research, information review, interviews, as well

as my personal knowledge and experience, I believe that the Settlement is in the best interests of

the Class and that the Settlement is fair, reasonable, and adequate. The benefits afforded by the Settlement reflect a reasoned compromise which not only takes into consideration the risks inherent in all complex, class litigation, but also the various issues in this case specifically, which had the potential to completely eliminate recovery available to the Class.

46. While I believe that the claims asserted in this action have merit and that the evidence developed to date supports those claims, I also recognize and acknowledge, based on my experience, the expense and length of time necessary to prosecute this case to judgment. I have also have taken into account the uncertain outcome and the risk of any litigation, as well as the difficulties and delays inherent in such litigation.

47. I further believe that the request of $530,000 to cover Plaintiffs' counsel's fees and expenses is modest in relation to the actual costs incurred litigating this matter.

48. Plaintiffs and the Settlement Class members have waited years to receive compensation, if at all, and would have had to wait more years had the case proceeded through trial and appeal. The class would be exposed to the attendant risks of litigation, including the uncertainties and difficulties pertaining to a disputed class certification proceeding, a likely summary judgment motion, the length of time necessary to see this matter through to trial, the uncertainties of the outcome of the litigation, and the likelihood that resolution of the class claims, whenever and however determined, would be appealed.

I declare under penalty of perjury under the laws of California and of the United States that the foregoing is true and correct. Executed this 21st day of August, 2017 in West Hollywood, California.

_____
Tina Wolfson

# EXHIBIT A



# AHDOOT & WOLFSON, PC
## ATTORNEYS



### Tina Wolfson, Founding Partner

Ms. Wolfson was born in the former Soviet Union and her family escaped when she was eleven years old. Seven years after her family arrived to the United States as indigent political refugees, without speaking any English, she attended Columbia College and graduated *cum laude*.

She then attended and graduated Harvard Law School *cum laude* in 1994. Ms. Wolfson began her civil litigation career at the Los Angeles office of Morrison & Foerster, LLP, where she defended major corporations in complex actions and represented indigent individuals in immigration and deportation trials as part of the firm's *pro bono* practice. She then gained further invaluable litigation and trial experience at a boutique firm, focusing on representing plaintiffs on a contingency basis in civil rights and employee rights cases.

In March 1998, Ms. Wolfson and Robert Ahdoot founded AW. AW is a top tier law firm specializing in advocating consumer and employee rights. The attorneys at AW vigorously litigate against large corporations to vindicate the rights of millions of consumers or employees in protracted, complex litigation, to successful results.

AW has been appointed class counsel in numerous class actions, and, as a founding member, Ms. Wolfson has obtained extensive experience in prosecuting complex class action and representative lawsuits. She has served as plaintiffs' counsel/co-counsel or class counsel and litigated numerous class actions or representative actions against large corporate defendants involving varied consumer rights claims, with an emphasis on privacy rights.

Ms. Wolfson has been prosecuting cutting edge privacy cases on behalf of consumer classes since the late 1990's. She was among the first group of attorneys who

successfully litigated the privacy rights of millions of consumers against major financial institutions. Plaintiffs alleged that the defendants used their personal information to compile detailed financial dossiers to use for internal marketing purposes and to sell them to third party telemarketers, without their consent. As lead counsel in these privacy class actions, Ms. Wolfson brought the consumer claims to successful conclusion on a class-wide basis, conferring millions of dollars of benefits to consumers. The business practices that her clients challenged in these cases later became the subject of Graham Leach Bliley Act regulation. At the time she was litigating and successfully resolving these cases, however, they were new territory. These consumer privacy class actions included, without limitation:

- *Zadeh v. Chase Manhattan Bank, et al.*, Case No. 323715 (Cal. Super. Ct., San Francisco Cty. ("SFSC")).
- *Steinhaus v. American Express Travel Related Services Co. et al.*, Case No. 416248 (SFSC).
- *Bernard v. MBNA America Bank, et al.*, Case No. 408700 (SFSC).
- *Shakib v. Discover Bank, et al.*, Case No. 416194 (SFSC).
- *Baumsteiger v. FleetBoston, et al.*, Case No. 408698 (SFSC).
- *Lanchester v. Washington Mutual Bank, et al.*, Case No. 429754 (SFSC).

