**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HILLARY REMIJAS, *et al.*, individually and on behalf of all others similarly situated, | Case No. 1:14-cv-01735 |
| *Plaintiffs*, | |
| *v.* | Honorable Samuel Der-Yeghiayan |
| THE NEIMAN MARCUS GROUP, LLC, | |
| *Defendant*. | |

**OBJECTION TO CLASS ACTION SETTLEMENT**

## TABLE OF CONTENTS

INTRODUCTION..... ..........................................................................................1

STANDING TO OBJECT..........................................................................................2

BACKGROUND..........................................................................................................3

GROUNDS FOR OBJECTION ...................................................................................6

I.     The Settlement Is Not Fair, Reasonable, Or
       Adequate And Approval Should Be Denied. ...............................................7

       A.    Most Of The Settlement Class Gets Nothing ...................................8

       B.    The Notice And Claim Form Are Confusing
             And Unfair...........................................................................................10

       C.    The Remainder Of The Class Was Sold Out By
             Class Counsel......................................................................................11

       D.    Notice Violated Due Process ............................................................12

       E.    The Reaction Of The Class Disfavors Approving
             The Settlement....................................................................................14

II.    The Settlement Class Should Be Decertified ...........................................15

       A.    The Settlement Class Is Insufficiently Cohesive To
             Warrant Certification........................................................................15

       B.    The Class Was Inadequately Represented
             By Attorney Yanchunis ....................................................................17

III.   Class Counsel's Requested Fees Should Be Reduced ..............................18

CONCLUSION ........................................................................................................23

## TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983)................................................................................................20

*Sears, Roebuck & Co. v. Butler,*
    133 S. Ct. 2768 (2013)..........................................................................................20

**United States Circuit Court of Appeals Cases**

*Americana Art China, Co., Inc. v. Foxfire Printing and Packaging, Inc.,*
    743 F.3d 243 (7th Cir. 2014) ................................................................................22

*Culver v. City of Milwaukee,*
    277 F.3d 908 (7th Cir. 2002) ................................................................................18

*Eubank v. Pella Corp.,*
    753 F.3d 718 (7th Cir. 2014) ................................................................................. 7

*In re Gen. Motors Corp. Engine Interchange Litig.,*
    594 F.2d 1106 (7th Cir. 1979) ............................................................................. 9

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.,*
    827 F.3d 223 (2d Cir. 2016)..................................................................................16

*In re Sears, Roebuck & Co. Front-Loading Washer Litig.,*
    No. 16-3554, 2017 WL 3470400 (7th Cir. Aug. 14, 2017) .............................20

*In re Synthroid Marketing Litig.,*
    264 F.3d 712 (7th Cir. 2001) ..........................................................................19, 21

*In re Subway Footlong Sandwich Marketing & Sales Practice Litig.,*
    No. 16-1652, 2017 WL 3666635 (7th Cir. Aug. 25, 2017) ........................ 7, 12

*In re Target Corp. Data Breach Litig.,*
    847 F.3d 608 (8th Cir. 2017) ............................................................................. 16

*In re Walgreen Co. Stockholder Litig.,*
    832 F.3d 718 (7th Cir. 2016) ............................................................................2, 7

*Isby v. Bayh,*
    75 F.3d 1191 (7th Cir. 1995) ............................................................................. 14

*Kohen v. Pacific Inv. Mgmt. Co. LLC,*
    571 F.3d 672 (7th Cir. 2009) ......................................................................... 15, 17

*Messner v. Northshore Univ. HealthSystem,*
    669 F.3d 802 (7th Cir. 2012) ........................................................17

*Mirfasihi v. Fleet Mortg. Corp.,*
    356 F.3d 781 (7th Cir. 2004)) .......................................................9

*Mullins v. Direct Digital LLC,*
    795 F.3d 654 (7th Cir. 2015) .......................................................15

*Nat'l Super Spuds, Inc. v. N.Y. Merc. Exch.,*
    660 F. 2d 9 (2d Cir. 1981)............................................................9

*Pearson v. NBTY, Inc.,*
    772 F.3d 778 (7th Cir. 2014) ....................................................7, 22

*Redman v. RadioShack Corp.,*
    768 F.3d 622 (7th Cir. 2014) .......................................................19

*Remijas v. Neiman Marcus Grp., LLC,*
    794 F.3d 688 (7th Cir. 2015) ................................................ *passim*

*Reynolds v. Beneficial Nat'l Bank,*
    288 F.3d 277 (7th Cir. 2002) ........................................................6

*Skelton v. Gen Motors Corp.,*
    860 F.2d 250 (7th Cir. 1988) .......................................................19

**United States District Court Cases**

*Bickel v. Sheriff of Whitley Cnty.,*
    No. 1:08-CV-102-TLS, 2015 WL 1402018 (N.D. Ind. Mar. 26, 2015) ............13

*Clement v. Am. Honda Fin. Corp.,*
    176 F.R.D. 15 (D. Conn. 1997) ......................................................10

*Douglas v. The Western Union Co.,*
    No. 14-cv-1741 (N.D. Ill.) ......................................................20, 21

*Gehrich v. Chase Bank USA, N.A.,*
    316 F.R.D. 215 (N.D. Ill. 2016)......................................................21

*Grok Lines, Inc. v. Pachall Truck Lines, Inc.,*
    No. 14 C 08033, 2015 WL 5544504 (N.D. Ill. Sept. 18, 2015)...............9, 12, 19

*In re Capital One TCPA Litig.,*
    80 F. Supp. 3d 781 (N.D. Ill. 2015) ..............................................21, 22

iv

*In re Dairy Farmers of Am., Inc.*,
    80 F. Supp. 3d 838 (N.D. Ill. 2015) ...................................................................19

*In re Michaels Stores Pin Pad Litigation*,
    No. 11-cv-3350 (N.D. Ill.) ..................................................................................12

*In re NCAA Concussion Litig.*,
    No. 13-cv-9116 (N.D. Ill. Jan. 27, 2017) ..........................................................20

