**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| HILARY REMIJAS, MELISSA FRANK, DEBBIE FARNOUSH, and JOANNE KAO, individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>    v.<br><br><br>THE NEIMAN MARCUS GROUP, LLC, a Delaware limited liability company,<br><br><br>               Defendant. | Case No. 1:14-cv-01735<br><br><br>Honorable Samuel Der-Yeghiayan |

**PLAINTIFFS' REPLY IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION
SETTLEMENT, ATTORNEYS' FEES, COSTS, AND CLASS REPRESENTATIVE
SERVICE AWARDS**

## TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................1

II.  BACKGROUND ....................................................................................................3

III. THE OBJECTIONS TO CLASS RELIEF LACK MERIT ............................................5

     A.   There Are No Conflicts Between Class Members ................................................5

     B.   The $1.6 Million Settlement Is an Excellent Result for the Class ......................6

     C.   Class Members Who Suffered No Injuries and Were Not Affected
          Still Benefit from the Settlement .....................................................................10

     D.   The Court Notice Program and Claims Process Satisfy Due Process ...............12

     E.   The Release Is Narrowly Tailored and Fair .....................................................16

     F.   The Settlement's Cy Pres Provisions Are Not Unfair ........................................17

     G.   The Class Has Responded Positively to the Settlement ....................................19

IV.  THE OBJECTIONS TO ATTORNEYS' FEES SHOULD BE OVERRULED ............20

     A.   Mr. Chohan's Objections to the Fee Request Are Meritless ..............................20

     B.   The Remaining Objections to the Fee Request Also Are Meritless ..................23

V.   THE OBJECTIONS TO CLASS CERTIFICATION SHOULD BE OVERRULED .....24

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Americana Art China, Co. v. Foxfire Printing & Packaging, Inc.,* 743 F.3d 243
(7th Cir. 2014).................................................................................................. 20

*Bickel v. Sheriff of Whitley Cnty,* No. 08-102, 2015 WL 1402018
(N.D. Ind. March 26, 2015) ............................................................................. 21

*Cohen v. Chilcott*, 522 F. Supp. 2d 105 (D.D.C. 2005)................................................ 14

*EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985) .......................... 10

*Gaskill v. Gordon*, 942 F. Supp. 382 (N.D. Ill. 1996) ................................................ 20

*Gehrich v. Chase Bank United States*, 316 F.R.D. 215 (N.D. Ill. 2016) ..................... 13

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ............................................................... 22

*In re AT&T Mobility Wireless Data Servs. Sales Litig*., 270 F.R.D. 330 (N.D. Ill. 2010) .......... 10

*In re Kentucky Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. 362
(N.D. Ill. 2011)................................................................................................ 14

*In re Mexico Money Transfer Litig*., 164 F. Supp. 2d 1002 (N.D. Ill 2000) ............... 19

*In re Sears, Roebuck & Co., Front-Loading, Washer Prods. Liability Litig.*, No. 16-3554,
2017 WL 3470400 (7th Cir. Aug. 14, 2017)................................................... 20

*In re Southwest Airlines Voucher Litig.*, No. No. 11 C 8176, 2013 WL 4510197
(N.D. Ill. Aug. 26, 2013)................................................................................. 19

*In re Synthroid Mktg. Litig.*, 325 F.3d 974 (7th Cir. 2003) ........................................ 22

*In re Target Corp., Customer Data Sec. Breach Litig.*, No. 14-2522 (PAM),
2017 WL 2178306 (D. Minn. May 17, 2017) ............................................. 5, 9

*In re U.S. OPM Data Sec. Breach Litig.*, No. 15-1394, 2017 U.S. Dist. LEXIS 151449
(D.D.C. Sept. 19, 2017) .................................................................................... 8

*In re: The Home Depot, Inc., Customer Data Security Breach Litig.*, N.D. Ga. Case No.
1:14-md-02583-TWT.......................................................................................... 9

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996) ...................................................... 6, 10, 19

*Kaufman v Am. Exp. Travel Related Servs. Co., Inc.*, 264 F.R.D. 438 (N.D. Ill. 2009)......... 13, 14

*Martin v. Dun & Bradstreet, Inc. et al.*, Case No. 1:12-cv-00215 (N.D. Ill. Jan 16, 2014) ......... 21

*McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806 (E.D. Wis. 2009).................... 22

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) ................................................ 14, 18

*Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682 (7th Cir. 2008) ................................................ 5, 18

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015)................................................ 12, 14

*Pearson v. NBTY, Inc.*, 772 F.3d 622 (7th Cir. 2014)................................................ 21

*Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) ................................................ 6

*Remijas v. Neiman Marcus Group*, 794 F.3d 688 (7th Cir. 2015)................................................ 7

*Taubenfeld v. Aon Corp.*, 415 F.3d 597 (7th Cir. 2005) ................................................ 21

## **Rules**

Fed. R. Civ. P. 23 ................................................................................................................ 24

## I.     INTRODUCTION

The proposed Settlement is fair, reasonable, and adequate, and it merits final approval. The two objections that have been lodged are meritless, and at least one is motivated by personal animus.  The Court should not be persuaded otherwise.

There are no conflicts between Class Members, and class certification is appropriate.  All Class Members whose payment cards were exposed to the Malware — referred to under the Settlement Agreement as "Eligible Claimants" — and whom, therefore, were harmed by the Incident are eligible for a generous monetary payment, regardless of their ability to prove any resulting financial loss.  All Class Members who shopped at a Neiman Marcus store during the Class Period, including those who are not Eligible Claimants and were not actually affected by the Malware (because it operated intermittently during the Class Period and only at certain stores) will not receive monetary benefits, but will nevertheless benefit from the non-monetary practice changes that have resulted from this litigation and the Settlement.

