IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HILARY REMIJAS, MELISSA FRANK, DEBBIE FARNOUSH, and JOANNE KAO, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE NEIMAN MARCUS GROUP, LLC, a Delaware limited liability company, <br><br> Defendant. | 1:14-cv-01735 <br><br> Judge Samuel Der-Yeghiayan |

## **DECLARATION OF ROBERT AHDOOT**

I, Robert Ahdoot, declare as follows:

1. I am an attorney licensed to practice in all court in the State of California. I am a founding member of the law firm of Ahdoot & Wolfson, PC ("AW"). I submit this declaration in support of Plaintiffs' Reply in Support of Final Approval of Class Action Settlement, Attorneys' Fees Costs, and Class Representative Service Awards. The matters stated herein are true of my own knowledge or, where indicated, I am informed and believe they are true. If called upon as a witness, I could and would competently testify as follows.

2. Plaintiffs, through their counsel, conducted an examination, investigation, and evaluation of the relevant law, facts, and allegations to assess the merits of the claims and potential claims to determine the strength of liability, potential remedies, and all defenses thereto.

1

3. As part of the investigation described above, Plaintiffs obtained verified information from Defendant concerning the Incident, which included the following facts:

    a. The time period when the Malware operated was between July 16, 2013 and October 30, 2013 (the "Malware Period").

    b. The Malware operated in certain Neiman Marcus stores, but never operated in other Neiman Marcus stores.

    c. As to those stores where the Malware did operate, it operated only on certain dates and this varied from store to store.

    d. Often, the Malware operated only during part of the time that each store was open for business.

    e. The times when the Malware operated varied day to day within each individual store and among the stores where the Malware operated.

    f. During the Malware Period, approximately 2,187,773 different payment card accounts were used at Neiman Marcus stores. Out of these approximately 2,187,773 different payment card accounts, only approximately 370,385 payment card accounts were used at a Neiman Marcus store during the Malware Period on a date and at a time that the Malware was operating in that store ("Eligible Claimants," within the meaning of the Settlement Agreement). The remaining approximately 1,817,388 payment card accounts were not exposed to the Malware at any time and, according to Neiman Marcus, could not have been compromised as a result of the Cybersecurity Incident.

    g. Neiman Marcus's records contain name and contact information for approximately 164,861 of the Eligible Claimants. Defendant further states that its records

contain neither name nor contact information for the cardholders of the remaining Eligible Claimants.

        h.     Because Defendant does not possess the full name and billing addresses of all of the payment cards used at a time and place that Malware capable of collecting payment card was operating, Defendant requires the information called for on the claim form in order to ascertain whether a particular claimant is an Eligible Claimant (that is, used his or her card at an affected Neiman Marcus store when the Malware was functioning).

4.     Neiman Marcus provide several possible explanations as to why their cybersecurity measures were sufficient. According to Neiman Marcus, no government regulator, bank, or credit card brand has (i) found that its security systems were unreasonable, (ii) informed Neiman Marcus that it should be held liable for the Incident, or (iii) imposed any penalty or assessment on Neiman Marcus related to the Incident. Neiman Marcus also provided information to the effect that it has not made any payments to or entered into any agreement with any governmental regulator, bank, or credit card brand as a result of or related to the Incident.

5.     On March 27, 2017, Mr. Edelson first emailed this firm regarding the present action. In that email, *inter alia*, Mr. Edelson accused our co-counsel, John Yanchunis, of being "unresponsive in a different matter."

6.     I thoroughly analyzed and evaluated all of Mr. Edelson's concerns and made every effort to respond to each of Mr. Edelson's questions and inquiries fully and in good faith. In this regard, on May 26, 2017, I sent Mr. Edelson a lengthy email responding to his various inquiries. Mr. Edelson's objections at that time did not align with his current briefing.

7.     More correspondence followed and, on June 13, 2017, Mr. Edelson accused Mr. Yanchunis of having a "conflict" and accused him, without substantiation, of "being unwilling to

perform his basic duties." In the same correspondence, Mr. Edelson proposed four amendments to the Settlement, only two of which related to the Settlement's merits; the remaining amendments called for removal of Mr. Yanchunis and slashing Class Counsel's fee request. Mr. Edelson's prior complaints in this correspondence do not align with his current briefing.

8. Following the Court's order preliminarily approving the Settlement, we continued to attempt to accommodate Mr. Edelson's merit-based demands, but to no avail.

I declare under penalty of perjury under the laws of California and of the United States that the foregoing is true and correct. Executed this 19th day of October, 2017 in West Hollywood, California.

                                                                                            Robert Ahdoot