Ms. Wolfson and AW have extensive experience in leadership roles prosecuting consumer data breach and privacy class actions, including consolidated multidistrict litigation. AW's successfully resolved and pending privacy class actions include, without limitation:

- *In re: The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-md-02583-TWT (N.D. Ga.): served, by court appointment, on the MDL Consumer Plaintiffs' Steering Committee. The finally approved settlement provided approximately $29 million of monetary relief to the consumer class, as well as robust injunctive relief requiring Home Depot to overhaul its data security practices.
- *In re: YapStone Data Breach*, No. 4:15-cv-04429-JSW (N.D. Cal.): preliminarily approved class settlement provides credit monitoring and identity theft services to claimants (valued at approximately $4.5 million annually in perpetuity), a non-reversionary fund to non-profit organizations, and injunctive relief in the form of YapStone implementing substantial data security measures.
- *In re: Experian Data Breach Litig.*, No. 8:15-cv-01592-AG-DFM (C.D. Cal.): currently serving as appointed co-lead counsel managing a PSC of six firms, after contested application and hearing in consolidated litigation consisting of thirty-eight class actions arising from a data breach disclosing the sensitive financial information of over 15 million T-Mobile customers. Plaintiffs seek both

monetary and injunctive relief.

- *Adlouni v. UCLA Health Systems Auxiliary*, No. BC589243 (Cal. Super. Ct. Los Angeles Cty.): currently serving by court appointment on PSC for plaintiff class allegedly impacted by university medical data breach, tentative settlement agreement in principle pending.
- *In Re: U.S. Office of Personnel Management Data Sec. Breach Litig.*, No. 1:15-mc-01394-ABJ (D.D.C.): currently serving, by court appointment, on the PSC, after contested leadership application and hearing.
- *In re: Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 15-md-02633-SI (D. Or.): currently serving, by court appointment, on the Executive Leadership Committee after contested leadership application and hearing.
- *In re: Target Corp. Customer Data Sec. Breach Litig.*, No. 0:14-md-02522-PAM (D. Minn.): AW contributed considerable effort to vetting hundreds of potential class representatives, legal research involving the different state laws in play, the consolidated complaint, and significant discovery efforts.
- *In re: Uber FCRA Litigation*, Case No. 3:14-cv-05200-EMC (N.D. Cal.): preliminary approval granted for class settlement providing $7.5M in monetary relief to the class as well as injunctive relief guaranteeing Uber's compliance with FCRA background check requirements.
- *Chimeno-Buzzi v. Hollister Co, et al.*, Case No. 1:14-cv-23120-MGC (S.D. Fla.): AW served as class counsel in $10 Million nationwide finally approved settlement arising from violations of the Telephone Consumer Protection Act of 1991 ("TCPA").
- *Melito v. American Eagle Outfitters, Inc.*, Case No. 1:14-cv-02440-VEC (S.D.N.Y.): $14.5 million nationwide settlement arising from TCPA violations pending preliminary approval.
- *Whitaker v. Health Net*, Case No. 2:11-cv-00910-KJM (E.D. Cal.): appointed to the Executive Committee in the consolidated action claiming violations of the California Confidentiality of Medical Information Act ("CMIA").
- *Sutter Medical Information Cases*, Case No. JCCP 4698 (Cal. Super. Ct., Sacramento Cty.): appointed to the Executive Committee in the consolidated action claiming violations of California CMIA.
- *Rivera v. Google, Inc.*, Case No. 1:16-cv-02714 (N.D. Ill.): prosecuting a class action for alleged violations of Illinois Biometric Information Privacy Act ("BIPA").
- *Monroy v. Shutterfly, Inc.*, Case No. 1:16-cv-10984 (N.D. Ill.): prosecuting a class action for alleged violations of Illinois BIPA.