*In re The Home Depot, Inc., Customer Data Security Breach Litigation*,
    No. 14-cv-2583-TWT (N.D. Ga.) ........................................................................11

*Jacob v. Duane Reade, Inc.*,
    293 F.R.D. 578 (S.D.N.Y. 2013) ........................................................................ 17

*Kaufman v. Am. Express Travel Related Servs., Inc.*,
    283 F.R.D. 404 (N.D. Ill. 2012) ....................................................................12, 13

*Kolinek v. Walgreen Co.*,
    311 F.R.D. 483 (N.D. Ill. 2015) ..........................................................................14

*Pratt v. Chi. Housing Authority*,
    155 F.R.D. 177 (N.D. Ill. 1994) ..........................................................................15

*Riffey v. Rauner*,
    No. 10 CV 2477, 2016 WL 3165725 (N.D. Ill. June 7, 2016) ............................17

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*,
    No. 97 C 7694, 2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) ...........................22

*Schulte v. Fifth Third Bank.*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) .............................................................13, 14

**Statutory Provisions**

Fed. R. Civ. P. 23 .......................................................................................................*passim*

N.D. Ill. L.R. 54.3 ......................................................................................................... 20

**Other Authorities**

Theodore Eisenberg & Geoffrey P. Miller,
    *Attorney Fees in Class Action Settlements: An Empirical Study*,
    1 J. Empirical Legal Studies 27 (2004)................................................................22

## INTRODUCTION

After winning a landmark victory, *see Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688 (7th Cir. 2015), Plaintiff and Class Counsel let this litigation stagnate until it was dismissed by this Court for want of prosecution. (Dkt. 137.) The settlement that they threw together in the wake of that dismissal is in no way fair, reasonable, or adequate.

The Settlement compensates a small subset of the certified Settlement Class and Class Counsel, but does so at the expense of the rest of the class, which benefits only from illusory injunctive relief. Only 17% of the more than 2 million class members releasing their claims can potentially get cash from this settlement. Even worse, of the small portion of the class members that are even eligible to submit a claim, none of those persons know whether or not they not they will actually receive a payment until they either get a check or a letter denying their claim. Rather than conduct discovery to determine which Settlement Class Members are eligible to receive a payout, Class Counsel agreed to a settlement that asks Class Members to submit information that will allow Neiman Marcus to determine if they are entitled to a payment without making that information available to the class. Class Members who might want to opt out because they receive nothing from the Settlement won't know that until after they submit a claim and forfeit their right to opt out.

In addition, the Settlement Class contains at least 3 distinct groups whose interests are so conflicting that class certification should not have been granted. Although Class Counsel's settlement briefing appears to advance a damages theory that applies to the Class as a whole, the Settlement itself compensates just a narrow set of Class Members. This has the effect of creating different groups of class members with competing interests, and requiring the creation of subclasses in order to ensure adequate representation. Finally, recent events make clear that

Class Counsel John Yanchunis does not have the Settlement Class's best interests in mind and will not adequately protect the interests of the Class. He obtained preliminary approval, cutting short efforts to obtain needed improvements to the Settlement.

Despite all of these issues, Class Counsel has petitioned for a fee award of $530,000, or more than 44% of the Settlement Fund. Class Counsel attempts to justify the award on a lodestar basis, but they do not submit bills (only summaries of the work performed) and provide no evidence other than a single conclusory paragraph in a declaration that the work performed was reasonable. Moreover, an ex ante fee negotiation, which Seventh Circuit precedent requires this Court to replicate when assessing a fee award, likely would dictate that counsel be compensated on a percentage-of-the-fund basis. There is no basis for awarding 44% of the fund in fees.

"The class action that yields fees for class counsel and nothing for the class[] is no better than a racket." *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718, 724 (7th Cir. 2016). The settlement reached here shares many features of the "racket" decried by the Seventh Circuit in *In re Walgreen*: a miniscule benefit to the class in exchange for outsize fees to counsel and an overbroad release to the defendant. The *Walgreen* settlement was rejected by the Seventh Circuit, and the same result should occur here. The Court's task is to ensure that the Settlement is "fair, reasonable, and adequate" for *all* class members, not just the few whose claims are favored by Class Counsel. For the reasons stated below, this Settlement simply does not meet that standard. The Court should deny approval of the Settlement and/or drastically reduce Class Counsel requested fee award.

## STANDING TO OBJECT

Parvinder Chohan lives at . His phone number is _____, and his email address is _____. He is a member of the

Settlement Class because made a credit-card purchase at the Neiman Marcus Store at 150 Stockton Street, San Francisco, California, on August 8, 2016. Mr. Chohan has the credit card statement showing that purchase. Chohan is represented by attorneys at Edelson PC and has entered into a written retention agreement. Mr. Chohan intends to appear at the Final Fairness Hearing solely through his counsel, Jay Edelson and Rafey S. Balabanian. He will not present testimony at that hearing.

## BACKGROUND

In January 2014, Defendant Neiman Marcus Group disclosed that it had been involved in a data breach involving theft of customer debit- and credit-card information. (Dkt. 27, ¶¶ 30-31.) Defendant later disclosed that malware had "scraped" customer information between July 16, 2013, and October 30, 2013. (Dkt. 27, ¶ 33.) Plaintiff Hillary Remijas sued Neiman Marcus in March 2014, alleging that its failure to reasonably safeguard customers' financial information breached an implied contract. (Dkt. 1, ¶¶ 56-57.) Three other plaintiffs joined the lawsuit in June 2014, and the claims expanded to include negligence, unjust enrichment, violation of unfair business practice statutes, invasion of privacy, and violation of state data breach acts. (*See generally* Dkt. 27.)