The Settlement is fair to all Class Members.  Neiman Marcus will have to pay $1.6 million, which will be used to provide monetary compensation of up to $100 per Eligible Claimant, and non-monetary compensation in the form of Business Practice Changes by Neiman Marcus.  The Settlement's claims process is necessary and fair because Neiman Marcus does not have contact information for all Class Members or all Eligible Claimants, and it requires the information called for on the claim form in order to ascertain whether a particular claimant is an Eligible Claimant (that is, used his or her card at an affected Neiman Marcus store when the Malware was functioning).  (Declaration of Robert Ahdoot ("Ahdoot Decl.") ¶ 3.)

Contrary to the bombastic language used by the objectors, no one has been "sold out" by Class Counsel.  Even those Class Members whose payment cards were not used within the

Malware Period and arguably were neither affected nor injured as a result of the Incident benefit from the Settlement. To the extent that a Class Member believes the relief conferred by the Settlement was insufficient, he or she may opt out and pursue an individual case.

The Settlement releases Neiman Marcus only from claims that result from, arose out of, are based upon, or relate to the Incident. The Release does not include claims that arise out of the theft, exposure, or disclosure of Settlement Class Members' Personal Information in general. To the contrary, the Release is narrowly tailored and fair — it releases Neiman Marcus only from claims in connection with the Incident. (Dkt. 145-1, Settlement Agreement ("SA") ¶ 68.) It does not release any claims arising from or relating to any conduct by Neiman Marcus after the date the Settlement Agreement is executed, or that are not related to the Incident. The Release simply is not as broad as the objectors argue.

Given the generally positive reaction of the Class, which includes a large number of claims filed to date, it appears unlikely that any funds will be available for *cy pres* distribution. Accordingly, objections based on that aspect of the Settlement will be moot. However, these objections never had any merit in the first place, given that the Settlement was carefully crafted to ensure that the most money possible out of the Settlement Fund is distributed directly to Eligible Claimants before any *cy pres* distribution could occur.

While it was not possible to provide actual notice to every Class Member in this case, the Court-approved Notice Program effectuated was the best notice practicable to apprise the Settlement Class of the pendency of this action, and reached *over* 71.48% of Class Members. (Declaration of Stephen Weisbrot ("Weisbrot Decl.") ¶ 6.) The notice afforded them the opportunity to opt out of or present any objections to this Settlement, and complied fully with due process, as already found by this Court in its Preliminary Approval Order. The deadline to

submit claims is on January 17, 2018. To date, over 16,447 claim forms have been submitted, and that number is expected to rise. (*Id.* ¶ 8.) By contrast, only 14 exclusion requests were submitted, and only three Settlement Class Members objected to the Settlement. (*Id.* ¶ 7.)

Like the notice process, the claims process also comports with due process. It provides a simple method for Class Members and the Settlement Administrator to determine whether Claimants are among those entitled to monetary compensation, and encourages claims by requiring claimants to answer only two questions using information that is readily obtainable from payment card statements or from memory.

The requested attorneys' fees are reasonable based on either the lodestar method or the percentage of the fund method. This case presented serious obstacles to recovery, and Class Counsel litigated the case fully cognizant of the possibility that the Class might recover nothing, in the face of dismissal at the pleading stage before this Court. Be that as it may, Class Counsel fought on, ultimately securing an excellent result for the benefit of the entire Class.

Class Counsel appreciate the important role that objectors can play in the settlement approval process, however, the objections before the Court are riddled with misunderstandings and misrepresentations about the Settlement, and lack merit. Plaintiffs respectfully request that the objections be overruled and the Settlement be approved.

## II.     BACKGROUND

In March 2017, Jay Edelson, Counsel for Objector Parvinder Chohan (although Mr. Edelson at that time asserted that he represented an attorney in his law firm), sent Class Counsel a long list of questions regarding the Settlement. In good faith, Class Counsel provided Mr. Edelson a lengthy and detailed response. (Ahdoot Decl. ¶¶ 5-7.)

Following this exchange and further discussions, Class Counsel requested a proposal that would assuage Mr. Edelson's concerns, and he listed four action items that could resolve his objections. Only two of the items related to the merits of the Settlement. Apart from the merits, Mr. Edelson also demanded that Mr. Yanchunis be removed from his position as Class Counsel, and that Class Counsel reduce the amount of their fee request. (*Id.* ¶ 7.) Although the Settlement was and remains fair, reasonable and adequate, Class Counsel engaged in an exchange with Mr. Edelson and the Defendant, in an effort to accommodate Mr. Edelson's merits-based requests regarding the Settlement, but to no avail. Mr. Edelson's current objections are baseless but, interestingly, his prior objections, which Class Counsel willingly addressed, do not align with his current briefing. (*Id.* ¶ 6.)

The one consistent theme in Mr. Edelson's attack has been his focus on Attorney John Yanchunis. His earliest correspondence concerning the present Settlement described how Mr. Yanchunis had been "unresponsive in a different matter." (*Id.* ¶ 5.) Mr. Edelson began insisting that Mr. Yanchunis be removed from the case *before* the June 21 hearing on which Mr. Edelson's current attacks on Mr. Yanchunis are supposedly based. (*Id.*; Dkt. 164 (Chohan Objection) at 2, 5-6, 17-18.)

As demonstrated by the respective amount of fees claimed, Mr. Yanchunis does not merit the singular attention Mr. Edelson showers upon him. (*Compare* Dkt. 161 (Yanchunis Decl.) ¶ 19 ($71,010 in fees), *with* Dkt. 160 (Wolfson Decl.) ¶ 25 ($485,601.20 in fees).) Mr. Edelson's motivation for filing an objection to this Settlement appears based on personal issues Mr. Edelson has with Mr. Yanchunis arising from "a different matter." (Ahdoot Decl. ¶ 5.)