In addition to privacy-related class actions, AW has been appointed lead counsel in numerous other complex consumer class actions, some times in contested leadership

applications. The following examples of such actions are either ongoing or have been successfully resolved, and have or will confer millions of dollars worth of benefits to the class, as well as injunctive relief:

- *Kirby v. McAfee, Inc.*, Case No. 14-cv-02475-EJD (N.D. Cal.): appointed as co-lead class counsel. Plaintiffs challenged defendant's auto renewal and false discount practices. The finally approved class action settlement made $80 Million available to the class and included injunctive relief requiring McAfee to notify customers at the point of every sale that the service will be auto-renewed at an undiscounted subscription price. Further, the settlement required McAfee to change its policy regarding the past product price it lists as a reference to any discount it's currently offering. McAfee will now only list a past price it has actually charged customers within the past 45 days.
- *McKnight v. Uber Technologies, Inc.*, Case No. 3:14-cv-05615-JST (N.D. Cal.): motion for preliminary approval of amended class settlement for non-reversionary fund of $32.5 million pending re "safe ride" fee charged to Uber customers.
- *Smith v. Floor and Décor Outlets of America, Inc.*, Case No. 1:15-cv-04316-ELR (N.D. Ga.): class action challenging product defect based on toxic emissions. $14 Million class settlement finally approved by the court.
- *Skeen v. BMW of North America, LLC*, Case No. 2:13-cv-01531-WHW-CLW (D.N.J.): served as one of six plaintiffs' counsel on behalf of purchasers of MINI Coopers with allegedly defective timing chain and timing chain tensioners, secured an uncapped settlement fund granted final approval for claims for warranty extension, reimbursement for repairs, and compensation for sale at a loss.
- *Cassidy v. Reebok International Ltd.*, Case No. 2:10-cv-09966-AHM (C.D. Cal.): $25 Million nationwide settlement of apparel false advertising case.
- *Carey v. New Balance Athletic Shoe, Inc.*, Case Nos. 1:11-cv-10632-LTS & 1:11-cv-10001-LTS (D. Mass.): $3.7 Million nationwide settlement of apparel false advertising case.
- *Pappas v. Naked Juice Co. of Glendora, Inc.*, Case No. 2:11-cv-8276-JAK-PLA (C.D. Cal.): appointed co-lead counsel after contested applications; resulted in nationwide settlement for $9 million non-reversionary fund and injunctive relief in the form of product labeling changes, and periodic audits to assure compliance with labeling representations.
- *Trammell v. Barbara's Bakery, Inc.*, Case No. 3:12-cv-02664-CRB (N.D. Cal.): lead

plaintiffs' counsel in $4 Million non-revertible fund nationwide settlement of food false advertising case. The case alleged false advertising of food products as "all natural" and "non-GMO." In addition to the monetary relief, defendant agreed to correct the labeling, re-formulate its product to include only truly non-GMO ingredients, and obtain certification from the non-GMO Project, including periodic audits. When preliminarily approving the settlement, the Hon. Charles R. Breyer commented that the settlement was an "excellent settlement" and that both sides did "an excellent job of resolving the case," doing a "superb job" and presenting "a model of good lawyering on both sides"; when granting final approval to the settlement, Judge Breyer reiterated that the settlement was "very good" and that the case was "quite a successful class action."

- *West v. ExamSoft Worldwide Inc.*, Case No. 14-cv-22950-UU (S.D. Fla.): $2 Million nationwide settlement arising from software error on bar exam.
- *Mirto v. AIG/Granite State Insurance Co. et al.*, Case No. HG 04180408 (Cal. Super. Ct., Alameda Cty.): $3 Million California settlement re insurance discriminatory pricing.
- *In re: Lumber Liquidators Chinese-Manufactured Flooring Durability Marketing and Sales Practices Litig.*, Case No. 1:16-md-02743-AJT-TRJ (E.D. Va.): class action arising from alleged misrepresentations of laminate flooring durability.
- *In re: Kind LLC "All Natural" Litig.*, No. 1:15-md-02645-WHP (S.D.N.Y.): currently serving as appointed interim co-lead counsel for the plaintiff class by MDL Court after contested hearing.
- *Citizens for Responsible Business v. Rite Aid Corporation, et al.*, Case No. 414831 (SFSC): prosecuted claims of false and illegal labeling in the herbal supplement industry against 107 retailers and manufacturers, who were gleaning millions of dollars from this nationwide practice; AW was successful in completely eradicating the alleged illegal practice in the United States.
- *Weiss v. Los Angeles*, No. BC141354 (LASC): currently serving as class counsel in this action challenging the defendant's review of parking violations, won *writ of mandate* trial to stop the allegedly illegal practice.
- *Lavinsky vs. City of Los Angeles*, Case No. BC542245 (LASC): appointed Class Counsel at class certification on behalf of LA residents challenging allegedly illegal utilities taxation practices.