On Neiman Marcus's motion, Judge Zagel dismissed the amended complaint on the grounds that none of the putative named plaintiffs had standing to sue. (Dkt. 49.) Judge Zagel rejected the plaintiffs' argument that fraudulent charges already suffered by some class members meant that the increased risk of identity theft was a cognizable injury, concluded that the costs of preventing identity theft were not themselves cognizable because the underlying risk of theft wasn't a cognizable injury in fact, and that the plaintiffs' overpayment theory (that they paid more for products than they would have if they had known about Neiman Marcus's lax security)

was "creative, but unpersuasive." (Dkt. 49, at 5-9.) The Seventh Circuit vacated this order. The appellate court held that the extant instances of fraudulent charges do give rise to a cognizable risk of impending harm, and that money expended taking steps to minimize this harm qualifies as an Article III injury in fact. *Remijas*, 794 F.3d at 692-94. As such, the "identifiable costs associated with the process of sorting things out" *id.* at 692, gave the plaintiffs standing to sue. The court expressed serious doubt that any of the other damages theories asserted by the plaintiffs could support standing. *Id.* at 694-96.

On remand, the parties litigated Neiman Marcus's motion to dismiss the case under Fed. R. Civ. P. 12(b)(6). The Court concluded in January 2016 that "dismissal is not appropriate at this time." (Dkt. 84.) The case then languished. Thirteen months later, the Court dismissed the action, noting that "[t]his matter has stagnated on the Court's docket," and invited the plaintiffs to file a motion to reinstate should they desire to proceed. (Dkt. 137.) One month after that, the plaintiffs moved to reinstate the case, informing the Court that they had reached a settlement. (Dkt. 140, at 2.)

Through the slapdash Settlement apparently cobbled together in the wake of the Court's order of dismissal, Plaintiffs and Class Counsel sought to certify, under Fed. R. Civ. P. 23(b)(3), a class of all individuals who had made purchases at certain Neiman Marcus Stores between July 16, 2013, and January 10, 2014. (Dkt. 154, at 1.) The class was not proposed to be certified on any particular theory or claim for relief; indeed, the class certification portion of Class Counsel's approval briefing discusses the class's legal theory in only the most general terms. The briefing discloses neither the legal theory nor the damages theory on which plaintiffs and Class Counsel proceed. And despite the length of the class period, the Settlement claims that malware with the ability to scrape credit- or debit-card information only operated between July 16 and October 30,

2013, (a period called the "Malware Period") and even then only at some stores and at some times. Dkt. 145, Exh. 1 ("Settlement Agreement"), ¶ 4. Neither the settlement nor any available information provides exactly when and at what store the malware was operating. Neither is there any record evidence that Neiman Marcus's self-serving estimate of the extent to which its servers were breached by malware is correct.

The Settlement creates a $1.2 million fund to compensate, on a pro rata basis with a ceiling of $100, individuals who made purchases during the Malware Period, and at stores and times where and when the malware was operating, but provides absolutely nothing to rest of the two-million-member-plus Class. (According to the Settlement's Recitals this means that less than 17% of the Settlement Class will receive any relief.) The Settlement further states that Neiman Marcus has beefed up its data security protocols, dkt. 145, at 2, but the Long Form Notice concedes that this information is provided "for information purposes only" and doesn't create any "rights or obligations." (Dkt. 145, Exh. 1-C ("Long Form Notice"), at 5.)

Class Counsel's proposed notice plan called for "direct Notice to all proposed Settlement Class Members." (Dkt. 145, at 29.) Direct notice was to be supplemented by an "internet campaign" with "multiple targeting layers." (Dkt. 145, at 30.)

Since Class Counsel moved for preliminary approval and the Settlement was made public, some 600 potential class members contacted objector counsel with concerns about the Settlement, a number that, in counsel's experience, far exceeds such reaction to any other settlement. Troubled by this response, objector counsel contacted Class Counsel to inquire about amending the Settlement. Class Counsel gave every impression that they and the defendant were amenable to at least some of the proposed changes. Nevertheless, after agreeing to continue the motion for preliminary approval, Co-Class Counsel Yanchunis informed the Court at a regularly

5

scheduled status hearing that there was no further reason for delay and that the Court could rule on the motion for preliminary approval. (Dkt. 156, at 2.) The Court granted preliminary approval, and ordered that Notice be disseminated.

In implementing the Notice Plan, the parties radically departed from their representation that each Settlement Class Member would receive direct notice of the Settlement. According to the Settlement Administrator, direct notice was only *attempted* to 33.7% of the Settlement Class. (Dkt. 162, ¶¶ 6-10.) The remaining 64.3% of the class was given publication notice via a single ad in *People* magazine and a 4-week Internet advertising campaign. Neither Class Counsel nor the Settlement Administrator makes any attempt to estimate what percentage of the class received notice via publication. Notably, the Administrator does not aver that at least 70% of the Settlement Class received notice of the Settlement.

Given how little of the Settlement Class received notice, and how much of the Class appears to have been troubled by the Settlement, it is perhaps unsurprising that, as of August 21, 2017, the claims rate for the Settlement is 0.6%. (Dkt. 162, ¶ 15.) The Settlement Administrator does not say how many of these claims have been submitted by individuals who are part of the portion of the class that is actually entitled to receive money from the settlement. But by any measure this is an exceedingly low claims rate, befitting a Settlement that sells out the Class in order to enrich Class Counsel. The Court should deny final approval.

### GROUNDS FOR OBJECTION

The Seventh Circuit has said that "[i]t is desirable to have as broad a range of participants in the fairness hearing as possible because of the risk of collusion over attorneys' fees and the terms of settlement generally." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 288 (7th Cir. 2002). "Objectors play an essential role in judicial review of proposed settlements of class

actions." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014). "Members of the class who smell a rat," *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014), can highlight problems with a settlement that neither Class Counsel (who is largely concerned with their fee) nor Defendant (who is concerned with making the litigation go away and any release they might receive) have the incentive to raise before the Court. *See id.*

Mr. Chohan sees four main issues with the instant Settlement: (1) a whopping 83% of Settlement Class has no chance of receiving a benefit from the Settlement but is forced to release all claims they have against Neiman Marcus related to the data breach; (2) of the class members who can submit claims for compensation, they are forced to do so not knowing whether their covered Neiman Marcus purchase actually occurred at a store and during a time when the malware was operating because the information has been withheld from the class; (3) the Settlement Class is conflicted and flunks Rule 23(b)(3)'s predominance criterion; and (4) Class Counsel's fee request is completely unjustified.