4

## III.    THE OBJECTIONS TO CLASS RELIEF LACK MERIT

### A.    There Are No Conflicts Between Class Members

Mr. Chohan objects to class certification on the basis that the Settlement Class is, what he contends, "insufficiently cohesive to warrant certification."  (Dkt. No. 164 at 15-17.)  Mr. Chohan wrongly assumes that the individual class members have different incentives under the Settlement, by distinguishing between those entitled to receive monetary compensation and those who receive only non-monetary relief.  But "the question is not whether there is any potential or theoretical conflict among class members, it is whether class members' different interests are antagonistic to each other."  *In re Target Corp., Customer Data Sec. Breach Litig.*, No. 14-2522 (PAM), 2017 WL 2178306, at *3 (D. Minn. May 17, 2017).

The Settlement Agreement provides that Class Members whose payment cards were exposed to the Malware will receive up to $100 if they submit valid and timely claims.  Each Eligible Claimant will receive the same monetary amount as other Eligible Claimants without any need to prove any particular loss occurred or resulted from the Incident.  Class Members who were not actually affected by the Malware and who therefore receive no monetary compensation will still benefit from the Settlement in the form of changes in Neiman Marcus's Business Practices.

There is no basis for arguing that Class Members whose Personal Information was not compromised in the Incident should receive the same monetary compensation as Class Members whose Personal Information was compromised.  Accordingly, there are no conflicts between class members, and Mr. Chohan's objections should be overruled.  *See, e.g.*, *Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682 (7th Cir. 2008) (affirming approval of class settlement that provided money to one subclass but only *cy pres* benefits to separate subclass).

5

Mr. Chohan also attempts to argue that the Settlement Class "contains too many uninjured individuals" and complains that "83% of the Class is not entitled to monetary relief," and therefore should be decertified. Mr. Chohan's objection suggests there is something inherently improper in including uninjured individuals in a settlement class. Mr. Chohan's argument fails, as the Seventh Circuit has recognized that not only is it permissible to include uninjured individuals in a class, a class can be certified even if it turns out that no class member was injured. *See, e.g.*, *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) ("While it is almost inevitable that a class will include some people who have not been injured by the defendant's conduct . . . , this possibility does not preclude class certification.").

**B.     The $1.6 Million Settlement Is an Excellent Result for the Class**

The monetary relief in this Settlement is a true common fund, comprised of $1.6 million that will be distributed to pay (i) Class Members who submit valid and timely Claims up to $100 apiece, (ii) Service Awards, (iii) Attorneys' Fees and Expenses, and (iv) Settlement Administration Charges of up to $400,000. (Settlement Agreement "SA" ¶¶ 46-48.)

A primary factor that courts consider in determining whether a proposed class action settlement is fair, reasonable, and adequate is "the relative strength of plaintiffs' case on the merits as compared to what the defendants offer by way of the settlement." *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996).

The proposed Settlement Fund in this matter, coupled with the remarkably simple process for obtaining payments from it, will provide a cash benefit to those Eligible Claimants at a level substantially higher than in comparable data breach cases. This conclusion is bolstered by the fact that attempting to obtain anything at all for Settlement Class Members through litigation would entail significant risk and delay.

While arguing that the Settlement is inadequate, Mr. Chohan himself recognizes that the Seventh Circuit, in its order reversing dismissal of this action on the pleadings, "expressed serious doubt that any of the . . . damages theories asserted by the plaintiffs" other than "the 'identifiable costs associated with the process of sorting things out,'" could "support standing." (Chohan Objection at 4 (quoting *Remijas v. Neiman Marcus Group*, 794 F.3d 688, 692 (7th Cir. 2015)).) Proving the "identifiable costs associated with the process of sorting things out" on a classwide basis — indeed, just persuading this Court that such damages *can be proven* on a classwide basis in support of an opposed class certification motion — presents a serious challenge to Plaintiffs if litigation continues.

Neiman Marcus has vigorously advanced a variety of arguments that could prevent Plaintiffs from establishing that any customers were actually injured, or that any such injuries were caused by Neiman Marcus's conduct.[1] Similarly, establishing the amount of damages each Settlement Class Member suffered presents real challenges. Neiman Marcus argued that Plaintiffs' burden of proving causation is further complicated by the fact that there were several other retailer data breaches that occurred at approximately the same time as the Neiman Marcus incursion, including the Target breach. Clearly, continued litigation would present risks in establishing liability and damages. *See, e.g.*, *In re U.S. OPM Data Sec. Breach Litig.*, No. 15-

---

[1] These arguments include: (i) that no governmental regulator, bank, or card brand has found that Neiman Marcus's security systems were unreasonable, has told Neiman Marcus that they have concluded that Neiman Marcus should be held liable, or has imposed any penalty or assessment on Neiman Marcus related to the incursion; (ii) that Neiman Marcus's cybersecurity architecture in place at the time of the incident was robust and was found by a third party forensic investigator reporting to the card brands to be in compliance with its applicable data security standards; (iii) that there is no evidence that the Malware collected, or was capable of collecting, any personal information other than the payment card data. (Ahdoot Decl. ¶ 4.)

1394, 2017 U.S. Dist. LEXIS 151449 (D.D.C. Sept. 19, 2017) (holding that plaintiffs could not plead facts demonstrating economic loss or that injuries were traceable to defendant's actions).

Neiman Marcus also would oppose class certification on a variety of additional bases if the action were to proceed to that stage. While Class Counsel believe that class certification is appropriate, a contested certification battle would present challenges in connection with the difficulties presented in ascertaining whether particular individuals are among those who actually suffered injuries. Neiman Marcus would advance arguments to the effect that individual issues predominate with regard to damages suffered by class members, and whether those damages can be tied to the Incident at issue.

While Class Counsel believe they could overcome such obstacles, the reality is that Neiman Marcus has an arguably stronger defense than defendants in some other data breach cases. There are pervasive fact-intensive inquiries in this case that involve consideration of many facts surrounding the Incident.

To be clear, Class Counsel believe that Plaintiffs claims are meritorious and are confident in prevailing on the merits, but candidly acknowledge that there are significant hurdles to obtaining a judgment for the full value of the Class's claims. Consideration of all of the above and the tremendous amount of time and resources it will take to litigate the case counsels in favor of approving the Settlement now.