Ms. Wolfson serves as a co-chair of the Federal Torts Section of the Federal Bar Association. She co-authored, along with AW associate Bradley King, an article discussing

developments in enforcement of arbitration agreements. Tina Wolfson & Bradley King, *Even After* Concepcion *and* Italian Colors, *Some Arbitration Agreements Are Not Enforceable*, FED. LAWYER, Jan./Feb. 2015, at 19.

Additionally, Ms. Wolfson frequently lectures on numerous topics related to class action litigation across the country. An incomplete list of her speaking engagements is as follows:

- Association of Business Trial Lawyers: "Navigating Class Action Settlement Negotiations and Court Approval: A Discussion with the Experts," May 2017, Los Angeles; featuring the Hon. Philip S. Gutierrez and the Hon. Jay C. Gandhi.
- American Conference Institute: "2nd Cross-Industry and Interdisciplinary Summit on Defending and Managing Complex Class Actions," April 2017, New York: Class Action Mock Settlement Exercise featuring the Hon. Anthony J. Mohr.
- CalBar Privacy Panel: "Privacy Law Symposium: Insider Views on Emerging Trends in Privacy Law Litigation and Enforcement Actions in California," March 2017, Los Angeles, California (Moderator), featuring the Hon. Kim Dunning.
- Federal Bar Association: Northern District of California Chapter "2016 Class Action Symposium," December, 2016, San Francisco (Co-Chair); featuring the Hon. Joseph F. Anderson, Jr., and the Hon. Susan Y. Illston.
- Federal Bar Association: The Future of Class Actions, featuring the Hon. Jon Tigar and the Hon. Laurel Beeler, "Cutting Edge Topics in Class Action Litigation," November 2015, San Francisco (Co-Chair and Faculty), featuring the Hon. Jon S. Tigar and the Hon. Laurel Beeler.
- American Association for Justice: AAJ 2015 Annual Convention – "The Mechanics of Class Action Certification," July 2015, Montreal.
- HarrisMartin: Data Breach Litigation Conference: The Coming of Age – "The First Hurdles: Standing and Other Motion to Dismiss Arguments," March 2015, San Diego.
- Bridgeport: 2015 Annual Consumer Class Action Conference, February 2015, Miami (Co-Chair).
- Venable, LLP: Invited by former opposing counsel to present mock oral argument on a motion to certify the class in a food labeling case, Hon. Marilyn Hall Patel (Ret.) presiding, October 2014, San Francisco.
- Bridgeport: 15th Annual Class Action Litigation Conference – "Food Labeling and Nutritional Claim Specific Class Actions," September 2014, San Francisco (Co-Chair and Panelist).
- Bridgeport: 2014 Consumer Class Action Conference – "Hot Topics in Food Class Action Litigation," June 2014, Chicago.

- Perrin Conferences: Challenges Facing the Food and Beverage Industries in Complex Consumer Litigations, invited to discuss cutting edge developments in settlement negotiations, notice, and other topics, April 2014, Chicago.
- Bridgeport: Class Action Litigation & Management Conference – "Getting Your Settlement Approved," April 2014, Los Angeles.
- HarrisMartin: Target Data Security Breach Litigation Conference – "Neiman Marcus and Michael's Data Breach Cases and the Future of Data Breach Cases," March 2014, San Diego.
- Bridgeport: Advertising, Marketing & Media Law: Litigation and Best Management Practices – "Class Waivers and Arbitration Provisions Post-*Concepcion / Oxford Health Care*," March 2014, Los Angeles.

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on August 21, 2017, I caused the foregoing to be electronically filed with the Clerk of the Court in the United States District Court for the Northern District of Illinois by using the CM/ECF system, which served copies on all interested parties registered for electronic service.

<u>*/s/ Tina Wolfson*</u>
Tina Wolfson