## I.     The Settlement is not fair, reasonable, or adequate and approval should be denied.

The Seventh Circuit has repeatedly condemned settlements that promise the class, or most of the class, nothing. *See In re Subway Footlong Sandwich Marketing and Sale Practice Litig.*, __ F.3d __, No. 16-1652, 2017 WL 3666635, at *4 (7th Cir. Aug. 25, 2017); *In re Walgreen*, 832 F.3d at 724; *Pearson*, 772 F.3d at 787. The instant Settlement shares that feature with these condemned settlements, but compounds that problem by providing a confusing claim form and paltry notice in an attempt to mask its inadequacy. The Settlement also promises Neiman Marcus an overbroad release including from class members who receive nothing from the Settlement. The Settlement is thus unfair and unreasonable, violates due process, and the Court should deny final approval.

7

## A. Most Of The Settlement Class Gets Nothing.

Having prevailed in the Seventh Circuit on their contention that the "costs associated with the process of sorting things out" once a data breach is publicized, and the costs of "preventive measures" taken to prevent any fraudulent credit card charges were cognizable in federal court, *see* 794 F.3d at 692, one would expect Class Counsel to present the Court with a settlement that provides redress for those injuries. They did not and the Settlement's failure to compensate these injuries cannot be squared with Plaintiffs' allegations.

As Plaintiffs alleged in their complaint, Neiman Marcus was originally tight-lipped about the scope of the data breach. (Dkt. 27, ¶¶ 29-32.) Any customer who made a purchase during the period of the breach, therefore, would be expected to have incurred some amount of costs associated with "preventive measures." And as the Plaintiffs further explained, there was good reason to be skeptical about Neiman Marcus's original statements regarding the scope of the data breach: Neiman Marcus had acknowledged the presence of "other malware" on its systems, "it's very unusual for malware to self-expire" so any hack likely lasted longer than Defendant claimed, and, Plaintiffs said, if the hack truly did occur between July and October of 2013 it would have been discovered before December 2013. (*Id.* ¶¶ 33-34.) So even rational actors who made purchases outside the Malware Period (when Neiman Marcus acknowledged the presence of malware) would take steps to prevent credit- or debit-card fraud. Thus, based on the theory that prevailed in the Seventh Circuit, everyone in the Settlement Class is potentially entitled to some recovery.

But the Settlement ignores many of those who suffered the type of injury that allowed this case to proceed. As the Claim Form makes clear, only individuals who made their purchase during the Malware Period are even *eligible* to submit a claim. And to submit a valid claim, a

Settlement Class Member must "submit information sufficient to establish that your credit or debit card was used at a Neiman Marcus, Bergdorf Goodman, Cusp, or Last Call store while malicious software capable of capturing payment card information was active in that store." The Settlement Agreement makes clear that this is a subset even of the Malware Period. (*See* Settlement Agreement ¶ 4(b),(c) (reciting that, during the Malware Period, malware was not active at all times and in all stores)). This means that only individuals who purchased within the Malware Period *and* at a time that malware was operating—a tiny fraction of the overall Settlement Class—are entitled to recovery. But the Class and the Court are never told when exactly that is, or who these individuals are.

The Settlement's Recitals establish that the class contains 2,187,773 members. (Settlement Agreement ¶ 5.) Only 17% of those individuals are among the population that is eligible to submit a claim. (*Id.* ¶ 4.) And an even smaller subset will get anything from the Settlement. Yet all Settlement Class Members, even those who get nothing, must release their claims against Neiman Marcus related not just to this data breach, but also related to Neiman Marcus's collection, retention, and disclosure of Personal Information more generally. *(Id.* ¶¶ 68-69.) The scope of the release—which on its face goes beyond the facts of this case—is impermissible. *See Nat'l Super Spuds, Inc. v. N.Y. Merc. Exch.*, 660 F. 9, 18 & n.7 (2d Cir. 1981) (concluding that a class-action settlement cannot release claims based on different facts). Regardless, the Seventh Circuit repeatedly has condemned such lopsided deals that force the absent class members to swallow a broad release for minimal recovery. *See Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 782-85 (7th Cir. 2004); *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1135-36 (7th Cir. 1979). "Counsel ... is supposed to get as robust a recovery as possible—*for the class members*." *Grok Lines, Inc. v. Pachall Truck Lines,*

*Inc.*, No. 14 C 8033, 2015 WL 5544504, at *8 (N.D. Ill. Sept. 18, 2015). The minimal relief that the instant Settlement affords only a tiny fraction of the Class makes it clear that Class Counsel failed in that endeavor here. The Settlement is therefore unfair and unreasonable.

**B.    The Notice And Claim Form Are Confusing And Unfair.**

Despite that only a fraction of Class Members who made a purchase during the Malware Period are entitled to recovery, those Class Members have no way of knowing whether or not they will receive compensation from the Settlement Fund prior to either receiving a check or notice that their claim was denied. The Claim Form, as discussed, requires claiming Class Members to submit information sufficient to show that they are "Eligible Claimants," that is, individuals who made a purchase on a date and at a time that malware was operating at a Neiman Marcus Group store. But Class Members, like Mr. Chohan, are not given access to the information that would let them determine whether they are Eligible Claimants, i.e., where the malware was operating and when. They can't know that until their claims are approved or denied.

Class Members who are not Eligible Claimants—and who, therefore, will get nothing from the Settlement—might rationally wish to opt out of the Settlement. They might wish to seek reimbursement for the expenses they incurred seeking to prevent identity theft or credit card fraud. *See Remijas*, 794 F.3d at 692-93. But these Class Members have no way of knowing whether that is the rational option until after they submit a claim and their opportunity to opt out has passed. In other words, the Settlement's structure renders the ability to opt out essentially worthless. *See Clement v. Am. Honda Fin. Corp.*, 176 F.R.D. 15, 29 n.22 (D. Conn. 1997) (concluding that confusing opt out form weighed in favor of a finding that class-action settlement was unfair).