As to Eligible Claimants, the Settlement Agreement provides for cash payments of up to $100 each despite the possibility that Settlement Class Members might not prevail if the action proceeded to trial. This sum compares favorably to the sums available for class members submitted claims in the *Home Depot* and *Target* data breach class action settlements. The settlement classes in the *Target* and *Home Depot* cases numbered approximately 100 million and

40 to 93 million,[2] respectively. *See In re: Target Corp. Customer Data Security Breach Litig*., 2017 WL 2178306 at \*1; *In re: The Home Depot, Inc., Customer Data Security Breach Litig.*, N.D. Ga. Case No. 1:14-md-02583-TWT, ECF No. 181-2 (Settlement Agreement), at 74.

     The Settlement Class here, consisting of approximately 2 million Class Members (SA ¶ 5), is about 2% the size of the *Target* class and at most 5% of the *Home Depot* class. Nevertheless, the Settlement Fund in this case, subtracting the maximum possible amount that could be awarded in fees and expenses as well as the costs of administration ($670,000) is approximately 7% the size of the *Target* settlement fund ($10 million) and more than 5% the size the Home Depot settlement fund ($13 million). Thus, relative to the size of the *Target* and *Home Depot* classes and settlement amounts, Neiman Marcus is paying about 1.9 times more than Target and (extremely conservatively) 1.3 times more than Home Depot.

     In light of the risk that the named Plaintiffs and the class would be unable to establish that they suffered actual injury, and that such injury was caused by Neiman Marcus's conduct, and the relatively favorable recovery that the Eligible Claimants will receive, Plaintiffs and Class Counsel rightly decided to resolve this matter by entering into the Settlement Agreement. Clearly, the present value of the monetary component of the Settlement is significant compared to the duration and uncertainty of litigation and valuation of damages — further indicating the Settlement here merits approval.

---

[2] The *Home Depot* Settlement Class consisted of "approximately 40 million Class members who made credit or debit card purchases" and "53 million . . . who had their email compromised," and there was "likely some Class member overlap between the two categories." N.D. Ga. Case No. 1:14-md-02583-TWT, ECF No. 181-2 (Settlement Agreement), at 74.

### C. Class Members Who Suffered No Injuries and Were Not Affected Still Benefit from the Settlement

Without addressing the substantial risks involved in the litigation and potential years of delay, Objector Chohan complains that the Settlement is not fair because he erroneously assumes that "most of the class gets nothing" from the Settlement (*See* Dkt. No. 164). Mr. Chohan's objections are based on his inaccurate standpoint that the settlement compensates only those who receive monetary compensation, which he contends represents only a small fraction of the Settlement Class. To the contrary, all Settlement Class Members — including those not eligible for a monetary payment because their payment cards were not exposed to the Malware — have received and will continue to benefit from the Settlement in the form of non-monetary compensation.

"[T]he essence of settlement is compromise," and "courts should not reject a settlement 'solely because it does not provide complete victory to the plaintiffs.'" *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (quoting *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) and *Isby*, 75 F.3d at 1200). While, perhaps, in the best of all possible worlds all Settlement Class Members would receive monetary payments, in this case many Settlement Class Members shopped at Neiman Marcus during the Class Period but their payment cards were not used within the Malware Period and, arguably, therefore they suffered no injuries. (Ahdoot Decl. ¶ 3(a)-(e).) Nonetheless, they receive benefits in the form of non-monetary compensation, and have a choice to opt out. The claims process is necessary to determine who among them was exposed to the Malware. (*Id.* ¶ 3(f)-(h).)

Courts "do not focus on individual components of the settlement, but rather view them in their entirety in evaluating their fairness." *Isby*, 75 F.3d at 1199. As discussed in the Motion for

Final Approval, there are pronounced and tangible advantages to this Settlement, regardless of whether Class Members were actually affected or suffered injuries as a result. (Dkt. 158 at 2.) And when the benefits of the settlement are compared to the risks of zero gain, added expenses, and time and effort associated with continued litigation, it becomes clear that the Settlement merits final approval.

The objectors in this case fail to grasp the unquantifiable but nevertheless tremendously valuable benefits to Settlement Class Members in the form of changes to Neiman Marcus's business practices. Neiman Marcus announced in January 2014, after the commencement of this litigation, that it would provide free credit monitoring and identity theft insurance for one year to every Neiman Marcus customer who shopped at Neiman Marcus Group store, or online, between July 2013 to January 2014. Neiman Marcus provided these benefits to *all* such consumers, even though it determined that customers outside the group of Eligible Claimants were not affected by the Malware, and no online customers were affected. Therefore, all actions that Neiman Marcus has taken to enhance its cybersecurity business practices since the initial lawsuit against it was filed, are benefits that the settlement class *as a whole* has received.

Mr. Chohan attempts to argue that injunctive relief in this case is "illusory" by pointing to language in the Settlement Agreement wherein Neiman Marcus is given the flexibility to amend and adopt other and alternative cybersecurity practices in the future. (SA ¶ 49.) Mr. Chohan misconstrues such language, describing it as a "valueless injunction" that "doesn't require a business to make any changes to its practices." (Dkt. No. 164 at 12.) This argument fails.

The Settlement Agreement recites the enhancements undertaken by Neiman Marcus to its cybersecurity business practices between 2014 and 2017 following and resulting from this litigation and the Incident. These are practices that Neiman Marcus has undertaken as a direct

11

result of this lawsuit, and that already have provided real value to Class Members. The value that Neiman Marcus has provided should be considered by the Court in assessing whether the settlement is fair, reasonable and adequate, regardless of Mr. Chohan's meritless objections.