Since a Class Member's status as an Eligible Claimant can be determined after a claim is submitted, it must have been possible for Class Counsel to obtain the necessary information, put together a class list, limit the release to those people, and provide this information to Class Members before they submit a claim. Class Counsel's failure to do so is unfair to a significant portion of the Class and warrants denial of the settlement.

### C.    The Remainder Of The Class Was Sold Out By Class Counsel.

According to the Settlement's Recitals, 83% of the Settlement Class is not eligible to submit a claim. Yet they are still bound by the same Settlement terms and release as class members who are. As already discussed, the simple bargain involved for these class members— nothing for something (the release)—is deeply unfair.

The denial of compensation to these Class Members also results from Class Counsel's unwarranted certainty about the scope of the data breach. In their Complaint, the named plaintiffs alleged that it was highly unlikely that the data breach was limited to the Malware Period. (Dkt. 27 ¶¶ 33-34.) Although the Settlement recites in no uncertain terms that the personal information of the 83% of the Class who made no purchase during the Malware Period was not compromised (Settlement Agreement ¶ 5), that may well turn out to be untrue, for the reasons expressed by the Plaintiffs in their Complaint. What's more, the release isn't tied to the so-called Cybersecurity Incident (i.e., to the malware that scraped financial information during the Malware Period), but instead releases Neiman Marcus from *any* claim related to the theft, storage, or disclosure of personal information. (Settlement Agreement ¶ 68.) Releases this broad are neither normal nor necessary. For instance in *In re The Home Depot, Inc., Customer Data Security Breach Litigation*, the settlement released Home Depot from any claims related to the particular data breach at issue. *See* Dkt. 181, Exh. 1, ¶ 56, No. 14-cv-2583-TWT (N.D. Ga. Filed Mar. 7, 2016).

The settlement in *In re Michaels Stores Pin Pad Litigation* also limited the release to claims arising out of the tampering and theft that gave rise to the claims in the first place. *See* Dkt. 82, Exh. 1, ¶ 18, No. 11-cv-3350 (N.D. Ill. filed Dec. 13, 2012). Class Counsel's decision to grant Neiman Marcus a broader release here is inexplicable.

The presence in the Class of individuals who made purchases outside the Malware Period benefits no one other than Neiman Marcus, who receives an exceedingly broad release under Rule 23(b)(3). The release is disproportionate both to the relief afforded by the Settlement and the claims asserted by the Named Plaintiffs. (As discussed, it is unclear what claim or theory certification is premised on. Regardless, no claim related to the data breach justified a release that sweeps more broadly than this single incident.)

Neither can the release be justified by reference to the injunctive "relief" afforded by the Settlement. The Long Form Notice concedes that Class Members have no right to enforce any changes to Neiman Marcus's business practices, so insofar as this can even be considered an injunction it is valueless. The Seventh Circuit recently concluded that an injunction that doesn't require a business to make any changes to its practices cannot justify a settlement. *See In re Subway*, 2017 WL 3666635, at *5; *see also Grok Lines*, 2015 WL 5544504, at *3 (concluding that illusory injunctive relief justified denying approval of settlement). Just as in *Subway*, the Court should conclude that the proposed Settlement is unfair and deny final approval.

### D. Notice Violated Due Process.

Because the Settlement Class was certified under Rule 23(b)(3), the federal rules require that absent Class Members be provided the opportunity to opt out of the Settlement. Fed. R. Civ. P. 23(c)(2)(B). And "[c]lass members are entitled to the best practicable notice, not just because the Rules require it, but as a matter of due process." *Kaufman v. Am. Express Travel Related*

12

*Servs., Inc.*, 283 F.R.D. 404, 406 (N.D. Ill. 2012) (internal quotes omitted). Although the best-practicable-notice standard is flexible, as a general rule of thumb notice should reach at least 70% of the class. *Bickel v. Sheriff of Whitley Cnty.*, No. 1:08-CV-102-TLS, 2015 WL 1402018, at *2 (N.D. Ind. Mar. 26, 2015). "If that number is below 70%, counsel should explain why the process was, nonetheless, the best notice that is practicable under the circumstances." *Id.* at *3. Ordinarily when, as here, the contact information for class members is readily ascertainable (as through information in the defendant's possession or that can be subpoenaed from third parties like credit card companies), direct individual notice is required. *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 595 (N.D. Ill. 2011).

Class Counsel here neither provides evidence that 70% of the Settlement Class has received notice of the Settlement nor discusses why this was the best notice practicable under the circumstances. First, Class Counsel appears to have pulled a bait and switch on the Court. At preliminary approval, Class Counsel represented that all 2,187,773 members of the Settlement Class would receive direct notice of the Settlement. (Dkt. 145, at 29.) This was a gross misrepresentation: according to the Settlement Administrator, direct notice was only *attempted* to 737,347 Class Members, or 33.7% of the Class. (Dkt. 162, ¶ 6.) This direct notice program was supplemented by publication notice, but not nearly enough to adequately notice the 66.3 % of the class that by Class Counsel's own brazen admission failed to receive direct notice. The administrator discusses a single advertisement in *People* and an Internet advertisement that received 4 million impressions. (Dkt. 162, ¶¶ 11-12.) This is far less than the effort put forth in other cases. *See Kaufman*, 283 F.R.D. at 407 & n.1 (collecting cases). Notably, neither the Settlement Administrator nor Class Counsel ever testifies that 70% of the Class received notice as is commonplace when seeking approval of a class notice program.