This lawsuit spurred Neiman Marcus to implement business practices that enhance and strengthen its cybersecurity. There is no reason for the Court or any objector to expect that Neiman Marcus is going weaken any of the Business Practice Changes after final approval. Class Counsel further agree that Neiman Marcus should have some leeway and flexibility to alter some of the practices as technology and "best practices" in cybersecurity evolve and improve.[3]

### D. The Court Notice Program and Claims Process Satisfy Due Process

Rule 23(c)(2)(B) requires the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 665 (7th Cir. 2015). Notably, "the rule does not insist on actual notice to class members in all cases. *Id.* As this Court found in its June 21, 2017 Order, the Notice Program effectuated here satisfies Due Process. (*See* Dkt. No. 154) The Notice Program is fully compliant with Due Process in that it informs Class Members of their right to opt-out or exclude themselves from the settlement, appear through their own counsel, object to the terms of the settlement along with the form that the objection must take, the

---

[3] To illustrate the point, Neiman Marcus has, for example, agreed to create and fill the position of Chief Information Security Officer (CISO). It is inevitable that a change in personnel may have to take place in the future, but this would not necessarily entail a weakening of Neiman Marcus's cybersecurity. Likewise, Neiman Marcus has, as a result of this lawsuit, also agreed to equip all of its Stores with devices that allow customers to pay for purchases using payment cards containing embedded computer chips. Such technology is certainly subject to change, and better and stronger security systems may become the norm in the future (such as cardless transactions using smartphones). It is therefore necessary to allow Neiman Marcus some flexibility to implement changes in the future, in order to keep up with technological advancements.

deadlines for opt-out/exclusion or objection, the date of the final approval hearing, the scope of

the claims released, and the amounts of potential service awards to Plaintiffs and of potential

awards of fees and expenses to Class Counsel. *See e.g.*, *Kaufman v Am. Exp. Travel Related*

*Servs. Co., Inc.*, 264 F.R.D. 438, 445-46 (N.D. Ill. 2009).

Mr. Chohan complains that not all Settlement Class Members received actual notice of

the Settlement. Neiman Marcus has maintained that it does not have information sufficient to

identify and contact many of the Settlement Class Members because its database often includes

payment card numbers without associated contact information (including physical or e-mail

addresses) sufficient to identify and contact the customers.

In this case, direct notice by e-mail and physical mail was sent to Settlement Class

Members for whom Neiman Marcus had such information by the court-appointed Claims

Administrator (Dkt. 162, Declaration of Brian Devery ("Devery Decl."), ¶¶ 7-10.) Notice was

also provided through a media campaign designed to reach as many Settlement Class Members

as possible. (*Id.* ¶¶ 11-14; Weisbrot Decl. ¶ 3.). *See Gehrich v. Chase Bank United States*, 316

F.R.D. 215, 231-232 (N.D. Ill. 2016) ("Courts may use alternative means such as notice through

third parties, paid advertising, and/or posting in places frequented by class members all without

offending due process."). The notice campaign reached an even greater proportion of Class

Members than originally predicted, exceeding 71.48% of the entire Settlement Class. (Weisbrot

Decl. ¶ 6.)

Nevertheless, Mr. Chohan argues the Notice Plan still was not enough, and that a more

robust alternative should have been used. Mr. Chohan ignores the reality that, in consumer fraud

cases such as here, the identity of class members typically cannot readily be ascertained and

publication notice is the only means of informing Settlement Class Members of the existence of

the Settlement and its terms. *Mullins*, 795 F.3d at 665 ("Rule 23(c)(2)(B) recognizes it might

be *impossible* to identify some class members for purposes of actual notice."); *Mirfasihi v. Fleet*

*Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) (approving publication notice for a nationwide

class that consisted of publication in one publication of national circulation and the posting of the

notice on a website set up by a settlement administrator); *Kaufman*, 264 F.R.D. at 446

("Publication of notice in a national newspaper of wide circulation, plus an online publication,

constitutes sufficient notice by publication.") (citing *Mirfasihi*); *Cohen v. Chilcott*, 522 F. Supp.

2d 105 (D.D.C. 2005) (approving notice plan consisting of publication in USA Today and an

Internet campaign targeted to the demographics of the class members); *In re Kentucky Grilled*

*Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. 362 (N.D. Ill. 2011) (approving

notice plan consisting of publication in Parade, internet advertising, and a website).

     The Court-approved Notice Program effectuated in this case was the best notice

practicable and complied with due process as this Court has already found in the preliminary

approval order.  In addition, the amount of money set aside for notice and settlement

administration is significant, with Neiman Marcus agreeing to separately pay for any costs that

exceed the $400,000 to be paid out of the Settlement Fund for Notice and Administration.

     Mr. Chohan's assertion that the claim process in unfair because Class Members have "no

way of knowing whether or not they will receive compensation from the Settlement Fund prior

to either receiving a check or notice that their claim was denied" is baseless.  Similarly, Objector

Carey's ("Ms. Carey") and Objector Plunkett's ("Mr. Plunkett") assertions that the Class

Members "do not know whether they a part of the class" and are forced to "opt in" to know

whether they are class members" are equally meritless.  To the contrary, it is simple for

individuals to determine whether or not they are in the Settlement Class: to do so, they need only

review their payment card statements to determine if their card was used at a Neiman Marcus store between July 16, 2013 and January 10, 2014. If so, they will know that they are in the Settlement Class, and will immediately have the option of either filing a claim, opting out of the settlement, objecting to the settlement, or doing nothing.

As discussed above, the information on the Claim Form is necessary for the Administrator and the parties to ascertain whether a Settlement Class Member is an Eligible Claimant entitled to monetary compensation. (Ahdoot Decl. ¶ 3.) According to Neiman Marcus, its records contain name and contact information for less than half of the payment cards used by would-be Eligible Claimants, and less than one-third of all Settlement Class Members. (*Id.* ¶ 3(f)-(g).) Accordingly, the basic information sought in the Claim Form is a necessary component of the Settlement.

The claims process set forth in the Settlement Agreement was designed to be simple for claimants to follow and inexpensive to administer. To file a claim and determine whether an individual is an Eligible Claimant, he or she must answer only two simple questions on the claim form. This information will enable the Settlement Administrator to compare the claimant's information with the information provided by Neiman Marcus.