And there is no indication that more robust notice was impracticable here. Instead, the evidence points in the other direction. First, Neiman Marcus has the credit card information of all Class Members and using that information to find contact information for all 2.1 million Class Members is relatively simple. If Neiman Marcus itself doesn't have the information required to direct notice to those that made credit card purchases in its stores, they certainly have sufficient information to permit Class Counsel to subpoena major credit card companies to put together a Class List. If direct notice to all class members is indeed feasible, then it is required by Due Process. *See Schulte*, 805 F. Supp. 2d at 595. Second, the parties negotiated a $400,000 fund to pay for notice, and Class Counsel secured a promise that Neiman Marcus would pay any notice costs beyond $400,000. Settlement Agreement ¶ 47. Yet the Settlement Administrator reports that so far less than $280,000 of that fund has been spent, and he "does not anticipate" needing to exhaust the $400,000 notice fund. Dkt. 162, ¶ 19. Plainly more notice was practicable. Notice therefore violated Due Process.

### E.     The Reaction Of The Class Disfavors Approving The Settlement.

One of the traditional factors courts weigh when considering whether to approve a settlement is the reaction of absent class members. *See Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1995). While many courts focus on the lack of opt outs or objections, many courts recognize that it is also necessary to gauge the extent of the class's participation in the settlement. *See, e.g.*, *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 493 (N.D. Ill. 2015). Here, participation in the Settlement is exceedingly low. The Settlement Administrator reports 13,872 claims. (Dkt. 162, ¶ 15.) This number does not tell the Court whether the claims have been submitted by individuals in the secret group entitled to payments or whether the claims even were submitted by individuals who made purchases during the critical Malware Period. And even on its face it

14

equals an abysmal 0.6% claims rate. Ordinarily claims rates are closer to 5%. *See Mullins v. Direct Digital LLC*, 795 F.3d 654, 667 (7th Cir. 2015). That participation in this Settlement is so low speaks volumes about the Settlement's unfairness, unreasonableness, and the fact that the notice plan violates due process.

## II.      The Settlement Class Should Be Decertified.

Apart from the Settlement's unfairness, the Settlement Class should be vacated because it does not meet the requirements of Rule 23(b)(3).

### A.      The Settlement Class Is Insufficiently Cohesive To Warrant Certification.

First, the Settlement contains too many intra-class conflicts. Such conflicts arise when the interests of different class members do not align. *See Pratt v. Chi. Housing Authority*, 155 F.R.D. 177, 179-80 (N.D. Ill. 1994). Here, Class Counsel has taken a homogenous class—one in which all 2,187,773 members could proceed under the damages theory approved by the Seventh Circuit—and created three separate groups (purchasers outside the Malware Period, purchasers inside the Malware Period not entitled to compensation, and purchasers entitled to compensation) with competing interests. Ordinarily, that would require the creation of subclasses to protect the interests of all class members. *See Kohen v. Pacific Inv. Mgmt. Co. LLC*, 571 F.3d 672, 679-80 (7th Cir. 2009). Here, no subclasses were certified, and, as discussed above, many class members' interests were inadequately protected.

Paradoxically, the record does not suggest that the subgroup of the Settlement Class that will actually receive compensation had an adequate representative protecting their interests. For instance, Melissa Frank's purchase was made in December 2013, definitively outside the Malware Period. (Dkt. 27, ¶ 4.) Debbie Farnoush's purchase was made in "2013," which doesn't even establish that she is in the class. (Dkt. 27, ¶ 5.) Hillary Remijas alleges that she made a

purchase on August 7, 2013, which is within the Malware Period. (Dkt. 27, ¶ 3.) But she never incurred any fraudulent charges. Perhaps this is because she did not make a purchase at a time when and in a store where malware was scraping payment information, a circumstance that would make her ineligible to receive compensation were she an absent Class Member. Joanne Kao made two purchases during the Malware Period. (Dkt. 27, ¶ 6.) The complaint includes significant detail about her purchase and subsequent fraudulent purchases made on her card. (Dkt. 27, ¶ 53.) The complaint, however, appears to connect the fraudulent charges to Kao's *December* purchase (dkt. 27, ¶¶ 53-54), which is not within the Malware Period. No further information about Kao's damages ever was provided. If the fraudulent charges are unconnected to her within-Malware Period purchases, perhaps she, too, is not an Eligible Claimant. Based on the information available to Class Members, there is simply no way to know.

Despite that these individuals have different incentives under the Settlement, the class-certification order contemplates unitary representation. The Settlement, however, exposes critical fault lines in the class, and the fact that only one distinct group in the Settlement Class gets any meaningful relief strongly suggests that this is a case in which unitary representation means inadequate representation. *See In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 827 F.3d 223, 233-34 (2d Cir. 2016); *see also In re Target Corp. Data Breach Litig.*, 847 F.3d 608, 613-14 (8th Cir. 2017) (suggesting that intra class conflicts between class members entitled to receive compensation from a settlement fund and those not entitled to receive such compensation might warrant creation of subclasses or decertification).

Second, the Settlement Class contains too many uninjured individuals; in fact it is comprised almost entirely of persons Class Counsel asserts were not harmed. While, as discussed, Class Counsel's damages theory applies to the entire Class, the Settlement renders

16

83% of the Class ineligible to submit a claim because their financial information "could not have been compromised." (Settlement Agreement ¶ 5.) If that truly is a reason to withhold relief from these class members, then Neiman Marcus's conduct could not have harmed these individuals. "[A] class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Kohen*, 571 F.3d at 677. According to the Settlement Agreement, that is the situation presented by the Settlement Class in this case. Whether a class contains too many "uninjured" individuals is, the Seventh Circuit has held, "a matter of degree." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). But it seems clear that a class for which counsel concedes that 83% of the members are entitled to no relief is unsuitable for certification. *See, e.g.*, *Riffey v. Rauner*, No. 10 CV 2477, 2016 WL 3165725, at *4 (N.D. Ill. June 7, 2016) (rejecting as overbroad a class definition for which 65% of members were likely to opt out).[1]