The claimant must first state whether his or her credit card was used at a Neiman Marcus Group store at the time the Malware capable of collecting payment data was operating – between July 16, 2013 and October 30, 2013. If the claimant answers the first question in the affirmative, he or she will then be required to provide at least one of two additional sets of information to submit a valid claim: either (1) provide full name and billing address associated with the card used, or (2) provide the last 4 digits of the payment card used and the dates and locations that the card was used. (Dkt. 145-2.) Class Members need not submit proof of purchase, but rather will

15

be required only to provide these two pieces of information that can be easily found either in Class Member's bank statements or from his or her memory. If they do these two things, and it turns out that their card was among those used when the Malware was operating, then they will be eligible to receive a monetary benefit.

### E.     The Release Is Narrowly Tailored and Fair

Mr. Chohan objects that the Settlement is "deeply unfair" because Settlement Class Members are "forced" to release claims against defendant. (Dkt. No. 164) Likewise, Ms. Carey and Mr. Plunkett incorrectly assert that the settlement provides a release to Neiman Marcus in "exchange for zero benefit." (Dkt. No. 165) Mr. Chohan inaccurately describes the release as being much broader than it actually is, while Ms. Carey and Mr. Plunkett misrepresent the terms of the release altogether.

First, the Settlement does not "force" anyone to release claims. To the contrary, each and every person had an opportunity to opt out of the Settlement and pursue their claims individually. Second, Mr. Chohan's assertions that "most settlement class members receive nothing" in exchange for giving up their legal rights to bring suit against Defendants "for any claim" is false and should be rejected. As described above, all Settlement Class Members receive substantial relief under the Settlement. But more to the point, they are not giving up their rights to bring suit against Defendant "for any claim," as Mr. Chohan asserts. (Dkt. 164 at 11.) Rather, they release claims "that result from, arise out of, are based upon, or relate to the Incident . . . ." (Dkt. 145-1, SA ¶ 68.)

In making his argument, Mr. Chohan misleadingly omits key language from the release, and incorrectly asserts that "the release isn't tied to the so-called Cybersecurity Incident … but instead releases Neiman Marcus from *any* claim related to the theft, storage, or disclosure of

16

personal information." (Dkt. No. 146.) Mr. Chohan omits crucial language from the release to mischaracterize it as being much broader than it actually is. It is simply untrue that Class Members are releasing any claims other than those arising from this particular litigation. In addition, the Released Claims do not include any claims arising from or relating to any conduct by Neiman Marcus after the date of the Settlement Agreement is executed. The Release is appropriate, and releases Neiman Marcus from only those claims that arose from the Incident and could have been brought in this action. (SA ¶ 68.)

### F.    The Settlement's *Cy Pres* Provisions Are Not Unfair

Ms. Carey and Mr. Plunkett object to the Settlement's *cy pres* distribution provisions, but their objections should be overruled. The Settlement was carefully crafted to make every effort to distribute the maximum possible Settlement Funds to Eligible Claimants. *First*, Eligible Claimants who submit claims ("Group 1 Eligible Claimants") will receive $100 per claim. (SA ¶ 51(b).)

Based on current claims data, Class Counsel and the Settlement Administrator predict that Group 1 Eligible Claimants will deplete the Settlement Fund. However, should any funds remain for distribution after all Group 1 Eligible Claimants are paid then, *second*, any remaining funds would be distributed to any excess administrative costs, though at this time the Settlement Administrator is not predicting any such excess costs, and accordingly this is not likely to consume any Settlement Funds. (*Id.* ¶ 51(c)(i).)

*Third*, any remaining Settlement Funds would be mailed as checks to Eligible Claimants who did not submit a Claim Form, for whom Neiman Marcus has a mailing address ("Group 2 Eligible Claimants"). (*Id.* ¶ 51(c)(ii).) The Settlement specifies that, if such payments are made at all (which Class Counsel does not anticipate), then there must be sufficient funds for the

amount of such checks to exceed $5.00. The administrative costs involved with making such payments make it undesirable to mail a large number of small-value checks so, in the unlikely event that this condition is met, then *fourth*, any remaining funds would go to a non-profit group to be chosen by the parties. (*Id.* ¶ 51(c)(iii).)

These objectors cite to *Mirfasihi* but, in that case, a discreet subclass referred to as "the pure information-sharing class" received "absolutely nothing." *Mirfasihi*, 356 F.3d at 782. The *Mirfasihi* court rejected the argument that the information-sharing class in that case actually received a *cy pres* remedy in the form of payments to a different subclass, called the "telemarketing class." *Id.* at 783. The court also was concerned that the information-sharing class in that case had no apparent representation and had claims possibly worth more than those of the telemarketing class. *Id.* at 782-86. *First*, no comparable subclasses exist in this case — the only difference between Group 2 Eligible Claimants and Group 1 Eligible Claimants is that the latter submit claims, but the nature of those claims is identical. *Second*, were the many conditions described in the Settlement to come to pass such that a *cy pres* payment were to be made, it would go to a jointly chosen non-profit charitable organization whose work has a nexus with the claims advanced in this case, not another subclass in the same case with some potential conflict of interest with Eligible Claimants. And the Seventh Circuit ultimately approved a settlement that entailed just such a *cy pres* remedy in later proceedings in the same *Mirfasihi* case. *See Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682, 687 (7th Cir. 2008).

Class Members have submitted 16,447 claim forms to date. (Weisbrot Decl. ¶ 8.) Given the number of Claims to date, there will likely be no unclaimed funds, and the non-reversionary portion of the Settlement Fund will be paid out entirely to Eligible Claimants. Thus, Ms. Carey's

and Mr. Plunkett's objections to the distribution of funds is essentially moot and should be overruled.