**B.    The Class Was Inadequately Represented By Attorney Yanchunis.**

The many issues with the Settlement are concerning to scores of Class Members. Many of these individuals, including Mr. Chohan, reached out to Edelson PC with their concerns. In light of the overwhelming, negative response to the Settlement, counsel reached out to Class Counsel to gauge whether they would be receptive to amending the Settlement. Counsel

---

[1]    Class Counsel's utter failure to specify the Settlement Class's damages theory raises significant predominance concerns, as well. According to Plaintiffs and Class Counsel, "the [unspecified] claims are based upon uniform conduct ... that affected all proposed class members in similar fashion [*sic* – it didn't], and for the same amount of time [what?]." (Dkt. 145, at 27.) Without adding any detail, Plaintiffs and Class Counsel then say the predominance criterion is satisfied because "these core issues" can be resolved on a classwide basis. (*Id.*) But there are *no* core issues specified. More fundamentally, Rule 23(b)(3) "requires that a putative class ... demonstrate a linkage between its theory of liability and its theory of damages." *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 588 (S.D.N.Y. 2013). There is simply no linkage here. Instead, both the Settlement Class and the Settlement Fund appear to be free-floating creations, with only a tenuous relationship between them. Rule 23(b)(3) does not permit classes to be certified in that manner.

proposed a series of specific changes, though these changes assumed that the notice ultimately proposed by Class Counsel would not be so confusing or poorly disseminated as to depress Class Member participation in the Settlement. Had counsel been aware of those issues, he likely would have proposed different changes to the Settlement.

Over the next few weeks, Class Counsel stated that they were seriously considering the proposals put forward by Mr. Chohan's counsel, and that both Class Counsel and Neiman Marcus had agreed in principle to amending the agreement to make it more fair. Nevertheless, Attorney Yanchunis, who by and large refused to participate in these discussions, represented to the Court on June 21, 2017, that the Plaintiffs were seeking an order preliminarily approving the Settlement. (Dkt. 156, at 2:18-22.) Mr. Yanchunis did not correct counsel for Neiman Marcus when he said "it would be appropriate to no longer hold [the motion for preliminary approval] in abeyance." (*Id*. at 3:2-7.) These actions robbed the Class of substantial benefits. The role of class counsel is to act as fiduciary to the absent class members. Mr. Yanchunis breached that duty by failing to incorporate beneficial revisions to the settlement and misrepresenting the status of negotiations to the Court. *See Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) ("If, therefore, the lawyer, through breach of his fiduciary obligations to the class, ... demonstrates that he is not an adequate representative of the interests of the class as a whole, realism requires that certification be denied.").

## III.    Class Counsel's Requested Fees Should Be Reduced.

For their efforts, Class Counsel seeks a fee award in the amount of $530,000. (Dkt. 159.) That amount represents an unprecedented 44.17% of the Settlement Fund. Their request should be rejected.

The Seventh Circuit has laid down two guideposts to determine whether a class-action attorney's fee is appropriate. First, a fee award should attempt to replicate the market for attorneys' fees by recreating a hypothetical ex ante negotiation. *See In re Synthroid Marketing Litig.*, 264 F.3d 712, 718-19 (7th Cir. 2001). Second, "[t]he ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014). This ratio remains relevant whether or not class counsel seeks their fee on the basis of their lodestar or as a percentage of the fund. *See Grok Lines*, 2015 WL 5544504, at *6.

Recognizing that their requested percentage fee award finds no support in the case law, Class Counsel primarily attempts to justify their excessive request first by pointing to their lodestar. That discussion is divorced from any discussion of the relationship between Class Counsel's requested fee and the relief Class Members receive (a ratio Class Counsel discusses only in the context of a percentage award). What's more, Class Counsel at no point provides any support for the notion that the market for attorney's fees in this case would produce an hourly fee. By contrast, an ex ante fee negotiation likely would have produced a contingency-fee arrangement in which Class Counsel agreed to take a percentage of any recovery. *See In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838, 844 (N.D. Ill. 2015) (noting that the percentage-of-the-fund method is "the favored method for calculating fees in common-fund cases"); *see also Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 253-55 (7th Cir. 1987) (recognizing that the calculation of attorney's fees in common fund cases is generally governed by the percentage approach, whereas the lodestar approach is more appropriate in cases invoking fee-shifting statutes).

19

These problems aside, there are serious flaws in Class Counsel's lodestar analysis. First, Class Counsel submits only summaries of some of its bills, not their actual billing records. (Dkts. 160, 161.) The Court should order Class Counsel to submit their detailed billing records to permit the Court to assess which expenditures of time are reasonable and which are not. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("The fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."); *see, e.g., In re NCAA Concussion Litig.*, Dkt. 345, No. 13-cv-9116 (N.D. Ill. Jan. 27, 2017) (ordering counsel to submit detailed billing records); *Douglas v. The Western Union Co.*, Dkt. 102, No. 14-cv-1741 (N.D. Ill. Apr. 25, 2016) (same); N.D. Ill. L.R. 54.3(d)(5) (requiring submission of billing records in cases when the parties contest a proper fee). Second, the only evidence that the time expended here was reasonable is one conclusory statement in the declaration of one Class Counsel. (Dkt. 160, ¶ 43.) Class Counsel bears the burden of justifying their fee, and they have not done so here on the basis of their lodestar. Class Counsel briefly suggests their fee as a whole is nevertheless reasonable by pointing to one case in which a lodestar award of fees that exceeded relief to the class was approved. *See In re Sears, Roebuck & Co. Front-Loading Washer Litig.*, No. 16-3554, 2017 WL 3470400 (7th Cir. Aug. 14, 2017). There are significant differences between that case and this, notably that the *Sears* litigation lasted for ten years and involved several complex, time-consuming issues of class-action practice that at one point took the case all the way to the Supreme Court. *Sears, Roebuck & Co. v. Butler*, 133 S. Ct. 2768 (2013). Nothing of that sort occurred here. The only complex issue here was purely legal, and was litigated entirely through briefs. Moreover, it is clear that Class Counsel failed to conduct any meaningful discovery to discover exactly when and where the Malware

was operating. They also failed to do any class-based discovery to determine contact information so that absent class members could be provided with the requisite notice.[2]

Class Counsel devotes more energy to justifying their requested fees as a percentage of the fund, which is understandable given the lack of support for their request. (Dkt. 164, at 9-13.) But these efforts fail. As Class Counsel realizes, a declining marginal fee percentage like that awarded in *Synthroid* best replicates the market for attorney services. (Dkt. 164, at 9-10.) But the requested 44.17% award cannot be justified on the basis of *Synthroid* or any other decision.