### G. The Class Has Responded Positively to the Settlement

The class members' reaction to a proposed settlement is a factor in determining whether the settlement is fair, reasonable, and adequate. *Isby*, 75 F.3d at 1199. Courts often infer that a settlement merits approval when few class members object to it. *Id*. at 1200 (affirming final approval of settlement where 13% of the class submitted written objections); *In re Southwest Airlines Voucher Litig.*, No. No. 11 C 8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013) ("[A] low level of opposition [amounting to 0.01% of the class] supports the reasonableness of the settlement."); *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill 2000) (holding that the fact that more than 99.9% of class members have neither opted out nor filed objections is strong circumstantial evidence in favor of the settlement), *aff'd*, 267 F.3d 743 (7th Cir. 2001)).

Here, 16,447 individuals have submitted claims, while only three members of the Settlement Class filed a total of two objections to the Settlement, and only 14 requested to opt out. (Weisbrot Decl. ¶ 7.) The overwhelmingly positive response evidences general support for the Settlement among Class Members and counsels in favor of final approval.

## IV. THE OBJECTIONS TO ATTORNEYS' FEES SHOULD BE OVERRULED

The Settlement Agreement provides that Class Counsel may request that the Court award them $530,000 in attorneys' fees and expenses, which is within the range of approval under Seventh Circuit precedent. The requested percentage amounts to 33% of the total Settlement Fund, or 44.17% of the $1.2 million remaining in the Settlement Fund after payment of

Administration Charges. The requested award is also a significant discount from Class Counsel's actual lodestar figure of $850,523.56.

The Seventh Circuit recognizes that when counsel's efforts result in the creation of a common fund that benefits plaintiffs and unnamed class members, counsel have a right to be compensated from that fund for their successful efforts in creating it. *Gaskill v. Gordon*, 942 F. Supp. 382, 388 (N.D. Ill. 1996) ("[a] court may award fees where a lawyer's efforts created, preserved, or increased the value of a fund for the benefit of others.") Courts have discretion to use one of two methods to determine whether a fee request is reasonable: (1) percentage of the fund; or (2) lodestar plus a risk multiplier. *See Americana Art China, Co. v. Foxfire Printing & Packaging, Inc.,* 743 F.3d 243, 247 (7th Cir. 2014). As set forth in Plaintiffs' Fee Motion submitted to this Court, the requested fee in this case is reasonable under either method, given the enormous risks and investment required to develop and prosecute a case of this nature, and the excellent result achieved for the Class. (Dkt. No. 159.) Therefore, none of the objections lodged by the objectors' counsel against awarding such a fee.

### A. Mr. Chohan's Objections to the Fee Request Are Meritless

Mr. Chohan first argues that Class Counsel's requested percentage fee award "finds no support in the case law" and that the proper percentage in this case should be "around 30% of the common fund, if not lower." (Dkt. No. 164.) As mentioned, the Court has discretion to award fees based on the percentage-of-fund method, and although a "district court should compare attorney fees to what is actually recovered by the class," the comparison is not necessarily controlling, and sometimes an award of attorney fees may even exceed the amount recovered by the class. *In re Sears, Roebuck & Co., Front-Loading, Washer Prods. Liability Litig.*, No. 16-3554, 2017 WL 3470400 at *2 (7th Cir. Aug. 14, 2017). Moreover, courts in this Circuit

routinely award percentage higher than 30%. *See Martin v. Dun & Bradstreet, Inc. et al.*, Case No. 1:12-cv-00215 (N.D. Ill. Jan 16, 2014) (Dkt. No. 63) (awarding one-third of defendants' total payout for fees); *Bickel v. Sheriff of Whitley Cnty*, No. 08-102, 2015 WL 1402018 (N.D. Ind. March 26, 2015) (awarding 43.7% of the fund); *Pearson v. NBTY, Inc.*, 772 F.3d 622, 630 (7th Cir. 2014) ("[A]ttorney's fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel.")

Mr. Chohan's objections to the requested percentage fee should be given little weight. Mr. Edelson, Mr. Chohan's counsel, has previously advocated the position that "fee awards in class actions of any type mirror that of the market for contingency fees in general litigation: 33 to 40 percent of the total benefit made available to the class." *Taubenfeld v. Aon Corp.*, 415 F.3d 597, 600 (7th Cir. 2005). By challenging Counsel's fee request in this case as "being excessive," Mr. Edelson in effect contradicts his earlier position before this same Court. Mr. Edelson should not be allowed to advocate a position he obviously does not support and should not now be allowed to deprive Class Counsel of the fees they appropriately request based on the extensive time required to secure the present Settlement.

Mr. Chohan seems to agree that a fee award *could* exceed one-third of the common fund, but only in "exceptional" cases. (Dkt. 164 at 22) Mr. Chohan contends this is not such an exceptional case but recognizes, simultaneously, that before any Settlement could be had Class Counsel had to "win[] a landmark victory" before the Seventh Circuit. (*Id.* at 2.) As described in Plaintiffs' fee motion, it was only through Class Counsel's significant expenditure of time and money that they were able to avoid dismissal and negotiate and secure the Settlement. (*See* Dkt. No. 159).

The Court has "considerable discretion to determine the reasonableness of attorneys' fees because it has the greatest familiarity with the case and is in the best position to scrutinize the attorneys' work." *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 814 (E.D. Wis. 2009). In light of the work done, Class Counsel believe their requested fee reasonable. *See Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified.") Plaintiffs respectfully request that the Court exercise its discretion to grant Class Counsel their requested fees based on their lodestar.

Mr. Chohan's argument that this Court should be guided by the 30% figure cited in *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 980 (7th Cir. 2003), misses the mark because, as argued in Plaintiffs' Fee Motion, that case addresses "megafund" settlements that are much larger than the present Settlement. And as that case recognizes, it is not surprising that a greater proportion of a smaller fund will go to fees than of a larger fund. (Dkt. 159 at 9.)

In support of his effort to attack Class Counsel's fee petition in whatever way possible, Mr. Edelson unfortunately denigrates one of additional Counsel of Record, who is not even Class Counsel — Siprut PC. With respect to the Siprut firm, Edelson's sole basis for attack is based on recasting work performed by Siprut in another, unrelated case. Suffice it to say Class Counsel and Siprut disagree with Edelson's characterization of the *Western Union* matter. More important, the billings in that case have nothing to do with this case. Mr. Edelson provides no evidence that any time expended by Siprut was not appropriately billed in either matter, and relies solely on unsupported character assassination.