In *Synthroid*, the Seventh Circuit approved a declining marginal fee for counsel that, as relevant here, awarded counsel 30% of the first $10 million recovered on behalf of the class. 264 F.3d at 721. Numerous district courts have used that fee schedule as the basis for their awards. *See, e.g.*, *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 235-38 (N.D. Ill. 2016) (collecting cases). Given the small fund here ($1.2 million), under *Synthroid* Class Counsel would take only 30%, or $360,000. Some cases do award a risk premium to account for the riskiness of particular litigation. *See id.* at 239. But Class Counsel seeks an unprecedented 14.17% risk premium (8.17% higher than any risk premium of which Mr. Chohan's counsel is aware). Class Counsel does nothing to justify such a large risk premium. Neither does the case law provide any basis for this request. Instead, "high risk consumer class actions yield a percentage fee premium of about 6%." *In re Capital One TCPA Litig.*, 80 F. Supp. 3d 781, 806 (N.D. Ill. 2015).

And even putting declining fee structures to one side, Class Counsel's fee request does not pass muster. The "customary contingency fee would range from 33 1/3% to 40% of the

---

[2]     Co-Class Counsel Wolfson also vouches for the credibility of hours expended by Siprut PC. (Dkt. 160, ¶¶ 37-38.) But as Judge Feinerman discovered in a different case, attorneys at Siprut PC don't keep detailed billing records, and instead "reconstruct" their time many months or years after the fact. *See, e.g.*, *Douglas v. The Western Union Co.*, Dkt. 111 (N.D. Ill. filed May 23, 2016). There is every reason to believe that Siprut PC attorneys did the same thing in this case, so those hours should be viewed with heavy skepticism.

amount recovered." *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001). In *Capital One*, the court found that the mean percentage fee awarded in cases that created common funds of this size was 29.4%. 80 F. Supp. 3d at 799. And a study of class-action fee awards across a decade revealed that the mean fee award in consumer class actions was 24.3%. Eisenberg & Miller, *Attorneys Fees in Class Action Settlements*, 1 J. of Empirical Legal Studies 27, 51 (2004). The authors also found a "paucity of awards above 35 percent of client recovery." *Id.* at 49. (*Capital One* notes that this data is relatively consistent regardless of subject matter, as well. *See* 80 F. Supp. 3d at 803 (noting that data from securities and antitrust litigation was relevant to setting a fee in a consumer class action because, "the overwhelmingly important determinant of the fee is simply the size of the recovery obtained by the class, not the subject matter of the litigation") (quotation omitted).)

In the face of the overwhelming consensus that attorney's fees in consumer class actions should be around 30% of the common fund, if not lower, Class Counsel relies on a stray remark in *Pearson* that "attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel." 772 F.3d at 782. But this statement makes clear that a fee award should exceed one-third of the common fund only in exceptional settlements. This is not an exceptional settlement.

Especially in light of the meager relief obtained here, Class Counsel's request for 44% of the common fund must be rejected. *See Americana Art China Co., Inc. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014) (observing that ex ante fee negotiations "often, and in some practice contexts almost exclusively, consider the litigation's ultimate degree of success" so a district court has discretion to consider the degree of success when deciding an appropriate fee). If despite its many flaws the Court is inclined to finally approve the instant

Settlement, Class Counsel should still not be so handsomely rewarded for negotiating a deal that leaves the vast majority of the Class high and dry, receiving no relief but bound to an overbroad release. An unprecedented 44% fee award simply does not fit the Settlement negotiated here. A fee award closer to 30% of the common fund is more appropriate.

## CONCLUSION

The instant Settlement is neither fair nor reasonable. It compensates only a fraction of the individuals harmed by Neiman Marcus's actions, and forces other individuals to release claims in exchange for valueless injunctive relief. These results strongly suggest that the Class has been sold out by its nominal champions. And Class Counsel seek, despite the poor results achieved, a fee award that cannot be justified by the relevant case law. Respectfully, the Court should deny final approval or, in the alternative, reduce Class Counsel's requested fees.

Date:   September 1, 2017                    Respectfully submitted,

                                             **PARVINDER CHOHAN**


                                             _____

                                             By: /s/ Jay Edelson
                                                     One of his Attorneys

                                             Jay Edelson
                                             jedelson@edelson.com
                                             Rafey S. Balabanian
                                             rbalabanian@edelson.com
                                             EDELSON PC
                                             350 N. LaSalle, Suite 1300
                                             Chicago, Illinois 60654
                                             Tel: 312.589.6370
                                             Fax: 312.589.6378

## CERTIFICATE OF SERVICE

I, Jay Edelson, an attorney, hereby certify that on September 1, 2017, I served the above and foregoing *Objection to Class Action Settlement*, by causing true and accurate copies of such paper to be transmitted to all counsel of record via the Court's CM/ECF electronic filing system. I further certify that I caused an unredacted version of the foregoing objection showing Mr. Chohan's contact information to be served via electronic mail on the following:

Robert Ahdoot
rahdoot@ahdootwolfson.com
Tina Wolfson
twolfson@ahdootwolfson.com
Theodore W. Maya
tmaya@ahdootwolfson.com

John A Yanchunis
jyanchunis@forthepeople.com

David H. Hoffman
david.hoffman@sidley.com
Geeta Malhotra
gmalhotra@sidley.com
Daniel C. Craig
dcraig@sidley.com

/s/ Jay Edelson