Mr. Chohan then attempts to attack Class Counsel's lodestar analysis with the unwarranted assertion that Class Counsel did not meet their burden of establishing the reasonableness of their fee. Mr. Chohan falsely asserts that "the only evidence that the time expended here was reasonable is one conclusory statement in the declaration of One Class Counsel." This argument is frivolous. Plaintiffs' fee motion, and Class Counsel's supporting declarations did, in fact, include detailed analyses of their time and expenditures in relation to this litigation. (*See* Dkt. No. 159; Declaration of Tina Wolfson ("Wolfson Decl."); Declaration of John Yanchunis ("Yanchunis Decl.")). If the Court requires more detail, Class Counsel can provide it *in camera*, but hourly records contain much privileged material.

**B.      The Remaining Objections to the Fee Request Also Are Meritless**

Ms. Carey and Mr. Plunkett argue that the requested fee award is inappropriate because the Settlement "improperly fails to factor out administrative costs before determining the percentage related to attorneys' fees." This argument is misguided and should fail. Plaintiffs have acknowledged that $530,000 is 33% of the 1.6 million common fund, *or* 44% of the fund after subtracting administrative expenses. (*See* Dkt. No. 158; Dkt No. 159 (Mot. for Fees) at 2.) This point never was in dispute, and such objections should be overruled.

Class Counsel have explained why the lodestar is reasonable in light of the expense and length of time necessary to prosecute the case to judgment. Class Counsel also emphasized the uncertainty of the outcome, risk of litigation, and difficulties and delays inherent in such litigation that were taken into account in reaching their lodestar. In addition, the amount requested is much lower than the actual lodestar in this case.

**V.      THE OBJECTIONS TO CLASS CERTIFICATION SHOULD BE OVERRULED**

Mr. Chohan argues that the class should be decertified because it was "inadequately represented" by Mr. Yanchunis — presumably because of Mr. Edelson's grudge with Mr. Yanchunis. This objector complains that Mr. Yanchunis failed "to incorporate beneficial revisions to the settlement" and "misrepresented the status of negotiations to the Court." (Dkt. No. 164 at 18.) Contrary to Mr. Chohan's assertions, the parties informed the Court of their position that it was appropriate for the Court to rule on that motion only after it became clear through correspondence with Mr. Edelson that his demands were unreasonable and that he was not likely to be satisfied unless Mr. Yanchunis removed himself from the case for no good cause. (Transcript 6/21/2017 at 3 (Defense Counsel: "As I think your Honor knows, the parties jointly had asked for [the motion for preliminary approval] to be held in abeyance in effect while there were some other discussions. I think we all -- both parties agree that it would be appropriate to no longer hold it in abeyance and to move forward with action in the motion . . . .").) In addition, Class Counsel continued to attempt to accommodate Mr. Edelson's merit based demands even after preliminary approval but to no avail. (Ahdoot Decl. ¶ 8.)

The remaining objections to class certification are similarly without merit. In addition to satisfying each of the prerequisites under Federal Rule 23(a), the Settlement Class in this case satisfies Fed. R. Civ. P. 23(b)(3) because: (i) the questions of law and fact common to members of the class predominate over any questions affecting only individuals; and (ii) the class action mechanism is superior to any other available methods to the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

Class action status is appropriate here, because regardless of the type of relief a Settlement Class Member may be entitled to receive, (either monetary, non-monetary, or both) the same legal question must be answered, and the same inquiry must be made—whether

Neiman Marcus put reasonable information technology security in place prior to the Incident, and complied with its statutory duties. The claims in this case are based upon uniform conduct regarding a single Cybersecurity Incident that affected all proposed Settlement Class Members in a similar fashion and for the same amount of time. Because these core issues involve uniform conduct common to all proposed Class Members, the predominance requirement under Rule 23(b)(3) is satisfied.

The "superiority" requirement under Rule 23(b)(3) is also satisfied because there is little interest or incentive for Settlement Class Members to individually control the prosecution of separate actions, each Settlement Class Member's claims are too small to justify the potential litigation costs to be incurred, and the cost of individually litigating such cases against Neiman Marcus would easily exceed the value of any relief that could be obtained by any one Class Member. The Settlement Class's claims therefore satisfy Rule 23(b)(3)'s requirements, and all objections to certification should be overruled.

## VI.     CONCLUSION

None of the objections to the Settlement are sound. Plaintiffs and Class Counsel respectfully submit that the Settlement is an excellent outcome for a class that faced numerous risks had the case proceeded to class certification and to trial. The Settlement is fair and should be approved.


Dated: October 19, 2017                              Respectfully submitted,

                                                                    */s/ Tina Wolfson*
                                                                    Tina Wolfson
                                                                    *twolfson@ahdootwolfson.com*
                                                                    **AHDOOT & WOLFSON, PC**
                                                                    1016 Palm Avenue
                                                                    West Hollywood, CA 90069

25

Tel: 310-474-9111; Fax: 310-474-8585

*Class Counsel*

John A. Yanchunis
*jyanchunis@forthepeople.com*
**MORGAN & MORGAN**
**COMPLEX LITIGATION DEPARTMENT**
201 North Franklin Street, 7th Floor
Tampa, FL 33602
Tel: 813-275-5272; Fax: 813-226-5402

*Class Counsel*

Joseph J. Siprut
*jsiprut@siprut.com*
**SIPRUT PC**
17 North State Street, Suite 1600
Chicago, Illinois 60602
Tel: 312-236-0000; Fax: 312-878-1342

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on October 19, 2017, I caused the foregoing to be electronically filed with the Clerk of the Court in the United States District Court for the Northern District of Illinois by using the CM/ECF system, which served copies on all interested parties registered for electronic service.

*/s/ Tina Wolfson*
Tina Wolfson