**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| |
|---|
| HILARY REMIJAS and JOANNE KAO, individually and on behalf of all others similarly situated, |
| Plaintiffs, |
| v. |
| THE NEIMAN MARCUS GROUP, LLC, a Delaware limited liability company, |
| Defendant. |

Case No. 1:14-cv-01735

Judge Sharon Johnson Coleman

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR**

**PRELIMINARY APPROVAL OF REVISED CLASS ACTION SETTLEMENT AND**

**CERTIFICATION OF SETTLEMENT CLASS**

i

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................... 1

II.     SUMMARY OF LITIGATION, INVESTIGATION,
        AND SETTLEMENT ................................................................................ 4

        A.      Procedural History Preceding the Prior Settlement ............. 4

        B.      The Prior Settlement and Revised Settlement ...................... 6

        C.      Terms of the Proposed Revised Settlement ......................... 9

                i.      Monetary Relief ....................................................... 9

                ii.     The Claims Process ................................................ 10

                iii.    Dissemination of Notice to the Class .................... 13

                iv.     Service Awards to Class Representatives .............. 15

                v.      Attorneys' Fees and Expenses ............................... 16

                vi.     Release Provisions ................................................. 16

                vii.    Opt-Out Procedure and Opportunity to Object ....... 16

III.    THE REVISED SETTLEMENT IS DESIGNED TO ADDRESS
        THE COURT'S REASONS FOR REJECTING THE PRIOR
        SETTLEMENT ...................................................................................... 17

IV.     THE REVISED SETTLEMENT MEETS THE STANDARDS FOR
        PRELIMINARY APPROVAL ............................................................... 19

        A.      The Strength of Settlement Class Representatives' Case Is
                Well-Balanced Against the Amount Offered In the
                Settlement, Which Is More Generous Than Comparable
                Settlements ...................................................................... 21

        B.      The Complexity, Length, and Expense of Continued
                Litigation Favors Settlement ............................................. 24

        C.      Settlement Class Representatives Support the Settlement .. 25

        D.      The Settlement Is the Product of Serious, Informed, Non-
                Collusive Negotiations ...................................................... 25

        E.      The Parties Engaged in Significant Motion Practice and
                Informal Discovery ........................................................... 26

V.      CLASS ACTION TREATMENT IS APPROPRIATE ............................ 27

        A.      The Class to Be Certified for Settlement Purposes ............ 27

B.     This Action Satisfies the Requirements of Rule 23(a) ....... 28

       i.       The Class is Numerous ......................................... 28

       ii.      The Action Presents Common Questions ............... 28

       iii.     Plaintiffs' Claims Are Typical .............................. 29

       iv.     Plaintiffs and Their Counsel Will Fairly and Adequately Protect the Interests of the Class ........ 30

C.     This Action Satisfies the Requirements of 23(b)(3) ........... 31

       i.       Common Questions of Law and Fact Predominate 32

       ii.      A Class Action Is Superior ................................... 32

D.     Plaintiffs' Counsel Should Be Appointed Class Counsel Under Rule 23(g) .............................................................. 33

E.     The Proposed Class Notice Is Adequate ........................... 33

VI.    CONCLUSION ..................................................................... 35

## TABLE OF AUTHORITIES

### CASES

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................................ 27, 28

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S.Ct. 1184 (2013) ............................ 32

*Butler v. Am. Cable & Tel., LLC*, Case No. 09 CV 5536, 2011 WL 2708399 (N.D. Ill. Jul. 12, 2011) ................................................................................................................................. 20

*Carson v. American Brands, Inc.*, 450 U.S. 79 (1981) ................................................................. 20

*Chau v. Neiman Marcus Group, Ltd, Inc.*, No. 14-cv-597 (S.D. Cal. filed Mar. 14, 2014) ........... 4

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ....................................................................... 22

*Culver v. City of Milwaukee*, 277 F.3d 908 (7th Cir. 2002) ........................................................ 31

*De La Fuente v. Stokely-VanCamp, Inc.*, 713 F.2d 225 (7th Cir. 1983) ....................................... 29

*Ebersohl v. Bechtel Corp.*, 2010 WL 2266736 (S.D. Ill. June 7, 2010) ......................................... 30

*EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985) ...................................... 20, 21

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014) ................................................................. 32

*Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998) ....................................................................... 25

*Frank v. Neiman Marcus Group*, No. 14-cv-00233-ADS-GRB (E.D.N.Y. filed Jan. 13, 2014) ..... 4

*Garner v. Healy*, 184 F.R.D. 598 (N.D. Ill. 1999) ..................................................................... 29

*Gautreaux v. Pierce*, 690 F.2d 616 (7th Cir.1982) ............................................................... 19, 22

*General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074 (7th Cir. 1997) ............. 24

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330 (N.D. Ill. 2010) ..... passim

*In re Bromine Antitrust Litig*, 203 F.R.D. 403 (S.D. Ind. 2001) .................................................. 20

*In re Cendant Corp. Secs. Litig.*, 109 F. Supp. 2d 235 (D.N.J. 2000) .......................................... 22

*In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp. 659 (D. Minn. 1974) .......................................................................................................................... 22

*In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000) ............................... 25

*In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002) ........................ 25

*In re Nat'l Collegiate Athletic Assoc. Student-Athlete Concussion Injury Litig.*, 314 F.R.D. 580 (N.D. Ill. 2016)..................................................................................................................20

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996) ...................................................... 19, 20, 21

*Mullane v. Central Hanover Trust*, 339 U.S. 306 (1950) ...................................... 34, 35

*Muro v. Target Corp.*, 580 F.3d 485 (7th Cir. 2009) ................................................29

*Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010)...........................................32

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985).............................................33

*Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688 (7th Cir. 2015)........................5

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992) ..........................................29, 32

*Shields v. The Neiman Marcus Group, LLC*, No. 14-cv-752 (S.D. Cal. filed Apr. 1, 2014) ..........4

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014) ....................................29

*Swanson v. Am. Consumer Indus., Inc.,* 415 F.2d 1326 (7th Cir.1969).......................28

*Wade v. Goldschmidt*, 673 F.2d 182 (7th Cir. 1982) ................................................30

*Wong v. Accretive Health, Inc.*, 773 F.3d 859 (7th Cir. 2014) ....................21, 22, 24, 25

*Wong v. The Neiman Marcus Group, LLC*, No. 2:14-cv-00703-SJO-JC (C.D. Cal. filed Jan. 29, 2014).........................................................................................................4

## STATUTES

28 U.S.C. §1715................................................................................................15

## RULES

Fed. R. Civ. P. 23(b) .............................................................................. 31, 32, 33

Fed. R. Civ. P. 23(c)....................................................................................34

Fed. R. Civ. P. 23(e) .............................................................................. 19, 21

Rule 23(g)(1)..............................................................................................33

## TREATISES

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure (2d ed. 1986).......................................................................................................32

Manual for Complex Litigation § 21.632 (4th ed. Supp. 2010) ..................................19

## I.    INTRODUCTION

Plaintiffs Hilary Remijas and Joanne Kao (collectively, "Plaintiffs" or "Settlement Class Representatives") brought this lawsuit as a putative class action on behalf of consumers whose credit or debit card information ("Payment Card Information") was potentially compromised in a 2013 cybersecurity incident (the "Cybersecurity Incident" or "the Incident") that affected certain stores owned by Defendant The Neiman Marcus Group LLC ("Neiman Marcus" or "Defendant") between July 16, 2013 and October 30, 2013 (the "Malware Period").  Plaintiffs assert claims for negligence, breach of implied contract, unjust enrichment, violation of state unfair business practices statutes, invasion of privacy, and violation of state data breach acts.

As the Court is aware, this case has a long history involving three presiding judges, an appeal to the Seventh Circuit, extended mediation before Judge Wayne R. Andersen (Ret.), and a prior settlement agreement about which notice was provided to the settlement class before the Court ultimately denied final approval of that proposed settlement.  (Dkt. 194.)  Plaintiffs and Defendant carefully considered the Court's written opinion denying final approval of the prior settlement, and believe that the Revised Settlement (filed as Exhibit 1 hereto) addresses the issues that led the Court to deny final approval.  In particular, the Revised Settlement:

- Narrows the settlement class by removing from it those individuals who did not shop at Defendant's stores during the Malware Period, which the parties believe resolves the "fundamental conflict" in the prior settlement identified by the Court between class members who shopped during the Malware Period and those who only shopped after the Malware Period ended (Dkt. 194 at 8);

- Provides the same relief as the prior settlement to settlement class members who used a payment card at one of Defendant's stores during a time when the malware was actually operating ("Group 1 Class Members") ;

- Newly provides monetary relief to class members who shopped at one of Defendant's stores during the Malware Period, but not at a store during a time

1

when that the malware was actually operating ("Group 2 Class Members"), to address the Court's concern that the non-monetary relief does not benefit the class (*id.* at 8–9);

- Is supported by a class representative who is a Group 1 Class Member (Plaintiff Remijas) and one who is a Group 2 Class Member (Plaintiff Kao), thus ensuring that both groups' interests were fully represented in the negotiations leading to the Revised Settlement and confirming that the Revised Settlement is fair to both groups, to address the Court's concern as to whether the class representatives and class counsel could adequately represent both groups (*id.* at 6–7);

- Effectively doubles the notice efforts provided to settlement class members by providing an entirely new round of notice, with a substantially higher reach percentage and frequency than the notice program in the prior settlement, while honoring claims filed in response to the notice of the prior settlement, which the parties expect will substantially increase the claims rate, to address the Court's concerns about the prior notice effort (*id.* at 10);

- Provides for the creation of a web page where potential claimants can input basic information and receive instant feedback stating whether that information is consistent with information associated with Group 1 Class Members, Group 2 Class Members, or neither, and thus provide a preliminary (though not dispositive) indication as to whether the individual is entitled to monetary benefits under the Revised Settlement and, if so, the amount of such benefits, to address the Court's concerns about requiring class members to decide whether to file a claim or exclude themselves before they know how they are situated (*id.* at 6); and

- Protects the interests of persons who were members of the prior settlement class but who are not included in the Revised Settlement class by providing them with notice (equivalent to notice provided to class members) informing them that they are not included in the Revised Settlement, and by tolling their individual claims while such notice is provided.

The Revised Settlement is the product of extensive arms' length negotiations between experienced and informed counsel, including multiple mediation sessions with the Honorable Judge Wayne R. Andersen (Ret.) of JAMS, a retired federal district judge with substantial experience in class action litigation and settlement, as well as numerous telephonic conferences between counsel, both with and without the facilitation of the Honorable Judge Andersen. The Revised Settlement Agreement is fair, reasonable, and adequate given the claims, the alleged harm, and the parties' respective litigation risks. It is "within the range of possible approval"

and, thus, merits preliminary approval. *E.g.*, *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 346 (N.D. Ill. 2010).

If approved, this Revised Settlement will result in a Settlement Fund of up to $1.6 million. (Revised Settlement at ¶ 49.) The Settlement Fund will be used to pay (i) eligible claimants who submit valid and timely Claims, (ii) Service Awards, (iii) Attorneys' Fees and Expenses, (iv) any taxes due on the Settlement Payments Fund, and (v) the Settlement Administration Charges. (*Id.* ¶¶ 50-51.) The Settlement also provides for an effective notice program, featuring direct notice to all Revised Settlement class members for whom Neiman Marcus has contact information, as well as internet advertising and publication notice, all of which are well-tailored to disseminate the best notice practicable. (*Id.* ¶¶ 58-65.) In exchange for these benefits, Revised Settlement class members will provide a general release to Neiman Marcus for all claims relating to the Cybersecurity Incident. (*Id.* at ¶¶ 73-76.)

For the reasons set forth above and explained in more detail below, Settlement Class Representatives respectfully request that the Court enter an Order, substantially in the form attached as Exhibit D to the Revised Settlement Agreement: (1) preliminarily approving the terms of the Revsied Settlement as within the range of fair, adequate, and reasonable; (2) provisionally certifying the Revised Settlement class pursuant to Federal Rule of Civil Procedure 23(b)(3) and (e) for settlement purposes; (3) approving the notice program set forth in the Revised Settlement Agreement and approving the form and content of the notice; (4) approving the procedures set forth in the Revised Settlement Agreement for settlement class members to exclude themselves from the settlement class or to object to the Revised Settlement; (5) staying all proceedings in this matter unrelated to the Revised Settlement pending final approval; (6) staying and/or enjoining, pending final approval of the Revised Settlement, any actions brought by settlement class members concerning a released claim; and (7) scheduling a fairness hearing

for a time and date convenient for the Court.

## II.    SUMMARY OF LITIGATION, INVESTIGATION, AND SETTLEMENT

### A.    Procedural History Preceding the Prior Settlement

In January 2014, Neiman Marcus announced that it experienced the Cybersecurity Incident, which potentially compromised the credit or debit card information of some of its customers who used a credit card or debit card at certain store locations.  In its notification letter to customers disclosing the Incident, Defendant offered anyone who made a payment card purchase at Neiman Marcus between January 2013 and January 2014 one year of free credit monitoring.  Before initiating this litigation, plaintiffs' counsel investigated the underlying facts, including by analyzing Defendant's public statements concerning the Cybersecurity Incident.

On March 12, 2014, Plaintiff Remijas filed her original Complaint in this action.  (Dkt. 1.) Prior to this time, other complaints related to the Incident already had been filed against Neiman Marcus, including *Frank v. Neiman Marcus Group*, No. 14-cv-00233-ADS-GRB (E.D.N.Y. filed Jan. 13, 2014), and *Wong v. The Neiman Marcus Group, LLC*, No. 2:14-cv-00703-SJO-JC (C.D. Cal. filed Jan. 29, 2014).  Similar actions followed, including *Chau v. Neiman Marcus Group, Ltd, Inc.*, No. 14-cv-597 (S.D. Cal. filed Mar. 14, 2014) and *Shields v. The Neiman Marcus Group, LLC*, No. 14-cv-752 (S.D. Cal. filed Apr. 1, 2014).  After these actions were filed, plaintiffs' counsel in all the actions related to the Incident met and conferred in order to self-organize the cases for the sake of judicial economy and efficiency.  (Declaration of Tina Wolfson ("Wolfson Decl.") ¶ 7.)  Plaintiffs agreed to consolidate and proceed with their cases in the Northern District of Illinois.  (*Id.* ¶ 8.)  Ms. Remijas moved for leave to amend the complaint in her action to include additional plaintiffs and their claims (Dkt. 22), which the Court granted on June 2, 2014.  (Dkt. 26.)  Plaintiffs filed ar First Amended Complaint on June 6, 2014.  (Dkt. 27.)

After filing, plaintiffs' counsel's investigation continued.  In this regard, plaintiffs' counsel retained and consulted with experts on data security issues, who helped analyze publicly available information concerning the Incident.  Plaintiffs' counsel fought for early discovery, filing, in the *Frank* case cited above, a motion to expedite discovery and, later, a motion to compel Defendant to participate in a Rule 26 conference so that regular discovery could proceed. (*Frank*, Dkt. Nos. 5, 29.)  Counsel to Plaintiff Frank also filed a motion for a protective order seeking to curtail Defendant's communications to the class.  (*Frank*, Dkt. No. 4.)  The *Frank* court did not rule upon those motions before the cases were effectively consolidated in this Court.

On July 2, 2014, in this action, Defendant moved to dismiss Plaintiffs' First Amended Complaint for lack of standing under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6).  (Dkt. 35.)  Plaintiffs opposed but, on September 16, 2014, the Court granted Defendant's motion to dismiss under Rule 12(b)(1) and dismissed the action on standing grounds. (Dkt. 49.)

Plaintiffs appealed and, after oral argument, this Court's dismissal was reversed by the Seventh Circuit.  *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688 (7th Cir. 2015).  The Seventh Circuit held that Plaintiffs adequately alleged standing under Article III of the U.S. Constitution.  (Dkt. 66 at 17.)  Following the Seventh Circuit's reversal and denial of Neiman Marcus's petition for rehearing en banc, Defendant renewed its Motion to Dismiss under Rule 12(b)(6) for failure to state a claim.  (Dkt. 75.)  On January 13, 2016, the Court denied Defendant's Motion to Dismiss, stating that "[d]ismissal is not appropriate at this time."  (Dkt. 84.)  On October 26, 2016, the Court issued an Executive Committee Order, transferring the action from the Honorable James B. Zagel to the Honorable Samuel Der-Yeghiayan.  (Dkt. 121.)

**B.     The Prior Settlement and Revised Settlement**

In December 2015, the parties began discussing possible settlement, which resulted in a long series of arms' length negotiations, including mediation and numerous post-mediation discussions between counsel and the mediator.  (Wolfson Decl. ¶ 13.)  In connection with the mediation, Plaintiffs requested information from NMG.  NMG provided information sufficient to permit Plaintiffs and Class Counsel to evaluate the claims and potential defenses and to meaningfully conduct informed settlement discussions.  (*Id*. ¶ 16.)  Before entering into the prior settlement agreement, Plaintiffs' counsel conducted a thorough examination, investigation, and evaluation of the relevant law and facts to assess the merits of the claims and defenses.  (*Id*. ¶ 18.)

The Honorable Judge Wayne R. Andersen (Ret.) of JAMS served as the mediator in two formal all-day mediation sessions, taking place on December 22, 2015 and on March 2, 2016, as well as numerous subsequent telephonic conversations and negotiations.  (*Id*. ¶ 14.)  Judge Andersen is a highly respected and experienced class action mediator, who joined JAMS following more than twenty-six years on the bench, spending the most recent nineteen years as a U.S. District Judge for the Northern District of Illinois.  (*Id*. ¶ 15.)  During the settlement negotiations, Plaintiffs obtained substantial information from Defendant concerning the Incident.  (*Id*. ¶ 16.)

Following these discussions, and extensive and detailed negotiations over the details of the prior settlement, Plaintiffs moved for preliminary approval of the prior settlement on March 17, 2017.  (Dkt. 144.)  In brief, the prior settlement included a settlement class of all individuals who held a payment card used to make a purchase at any Neiman Marcus store (excluding restaurant and online purchases) between July 16, 2013 and January 10, 2014 (that is, all Group 1 Class Members, Group 2 Class Members, as well as individuals whose cards were used only after the malware ceased operation on October 30, 2013).  Group 1 Class Members filing valid and

timely claims could recover up to $100; other class members were not eligible for a monetary recovery.

Judge Der-Yeghiayan granted preliminary approval of the prior settlement and preliminarily certified the settlement class on June 21, 2017 (Dkt. 154). The Settlement Administrator then provided the notice ordered by the Court. Objections were filed to the prior settlement (Dkt. 164, 165), on which the parties and objectors submitted briefing. Judge Der-Yeghiayan held a fairness hearing on October 26, 2017. (Dkt. 183.) On January 16, 2018, in light of Judge Der-Yeghiayan's decision to retire from the Court as of February 17, 2018, this action was reassigned to Judge Sharon Johnson Coleman. (Dkt. 188.)

On September 17, 2018, the Court issued an opinion denying final certification of the prior settlement and decertifying the settlement class. (Dkt. 194.) The Court cited one principal reason for its decision: that there was a "fundamental" and "inevitable conflict" between class members who shopped during the Malware Period and those who did not (*id.* at 8–9). The Court noted that it saw "no adequacy problem as between the recovering and non-recovering class members [*i.e.*, Group 1 Class Members and Group 2 Class Members] who made their purchases within the malware period." (*Id.* at 7.) The Court did, however, note several other concerns about the prior settlement, including that:

- No settlement class representative clearly represented class members whose cards were used only after the Malware Period ended (*id.* at 8 n.3);

- It offered no meaningful relief to class members whose credit card information was not compromised (Group 2 Class Members), yet did not inform class members whether they would recover monetarily from the settlement (*i.e.*, whether they were a Group 1 Class Member) until after they filed claims (*id.* at 6, 8);

- A representation in Plaintiffs' preliminary approval motion that all class members would be given direct notice was incorrect because direct notice was only given to all class members for whom Neiman Marcus had contact

information;[1] and

- The Court viewed the number of claims filed—16,447 out of a class of approximately 2.2 million—as low, suggesting that further notice efforts were warranted. (*Id.* at 10.)

Following the Court's rejection of the prior settlement, the parties began to negotiate a revised settlement that would address the concerns raised by the Court. The parties participated in another all-day mediation with Judge Andersen on January 23, 2019, which was also attended by counsel to one of the objectors to the prior settlement. The parties reached agreement as to all material terms of the Revised Settlement on June 12, 2019 and thereafter continued to negotiate with that objector's counsel, including in communications through Judge Andersen. (Wolfson Decl. ¶¶ 24-26.) After those negotiations failed to bear fruit, the parties determined to seek approval of the Revised Settlement without the objector's counsel's agreement.

The parties designed the Revised Settlement to address each of the Court's concerns with the prior settlement, including by:

- Narrowing the settlement class to exclude those whose cards were not used at one of Defendant's stores during the Malware Period, thus resolving the "fundamental" conflict identified by the Court and eliminating the need for a settlement class representative who shopped exclusively outside the Malware Period;

- Making all settlement class members eligible for significant monetary relief, including those class members whose cards were not used at a store when the malware was actually operating; and

- Effectively doubling notice efforts by providing an entirely new round of

---

[1] Plaintiffs explained that this statement was the result of an error, which the Court noted that it had no reason to doubt. (*Id.* at 10.) Indeed, other contemporaneously-filed documents clearly indicated that direct notice was given to all class members for whom Neiman Marcus had contact information (*see, e.g.*, Dkt. No. 145-1 at ¶ 62 ("The Settlement Administrator shall send the Summary Notice via E-Mail to all Settlement Class Members for whom Neiman Marcus can ascertain an e-mail address from its records with reasonable effort."); Dkt. No. 145-9 at ¶ 7 ("The notice program . . . provides individual notice to all Class Members who can be identified through reasonable effort.").

notice to settlement class members, while still honoring claims filed under the previous settlement.

Plaintiffs have filed a Second Amended Complaint, with Defendant's consent, that narrows the settlement class definition and removes as proposed class representatives two individuals (Melissa Frank and Debbie Farnoush) who no longer are class members under the narrowed settlement class definition. The Second Amended Complaint also removes allegations that the malware continued to operate after October 30, 2013, which information gleaned since the original complaint was filed confirms to be true. (Dkt. 213.)

### C.    Terms of the Proposed Revised Settlement

#### i.    Monetary Relief

Defendant will pay up to $1.6 million to create a settlement fund. (Revised Settlement ¶ 49.) Up to $400,000 of the settlement fund will be used to pay charges and costs invoiced or charged by the settlement administrator arising from implementation of the notice program and administration of the Settlement, which the parties expect will amount to $400,000. (*Id*. ¶ 50.) In the unlikely event that settlement administration charges are less than $400,000, Defendant would retain the difference. (*Id*. ¶ 50(b).) If settlement administration charges exceed $400,000, such excess charges will be paid using funds set aside for payments to class members that have not been claimed and, if such funds are not sufficient to pay those excess charges, then Defendant will pay the excess charges not covered by unclaimed funds. (*Id*. ¶ 50(c).)

The remaining $1.2 million of the settlement fund will be used to pay eligible claimants who submit valid and timely claims, any taxes due, any service awards to Plaintiffs and attorneys' fees and expenses ordered by the court. (*Id*. ¶ 51.) If such payments do not exhaust this portion of the settlement fund, then the remaining funds would be used to pay any excess notice and administration costs, to make supplemental distributions to certain class members, and

to make a charitable contribution. (*Id* ¶ 53(c).) Each Group 1 Class Member who submits a valid Claim will receive up to $100, and each Group 2 Class Member who submits a valid Claim will receive up to $25. (*Id*. ¶ 53(b).)

In addition, the Settlement provides for valuable changes to Defendant's business practices, designed to ensure that similar incidents do not re-occur in the future. (*Id*. ¶ 52.)

### ii. The Claims Process

The parties have developed a streamlined and convenient method to determine whether a claimant has a valid claim. Claimants need only answer two questions to submit a claim:

**Question One.** A claimant must state whether his or her credit or debit card was used at a Neiman Marcus store between July 16, 2013 and October 30, 2013. (*Id*. Ex. A.) Answering this question in the affirmative establishes that the claimant is a member of the settlement class. Claimants who answer in the negative are not class members.

**Question Two.** Claimants who answer the first question in the affirmative must provide at least one of two additional sets of information to submit a valid claim. First, claimants may provide (i) the last four digits of the payment card used at a Neiman Marcus store between July 16, 2013 and October 30, 2013, and (ii) the dates and locations that that card was used at a Neiman Marcus store between these dates. Second, claimants may provide the full name and billing address associated with the payment card. This information is necessary to determine whether the payment card was actually used at a time and place that malware capable of collecting payment card data was operational (and therefore, determine whether the claimant is a Group 1 Class Member or Group 2 Class Member). Because Neiman Marcus does not possess the full name and billing address of all of the payment cards used during the Malware Period, it is possible that claimants who submit only the name and billing address associated with their

payment card will have their claims denied due to a lack of information sufficient to determine whether or not that card was used during the Malware Period.  The Claim Form therefore clearly explains this possibility and explains that claimants may avoid it by submitting the last four digits of the payment card used at a Neiman Marcus store during the Malware Period, along with the dates and locations of such purchases.  If the information submitted by the claimant establishes that their card was actually used during the Malware Period, then they will be eligible to receive a monetary benefit; if it does not, they will not, because the claimant will not have established that he or she is a class member.  (*Id*. ¶ 40.)

Finally, Claimants must affirm that the information they provided is true, and that the claimant is the cardholder of the card identified in the response to Question Two.  (*Id*. Ex. A.)

This claim validation procedure is convenient for claimants.  It is possible for claimants to submit a valid claim using only information from their memory, such as the name and billing address of a potentially-affected payment card.  All of the information requested is easily ascertainable from billing records that claimants may have in their files or be able to quickly obtain from the websites maintained by the issuers of their payment cards.  Unlike in other data breach class action settlements, claimants need not collect or submit any documents to the settlement administrator in order to obtain a monetary benefit, which would substantially increase the burden on potential claimants.

In order to ensure that the claims rate is as high as possible, and to maximize the value delivered to the settlement class, the parties have agreed that claims submitted under the prior settlement will be treated as though submitted under the Revised Settlement; no further action by

such claimants will be required.[2]

Each class member who submits a valid and timely claim—including those who submitted valid and timely claims under the prior settlement—are eligible to receive a monetary payment. The Settlement Payments Fund will first be used to pay any taxes due on the settlement fund, any service awards to Plaintiffs ordered by the Court, and any attorneys' fees and expenses awarded by the Court. Once these payments have been made, the Settlement Administrator will pay an amount of up to $100 to each Group 1 Class Member who submitted a valid and timely claim (the same relief offered to them under the prior settlement) and up to $25 to each Group 2 Class Member who submitted a valid and timely claim. In the event that the aggregate value of valid and timely claims exceeds the amount remaining in the Settlement Payments Fund after taxes, service awards, and attorneys' fees and expenses are paid, then the cash payment provided to each class member who submitted a valid and timely claim will be reduced on a *pro rata* basis,[3] and such class members will be paid a *pro rata* amount that exhausts the Settlement Payments Fund.

In the event that there are funds left in the Settlement Payments Fund after all class members who submitted a valid and timely claim have been paid $100, then the remaining funds

---

[2] If any settlement class member who submitted a claim under the prior settlement files an opt-out notice, then they will be treated as having opted out of the Revised Settlement. (Revised Settlement Agreement ¶ 69.) Their prior claim will not be paid, and they will not be subject to the release set forth in the Revised Settlement. (*Id.*)

[3] Specifically, should a *pro rata* reduction be necessary, the amount payable to Group 2 Class Members will be reduced first, with a minimum of $5.00, followed by reduction of the amount payable to Group 1 Class Members, with a minimum of $10.00, followed by a further reduction of the amount payable to Group 2 Class Members and then a further reduction of the amount payable to Group 1 Class Members. (*Id.* ¶ 53(b).) The parties designed this structure to ensure, to the extent possible, that all settlement class members receive a cash payment regardless of the number of valid and timely claims filed, while ensuring that Group 1 Class Members (who may have actually had their payment card information affected) do not receive relief inferior to Group 2 Class Members (whose payment card information was not affected).

will be distributed as follows: First, such funds will be used to pay any costs of providing class notice and administering the Revised Settlement in excess of $400,000. Second, if there are funds remaining in the Settlement Payments Fund after payment of any such excess notice and administration costs, the Settlement Administrator will estimate the cost of sending a check to each class member who could have submitted a valid claim but did not for whom Defendant has a mailing address, and subtract that amount from the remaining funds. After subtracting this cost, any remaining amounts will be distributed to such class members on a *pro rata* basis, provided that each such distribution would exceed $5.00. Third, if there are funds remaining in the Settlement Payments Fund after any such distribution, such remaining funds shall be donated to a charitable organization chosen jointly by the Parties. (*Id.* ¶ 53.)

The Parties have thus designed a process to distribute the Settlement Payments Fund that will provide substantial monetary benefits to all class members who submit valid and timely claims and may provide substantial monetary benefits to class members who could have submitted valid and timely claims, but did not.

### iii. Dissemination of Notice to the Class

Settlement class members for whom Neiman Marcus can ascertain an e-mail or mailing address from its records with reasonable effort will directly receive the Summary Notice (*Id.*, Ex. F) by e-mail, and, if a valid e-mail address is not available, by U.S. Mail to the extent such information is available in Neiman Marcus's records. (*Id.* ¶ 65.)

The Settlement Administrator also will promulgate publication notice by purchasing both print and online advertisements. The publication notice program for the Revised Settlement is designed to have a higher reach percentage (79.18%, with an average frequency of 3.00 times) (*id.*, Ex. H ¶ 10) than the publication notice program achieved for the prior settlement (71.48%, with an average frequency of 2.95 times) (Dkt. 167-2 ¶ 5). This substantial increase in the notice

program's reach was intended to address the Court's request that the parties "consider whether further attempts at notice are warranted in this case." (Dkt. 194 at 10.) These reach percentages are calculated based on the publication notice plan alone; they do not include the direct notice of the Revised Settlement that will be given to individuals for whom Neiman Marcus has e-mail or mailing addresses, so the actual reach percentage will likely be well in excess of 80%.

Although individuals whose cards were used only after the Malware Period ended are not included in this settlement class, the parties have agreed that notice of the Revised Settlement will still be provided to these individuals using the same methods being used to provide notice to the revised settlement class members. The notice will inform these individuals that they are no longer part of a putative class action or settlement class, and that the statute of limitations on their individual claims will no longer be tolled, ensuring that they are not prejudiced by their exclusion from the revised settlement class.

The Court's opinion disapproving the prior settlement cited "[t]he refusal to inform class members of how they were situated until after they opted into the settlement" as a reason for that disapproval. (Dkt. 194 at 6.) The Parties have addressed this concern by directing the Settlement Administrator to create, on the Settlement Website, a page where potential class members may enter certain specific information (such as last name on, and the last four digits of the number of, their payment card that they believe was used at a Neiman Marcus store during the Malware Period), and receive instantaneous feedback about whether that information is consistent with information known about cards held by Group 1 Class Members (in which case, the submitter may be eligible to receive up to $100), Group 2 Class Members (in which case, the submitter may be eligible to receive up to $25), or neither (in which case, the submitter may not be a Revised Settlement class member and thus not entitled to benefits under the Revised Settlement). Use of this web site is in no way mandatory, and individuals are free to submit claims without

using it, but for those who wish to do so, it can provide a preliminary indication about whether the individual is a Revised Settlement class member, and if so, the amount of benefits to which he or she may be entitled.

In addition, the Long Form Notice (*id.*, Ex. C) will be made available on the Settlement Website (www.NMSettlement.com). The Settlement Administrator also will establish a toll-free telephone number through which settlement class members may ask questions or request a mailed copy of the Long Form Notice and Claim Form. (*Id.* ¶ 64.) The Summary Notice will refer settlement class members to the Settlement website, which will make available the Long Form Notice, Summary Notice, the Revised Settlement Agreement, any motion seeking final approval of the Settlement, any motion for an award of attorneys' fees and expenses or service awards to Plaintiffs, the Preliminary Approval Order, the Claim Form, the Second Amended Complaint, and other relevant Court documents that class counsel and Defendant agree to post or that the Court orders to be posted. (*Id.* ¶ 62.) Finally, Defendant will comply with the requirements of 28 U.S.C. §1715 ("CAFA"). *Id.* ¶ 55.

### iv. Service Awards to Class Representatives

Each of the Settlement Class Representatives took the initiative to commence this litigation, assisted in case development, stayed apprised throughout the litigation, and accepted risks and responsibilities individually and on behalf of others similarly situated. Therefore, subject to Court approval and in recognition of these efforts, the Revised Settlement Agreement allows each Settlement Class Representative to apply for a service award of up to two thousand five hundred dollars ($2,500), no later than 14 days prior to the Objection Deadline, to be paid out of the Settlement Fund. (Revised Settlement Agreement, ¶ 77.)

15

### v. Attorneys' Fees and Expenses

The Revised Settlement Agreement provides that Class Counsel will make their application for reasonable attorneys' fees, costs, and expenses at least 14 days before the Objection Deadline. (*Id.* ¶ 78.) Class counsel agree not to seek an award of attorneys' fees, costs, and expenses in excess of five hundred and thirty thousand dollars ($530,000). (*Id.*) This maximum amount is stated on the relevant notice forms. (*Id.* Exs. D, G.) Neiman Marcus reserves the right to object to Class Counsel's request for attorneys' fees, costs, and expenses. (*Id.* ¶ 78.)

### vi. Release Provisions

If the Court grants final approval to the Revised Settlement, settlement class members will automatically be deemed to have released Defendant of all claims, known or unknown, that relate to the Incident that were or could have been alleged in this action. (*Id.* ¶¶ 73-76.) The Released Claims do not include any claims arising from or relating to any conduct by Neiman Marcus after the date the Revised Settlement Agreement was executed. (*Id.* ¶ 74.)

### vii. Opt-Out Procedure and Opportunity to Object

Any settlement class member may request to be excluded from the Revised Settlement by sending a written request to the Settlement Administrator postmarked no later than the Opt-Out Deadline, as specified in the Notice. (*Id.* ¶ 66.) Valid requests must include information described in the Notice, including a statement that the person sending the request wishes to be excluded from the Class. (*Id.*)

Any settlement class member who does not request to be excluded may object to the Revised Settlement, class counsel's fee application, and/or the requests for service awards. (*Id.* ¶ 67.) To be considered, an objection must either be mailed to the Class Action Clerk or filed

with the Court, and must be in writing, personally signed by the objector, and include the information prescribed by the Notice.  (*Id.*)

### III.    THE REVISED SETTLEMENT IS DESIGNED TO ADDRESS THE COURT'S REASONS FOR REJECTING THE PRIOR SETTLEMENT

In negotiating the Revised Settlement, the parties sought to address the Court's expressed concerns with the prior settlement.

First, to address the "fundamental" conflict identified by the Court between class members whose payment cards were used during the Malware Period and those whose cards were not (Dkt. 194 at 8), the parties agreed to narrow the settlement class to exclude individuals whose cards were not used during the Malware Period, which had the effect of reducing the size of the settlement class by approximately half.  (Revised Settlement Agreement ¶ 40.) This change represented a significant concession on Defendant's part, since it was now agreeing to pay the same amount of money for a release from only half as many persons, some of whom (*e.g.*, Plaintiffs Farnoush and Frank) had sued Defendant.  The parties took care to avoid causing prejudice to individuals who were in the previous putative class but are no longer in the revised settlement class by (i) agreeing that such individuals would receive notice of the Revised Settlement according to the same procedures used to provide notice to Revised Settlement class members, which will inform them that they are no longer members of a putative class or settlement class, and by (ii) agreeing to stipulate that the statutes of limitations on their individual claims against Neiman Marcus are tolled under *American Pipe & Construction v. Utah*, 414 U.S. 538 (1974) and its progeny, and shall continue to be tolled until the deadline for the settlement administrator to provide notice to the Settlement class.  (*Id.* ¶ 68.)

Second, to address the Court's concern that class members whose cards were not used at a time and place the malware was operating (Group 2 Class Members) received only "lackluster non-monetary relief" under the prior settlement (Dkt. 194 at 8), the parties agreed that all members of the narrowed settlement class will be eligible for monetary relief—up to $100 for Group 1 Class Members (the same amount they stood to recover under the prior settlement) and

up to $25 for Group 2 Class Members, who were not eligible for a monetary recovery under the prior settlement.  (Revised Settlement Agreement ¶ 53(b).)

Third, to ensure that both Group 1 Class Members and Group 2 Class Members were represented by individual class representatives, and thus address the Court's concern that class members whose cards were used only after the Malware Period ended were not represented by class representatives under the prior settlement (Dkt. 194 at 7), the parties confirmed that Plaintiff Hilary Remijas is a Group 1 Class Member, and Plaintiff Joanne Kao is a Group 2 Class Member, and informed Plaintiffs Remijas and Kao of their respective statuses.  Both Plaintiff Remijas and Plaintiff Kao signed the Revised Settlement Agreement, and agree that it is fair, reasonable, and adequate for all class members.[4]

Fourth, to address any concerns the Court had about the notice provided to members of the previous class (Dkt. 194 at 10), the parties agreed not only that they would provide an entirely new round of notice to the Revised Settlement class, with a higher reach percentage and frequency than the publication notice provided for the prior settlement, but that they also would honor claims filed under the prior settlement.  Accordingly, if approved by the Court, the Revised Settlement notice effort will begin with 17,000 claims already filed (approximately 1.5% of the Settlement Class), with the number sure to rise as new notice is provided to Revised Settlement class members.  (Revised Settlement Ex. H ¶ 16.)  Although the claim rate is expected to rise, settlements with lower claims rates than that already achieved have been approved by courts in this district.  *See Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 223 (N.D. Ill. 2016) (approving class settlement with claims rate of approximately 1.08%).

Fifth, as discussed above, the parties agreed to create a web site where potential claimants could instantaneously input basic information and instantly receive feedback about whether the information submitted is consistent with cards held by Group 1 Class Members, Group 2 Class

---

[4] The Court's opinion rejecting the prior settlement noted that it saw "no adequacy problem as between the recovering and non-recovering class members who made their purchases within the malware period."  (Dkt. 194 at 7.)

Members, or neither.  While not dispositive, this website will give potential claimants a preliminary indication as to whether they may be eligible to receive benefits from this settlement, and the amount of such benefits, which will help individuals make informed choices about whether to file a claim or exclude themselves from the Revised Settlement.

All in all, the parties have designed the Revised Settlement to not only meet the standards for preliminary approval (as discussed below) but also to address the particular concerns raised by the Court in its opinion rejecting the prior settlement.  The parties believe that the Revised Settlement delivers better results for the settlement class, and is worthy of approval.

## IV.    THE REVISED SETTLEMENT MEETS THE STANDARDS FOR PRELIMINARY APPROVAL

Federal courts "naturally favor the settlement of class action litigation."  *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).  Any settlement of claims on a classwide basis requires: (i) the Court to preliminarily approve the proposed settlement; (ii) that members of the settlement class receive notice of the proposed settlement; and (iii) that the Court hold a final hearing at which it decides whether the proposed settlement is fair, reasonable, and adequate.  *See Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982); Manual for Complex Litigation § 21.632 (4th ed. Supp. 2010).

In considering a motion for preliminary approval of class action settlement, the Court must determine whether the settlement is within the "range of possible approval," *i.e.*, within the range of what might be found fair, reasonable, and adequate.  *In re AT&T Mobility Wireless*, 270 F.R.D. at  346; *Gautreaux*, 690 F.2d at 621 n.3.  And Rule 23 requires the Court to give notice of the Revised Settlement if the Court is likely to approve it and certify the Settlement Class for purposes of judgment.  Fed. R. Civ. P. 23(e)(1)(B).

However, at the time of preliminary approval, the Court is not required to make a final determination as to the fairness of the Revised Settlement.  *In re AT&T Mobility Wireless*, 270

F.R.D. at 346. As a result, Courts have noted that the standard for preliminary approval is less rigorous than the analysis at final approval. *See, e.g.*, *In re Nat'l Collegiate Athletic Assoc. Student-Athlete Concussion Injury Litig.*, 314 F.R.D. 580, 588 (N.D. Ill. 2016) ("At this initial stage, the court is not 'resolving the merits of the controversy or making a precise determination of the parties' respective legal rights.' . . . This is why some courts at this stage perform a summary version of the exhaustive final fairness inquiry.") (quoting *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir.1985)); *see also In re Bromine Antitrust Litig.*, 203 F.R.D. 403, 416 (S.D. Ind. 2001) (the "bar [for obtaining preliminary approval] is low"); *Butler v. Am. Cable & Tel., LLC*, No. 09 CV 5536, 2011 WL 2708399, at *8 (N.D. Ill. Jul. 12, 2011) ("Although the 'fair, reasonable, and adequate standard' and the factors used to measure it are ultimately questions for the fairness hearing, a more summary version of the same inquiry takes place at the preliminary phase.") (citations omitted). The Supreme Court has cautioned that, in reviewing a proposed class settlement, a court should "not decide the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *see also Hiram Walker & Sons, Inc.*, 768 F.2d at 889; *Isby*, 75 F.3d at 1196-97.

Here, the Revised Settlement before the Court is fair, reasonable, and adequate, and well within the range of possible approval, because it provides monetary benefits to all settlement class members, avoids the uncertainty and expense of prolonged litigation, and avoids the need to resolve contentious factual and legal issues. The Revised Settlement Agreement further satisfies the factors set forth by the Seventh Circuit in assessing whether a proposed settlement agreement is within the range of fair, reasonable, and adequate.

In deciding whether to preliminarily approve a settlement, courts must consider: (1) the strength of plaintiffs' case compared to the terms of the proposed settlement; (2) the likely complexity, length and expense of continued litigation; (3) the amount of opposition to settlement among effected parties; (4) the opinion of competent counsel; and (5) the stage of the proceedings and the amount of discovery

completed.

*In re AT&T Mobility Wireless*, 270 F.R.D. at 346; *see also, e.g.*, *Wong v. Accretive Health, Inc.*, 773 F.3d 859 (7th Cir. 2014) (reiterating "longstanding guidance" of the relevant factors for determining fairness of class action settlement). In weighing these factors, the district court should "recognize[] that the first factor, the relative strength of the plaintiffs' case on the merits as compared to what the defendants offer by way of settlement, is the most important consideration." *Isby*, 75 F.3d at 1199. The Seventh Circuit has explained that district courts should "consider the facts in the light most favorable to the settlement." *Id.* at 1198-99. Further, "[t]he essence of settlement is compromise . . . [t]hus the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution after trial." *EEOC v. Hiram Walker & Sons*, 768 F.2d at 889. Indeed, a district court should not reject a settlement "solely because [the settlement] does not provide a complete victory to the plaintiffs." *Isby*, 75 F.3d at 1200.

### A. The Strength of Settlement Class Representatives' Case Is Well-Balanced Against the Amount Offered In the Settlement, Which Is More Generous Than Comparable Settlements

The most important settlement-approval factor is "'the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.'" *In re AT & T Mobility Wireless*, 270 F.R.D. at 346 (internal citations omitted). "An integral part of the strength of a case on the merits is a consideration of the various risks and costs that accompany continuation of the litigation." *Id.* at 347; *see also* Fed. R. Civ. P. 23(e)(2)(C) (requiring courts considering class settlements to consider whether "the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal . . . ."). While Plaintiffs believe in the

merits of their case, they must acknowledge the risks of continuing litigation.[5]

First, fact-intensive inquiries are pervasive in this action. Plaintiffs' contention that Defendant failed to secure and safeguard payment card information (*e.g.*, Second Amended Complaint ¶¶ 1, 84-85, 98, 107) involve consideration of many facts surrounding the Incident, including the manner in which the information was potentially compromised in the first instance, the length of time the information was potentially compromised, the types of information that were potentially compromised, and whether any of the information actually was improperly accessed or used as a result. As the Seventh Circuit recognized, proving causation in this case presents a significant hurdle. (Dkt. 66 at 10.) Similar difficulties exist for purposes of quantifying settlement class members' damages. Likewise, Plaintiffs' claims regarding Defendant's failure to provide timely and adequate notice to settlement class members after the Incident require a factual inquiry into Defendant's notification program.

In support of its defenses, Plaintiffs expect that Defendant would attempt to present certain materials as evidence and arguments that would seek to demonstrate that: (i) Defendant implemented robust security architecture to protect its systems and customer data, (ii) Plaintiffs' damages were not caused by the Incident or, at least, could have had other causes including other cybersecurity incidents; (iii) Assessments by allegedly independent third parties found that Defendant was in compliance with applicable data security standards before, during, and after the Incident; (iv) the payment card information collected by the malware in the Cybersecurity

---

[5] In considering a settlement, a court should take the parties' views into account. *Wong*, 773 F.3d at 863 (reiterating that factors for determining a class settlement's fairness include "'the opinion of competent counsel'") (quoting *Gautreaux*, 690 F.2d at 631); *In re Cendant Corp. Secs. Litig.*, 109 F. Supp. 2d 235, 255 (D.N.J. 2000) ("Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class.") (citation and internal quotation marks omitted); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (holding that in analyzing a class settlement, a trial court may rely on the judgment of experienced counsel and, "absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel").

Incident was not actually exfiltrated; (v) transactions on Defendant's websites and at Defendant's restaurants were not compromised; and (vi) PIN data was not compromised. (Wolfson Decl. ¶ 17.) Defendant also likely would attempt to present evidence establishing that its sent written notice of the Incident to consumers with an offer of free credit monitoring for one year, decreasing damages. (*Id.*)

Second, continued litigation would present risks in establishing liability and damages. If the Settlement is not approved, this action will proceed to intense litigation and possibly trial and appeal. Plaintiffs and Defendant vehemently disagree about the merits of Plaintiffs' claims. Although this Court denied Defendant's Motion to Dismiss based on Fed. Rule Civ. P. 12(b)(6), it did not rule on the merits (Dkt. 85), and Defendant has expressed its position that, should litigation go forward, it will move for a judgment on the pleadings. Regardless of each party's respective position, there is uncertainty about the ultimate outcome of this action.

Third, valuation of Plaintiffs' damages is difficult. Even without any discount for the significant risks of continued litigation, most if not all injuries suffered by settlement class members were relatively small, and establishing a nexus between those injuries and the Cybersecurity Incident may be problematic. Even if economic damages can be proven, the value of any monetary recovery to Plaintiffs erodes over time, and litigation expenses increase.

Fourth, Defendant would oppose class certification if the action were to proceed to that stage. Plaintiffs believe that class certification is appropriate in this action, but are cognizant of the risk that the Court may not certify a class at all, may not certify a class covering all claims asserted in the Second Amended Complaint, or may limit the size of any class. This Court or the Seventh Circuit might ultimately conclude that individualized questions predominate over any common questions. Finally, even if Plaintiffs are successful in gaining certification of their claims, the class certified may ultimately be smaller than the nationwide class to whom the

Revised Settlement will confer its benefits.

Finally, the tremendous amount of time and resources it will take to litigate the case to conclusion counsels in favor of accepting the Revised Settlement now. *See General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997); *see also In re AT&T Mobility Wireless*, 270 F.R.D. at 347 ("Even if Plaintiffs were to succeed on the merits at some future date, a future victory is not as valuable as a present victory. Continued litigation carries with it a decrease in the time value of money, for '[t]o most people, a dollar today is worth a great deal more than a dollar ten years from now.'") (citations omitted). Under this Revised Settlement, the settlement class will realize immediate benefits once the Revised Settlement is approved and the claims process is completed.

As a factual matter, it is clear that the Incident occurred. But the legal questions, such as whether Defendant's conduct gives rise to liability and cognizable damages, remain disputed. And while Plaintiffs strongly believe that they could overcome these legal hurdles, they cannot responsibly ignore the risk that this Court or a reviewing court might not accept some or all of their arguments. As a result, the present value of the monetary component of the Settlement is significant compared to duration and uncertainty of litigation and valuation of damages— indicating the Revised Settlement merits approval.

### B. The Complexity, Length, and Expense of Continued Litigation Favors Settlement

The likely complexity, length, and expense of continued litigation are relevant factors in assessing a proposed settlement. *Wong*, 773 F.3d at 863. The Revised Settlement makes a final decision on several disputed factual and legal issues unnecessary. While the parties have conducted informal discovery for settlement purposes, in the event litigation proceeded, the parties would need to engage in further and significant discovery. Both parties would require

experts. Costs of testifying experts regarding the economic harm caused to consumers, discovery, class certification, summary judgment motion practice, as well as other pre-trial and trial expenses, would be substantial. Continued litigation would likely involve, as indicated by the procedural history in this matter, motions to dismiss, motions for summary judgment, a motion for class certification, and one or more interlocutory appeals, all of which would delay final resolution. This factor also weighs in favor of preliminary approval.

### C.     Settlement Class Representatives Support the Settlement

At the current stage of the litigation, prior to the dissemination of the class notice, no settlement class members, including the named Plaintiffs, have indicated any objections to the proposed Revised Settlement. Class counsel will revisit this issue at the fairness hearing, to the extent necessary.

### D.     The Settlement Is the Product of Serious, Informed, Non-Collusive Negotiations

A proposed settlement is presumed to be fair and reasonable when it is the result of arms' length negotiations. *See Wong*, 773 F.3d at 864; *Armstrong v. Bd. of School Dirs. of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980), *overruled on other grounds in Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 375-76 (D.D.C. 2002) ("A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms-length negotiations'") (internal quotation omitted); *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 145-46 (E.D.N.Y. 2000) (assessing "the procedural component of the fairness determination" by "focus[ing] on the 'negotiating process by which the settlement was reached'") (citation omitted). This presumption is applicable here.

As discussed above, the Revised Settlement is the result of over twelve months of arm's length negotiations following the Court's rejection of the prior settlement, including an in-person mediation, and numerous other telephone conferences with the mediator and directly between experienced counsel who had a comprehensive understanding of the strengths and weaknesses of each party's claims and defenses. The negotiations were mediated and facilitated by a retired judge with substantial judicial and mediation experience in class actions. Moreover, the settlement was reached after Plaintiffs' counsel analyzed information provided by Defendant in informal discovery, conducted interviews of putative class members, and performed other meticulous investigation. Given these facts, the Revised Settlement is shown to be non-collusive.

### E. The Parties Engaged in Significant Motion Practice and Informal Discovery

Class Counsel conducted a detailed investigation into the facts and law relating to the matters alleged. Plaintiffs requested, received, and reviewed information from Defendant in connection with mediation and settlement negotiations. Among other facts, Plaintiffs learned that malicious software capable of collecting payment card data operated in Neiman Marcus stores between July 16, 2013 and October 30, 2013. In addition, Plaintiffs learned that (a) this malware never operated in some Neiman Marcus stores, (b) as to those stores where this malware did operate, it did not operate in each of the stores during each day between July 16, 2013 and October 30, 2013, and (c) often, this malware only operated during part of the time that each store was open for business, and the times when this malware operated varied from day to day within each individual store and among the stores where this malware operated. (Revised Settlement Agreement at ¶ 4.) These facts refined Plaintiffs' understanding of the Incident, and Plaintiffs no longer contend that the Cybersecurity Incident continued until January 10, 2014.

The parties also briefed the legal issues at hand extensively, as described above. As a result of this informal discovery and motion practice, Plaintiffs fully understand the merits of this case—weighing in favor of preliminary approval.[6]

## V. CLASS ACTION TREATMENT IS APPROPRIATE

### A. The Class to Be Certified for Settlement Purposes

Plaintiffs seek certification of the following settlement class for settlement purposes:

All residents of the United States who held a credit card or debit card account that was used in any stores at physical locations operating under the "Neiman Marcus," "Bergdorf Goodman," "Cusp," or "Last Call" names, but excluding all restaurants operating in any such stores, and excluding any website or online store, at any time from July 16, 2013 to October 30, 2013. Excluded from the Settlement Class are the judge presiding over this matter, any members of her judicial staff, the officers and directors of Neiman Marcus, and persons who timely and validly request exclusion from the Settlement Class.

(Revised Settlement Agreement at ¶¶ 4, 24, 40.)

The Court should certify the settlement class because Rules 23(a) and 23(b)(3) are satisfied. "Settlement is relevant to a class certification" and is "a factor in the calculus." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619, 622 (1997). The Supreme Court "has expressly approved the use of the settlement class device." *Id.* at 618 ("[T]he 'settlement only' class has become a stock device."). Settlement Class Representatives seek conditional certification of the class under Rule 23(b)(3), their appointment as Settlement Class Representatives solely for purposes of the settlement, and appointment of their counsel as class counsel. A class may be certified if it satisfies all of the requirements of Rule 23(a) and one of

---

[6]     A lack of formal discovery does not preclude preliminary approval "[b]ecause counsel have conducted a significant amount of informal discovery and 'dedicated a significant amount of time and resources to advancing the underlying lawsuits.'" *In re AT & T Mobility Wireless Data Servs. Sales Litig.,* 270 F.R.D. 330, 350 (N.D. Ill. 2010) (internal citations omitted).

the three subparagraphs of Rule 23(b), but without regard to whether the class would be manageable for trial. *See Amchem*, 521 U.S. at 620.

**B.    This Action Satisfies the Requirements of Rule 23(a)**

Fed. R. Civ. P. 23(a) sets forth the four prerequisites to class certifications: (i) the class is so numerous that joinder of all members is impracticable ("numerosity"); (ii) the claims raise common questions of law or fact ("commonality"); (iii) the claims or defenses of the proposed representatives are typical of those of the class ("typicality"); and (iv) the representative parties can fairly and adequately protect the interests of the class ("adequacy").   The settlement class proposed here satisfies each of these prerequisites.

**i.    The Class is Numerous**

Rule 23(a)(1) provides that a class must be "so numerous that joinder of all members is impracticable."  Here, the nationwide class includes individuals who held approximately 1,144,827 different payment card accounts.  Courts in the Seventh Circuit have found that classes with significantly less members than the proposed settlement class satisfy the numerosity requirement.  *See, e.g.*, *In re AT&T Mobility Wireless*, 270 F.R.D. at 341 (citing *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n. 9 (7th Cir.1969) (forty class members satisfy numerosity requirement)).  The proposed settlement class is so numerous that joinder would be impracticable.

**ii.    The Action Presents Common Questions**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Commonality focuses on the relationship of common facts and legal issues among class

members.  1 H. Newberg & A. Conte, Newberg on Class Actions, § 3:10 at 271 (4th ed. 2002).

"Courts have consistently found a 'common nucleus of operative fact[s]' when the defendants

are alleged to have directed 'standardized conduct toward [the putative class] members.'"

*Chandler*, 162 F.R.D. at 308 (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir.

1992)); *accord Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014).  Here,

commonality is satisfied because a determination of whether Defendant put reasonable

information technology security in place prior to the Incident, and complied with its statutory

duties following the Incident, will resolve issues "central to the validity" of each class

member's claims "in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011).

For purposes of Rule 23(a)(2), even a single common question will do.  *Id.* at 2556.

### iii.    Plaintiffs' Claims Are Typical

Rule 23(a)(3) requires that the settlement class representatives' claims be typical of other

proposed settlement class members' claims.  A "plaintiff's claim is typical if it arises from the

same event or practice or course of conduct that gives rise to . . . the same legal theory."

*Rosario*, 963 F.2d at 1018 (quoting *De La Fuente v. Stokely-VanCamp, Inc.*, 713 F.2d 225, 232

(7th Cir. 1983)).  While "the typicality requirement may be satisfied even if there are factual

distinctions between the claims of the named plaintiffs and those of other class members," the

requirement "primarily directs the district court to focus on whether the named representatives'

claims have the same essential characteristics as the claims of the class at large."  *Muro v.

Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (internal quotations omitted); *see also Garner

v. Healy*, 184 F.R.D. 598, 604 (N.D. Ill. 1999) (finding typicality satisfied where plaintiffs, like

the class, "believed that they were getting something more than they ultimately received").

Typicality is satisfied here because Plaintiffs and the proposed settlement class members have

the same claims arising from the same alleged course of conduct—that Defendant allegedly failed to implement reasonable information technology security and then allegedly failed to respond to the Cybersecurity Incident that followed, adequately and in compliance with state law. Accordingly, the typicality requirement is met.

### iv. Plaintiffs and Their Counsel Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4) requires that the named plaintiffs "fairly and adequately protect the interests of the class." Adequacy is satisfied where the class representative (1) has retained competent counsel, (2) has a sufficient interest in the outcome of the case to ensure vigorous advocacy, and (3) does not have interests antagonistic to those of the class. Moreover, "it is clear that adequacy of representation is established when no collusion is shown between the representative and an opposing party, when the representative does not have or represent an interest adverse to the proposed intervenor, and when the representative has not failed in the fulfillment of his duty." *Ebersohl v. Bechtel Corp.*, No. 09-1029-GPM, 2010 WL 2266736, at *2 (S.D. Ill. June 7, 2010) (quoting *Wade v. Goldschmidt*, 673 F.2d 182, 186 n.7 (7th Cir. 1982)).

Here, the interests of Plaintiffs and other members of the Settlement Class are fully aligned. Plaintiffs seek the same remedy as all proposed settlement class members: relief to address claims arising from the Cybersecurity Incident, through which certain Payment Card Information of proposed settlement class members may have been compromised. Further, proposed class counsel have extensive experience litigating and settling class actions, including class actions based on data breaches, false advertising, breach of contract, and unlawful business practices claims. They have demonstrated expertise in handling all aspects of complex litigation and class actions, and are well qualified to represent the Class. (Wolfson Decl. ¶ 3 & Ex. A; *see*

*generally*, Declaration of John Yanchunis, filed concurrently herewith). Plaintiffs and proposed class counsel remain fully committed to advancing the interests of, and obtaining relief for, the proposed settlement class members, as evidenced by the terms of the Revised Settlement Agreement. *See Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) (addressing Rule 23(a)(4)'s adequacy requirement).

In particular, both Group 1 Class Members and Group 2 Class Members are represented by the Settlement Class Representatives: Plaintiff Hilary Remijas is a Group 1 Class Member and Plaintiff Joanne Kao is a Group 2 Class Member. Both have approved the Revised Settlement with a full understanding of the benefits it provides to, and the release it requires from, similarly-situated settlement class members.

Plaintiffs' counsel and Defendant engaged in extended negotiations regarding the claims validation process, and throughout the negotiations, Plaintiffs' counsel sought to simplify the process and lower the burden that claimants must meet. That the parties ultimately agreed to the simple claims validation process described above is further evidence that Plaintiffs and their counsel will fairly and adequately represent absent proposed settlement class members.

## C. This Action Satisfies the Requirements of 23(b)(3)

In addition to meeting the requirements of Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Fed. R. Civ. P. 23(b). Here, Fed. R. Civ. P. 23(b)(3) is satisfied because: (i) the questions of law and fact common to members of the class predominate over any questions affecting only individuals; and (ii) the class action mechanism is superior to any other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

### i. Common Questions of Law and Fact Predominate

Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim is susceptible to classwide proof.'" *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013) (emphasis and alterations in original) (citation omitted). Plaintiffs need only show that "common questions 'predominate over any questions affecting only individual [class] members.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3)); *see also Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) reversed on other grounds by *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014) (predominance requirement may be satisfied when "the central questions in the litigation are the same for all class members"). Class action status is appropriate where common questions represent a significant aspect of a case and they can be resolved in a single action. *See* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1778, at 528 (2d ed. 1986). Common questions, however, need not be dispositive of the entire action, because "predominate" does not mean "determinative." *Id.* at 528-29. The presence of "some factual variation among the class grievances will not defeat a class action." *Rosario*, 963 F.2d at 1017.

Here, the claims are based upon uniform conduct regarding a single Cybersecurity Incident that affected all proposed settlement class members in similar fashion. The Rule 23(b)(3) predominance requirement is satisfied.

### ii. A Class Action Is Superior

A class action is superior to other available methods for the fair and efficient adjudication of this controversy. To determine the issue of "superiority," Rule 23(b)(3) enumerates the following factors: "(A) [T]he interest of members of the class in individually controlling the

32

prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by . . . members of the class; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3).

Each of these factors supports certifying the proposed settlement class. There is little interest or incentive for proposed settlement class members to individually control the prosecution of separate actions. While the total amount of economic harm caused by this Cybersecurity Incident is significant, the settlement class Members' individual claims are too small to justify the potential litigation costs that would be incurred by prosecuting these claims individually. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). Although the injuries resulting from Defendant's alleged failure to secure and safeguard the Payment Card Information of the settlement class are real, the cost of individually litigating such cases against Defendant would easily exceed the value of any relief that could be obtained by any one consumer. This fact strongly warrants a finding that a class action is a superior method of adjudication. In sum, the proposed settlement class's claims satisfy Rule 23(b)(3)'s requirements, and should be certified.

### D. Plaintiffs' Counsel Should Be Appointed Class Counsel Under Rule 23(g)

Rule 23(g)(1) states that "a court that certifies a class must appoint class counsel." As discussed supra, and in the Declarations of Tina Wolfson and John Yanchunis, Plaintiffs' counsel are well-qualified.

### E. The Proposed Class Notice Is Adequate

Class notice must be "reasonably calculated, under all the circumstances, to apprise

interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Trust*, 339 U.S. 306, 314 (1950). Notice must clearly and concisely state the following, in plain, easily understood language: (i) the nature of the action; (ii) the class definition; (iii) the class claims; (iv) that a class member may enter an appearance through an attorney; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members. Fed. R. Civ. P. 23(c)(2)(B). Rule 23(e)(B) similarly directs that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise."

Here, the method and form of notice meet all of the requirements of Rule 23. The proposed notice program will include direct notice to all proposed settlement class members for whom Neiman Marcus can ascertain contact information from its records with reasonable effort. (Revised Settlement Agreement ¶ 61, 65.) Moreover, the Summary Notice and Long Form Notice are written in clear and concise language and contain the information required by Rule 23(c)(2)(B). (*Id*. Exs. C, F.) The proposed Notice, *inter alia*, describes the nature, history, and status of the action; sets forth the definition of the proposed settlement class; states the proposed settlement class's claims and relevant issues; informs proposed settlement class members of the right to exclude themselves from the settlement class or object to the Revised Settlement Agreement, as well as the deadline and procedure for doing so; sets out the attorneys' fees and expenses that class counsel intend to seek in connection with final settlement approval; provides contact information for class counsel; warns of the binding effect of the settlement approval proceedings; and outlines the date, time, and place of the Fairness Hearing.

Notice will be disseminated both directly to proposed settlement class members, as well as through a combination of traditional print publication and internet banner advertisements tailored

to reach the target audience. (*Id*. Ex. G.) The internet campaign will implement multiple targeting layers to ensure that notice is delivered to the persons most likely to be members of the proposed settlement class, including search targeting, demographic targeting, category contextual targeting, keyword contextual targeting, site retargeting, and purchase data targeting. (*Id*. Ex. H, ¶ 29.) The Notice, therefore, is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314 (1950). Accordingly, the forms of notice and plan of dissemination should be approved.

## VI.   CONCLUSION

For all of the foregoing reasons, Settlement Class Representatives, by their counsel, respectfully ask that the Court (1) preliminarily approve the terms of the Revised Settlement as fair, adequate, and reasonable; (2) provisionally certify the Settlement Class under Federal Rule of Civil Procedure 23(b)(3) and (e) for settlement purposes only; (3) approve the notice program set forth in the Revised Settlement Agreement and exhibits thereto and approve the form and content of the notice; (4) approve the procedures set forth in the Revised Settlement Agreement for settlement class members to exclude themselves from the settlement class or to object to the Revised Settlement; (5) stay all proceedings in this matter unrelated to the Revised Settlement pending final approval of the Revised Settlement; (6) stay and/or enjoin, pending final approval of the Revised Settlement, any actions brought by settlement class members concerning a released claim; and (7) schedule a fairness hearing for the purpose of determining whether the Revised Settlement is fair, reasonable, and adequate and, therefore, deserving of final approval.

Dated: October 28, 2019

Respectfully submitted,

/s/ Tina Wolfson
Tina Wolfson
twolfson@ahdootwolfson.com
AHDOOT & WOLFSON, PC
10728 Lindbrook Drive
Los Angeles, CA 90024
Tel: 310-474-9111; Fax: 310-474-8585

Proposed Class Counsel and Attorneys for
the Plaintiffs


John A. Yanchunis
jyanchunis@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION DEPARTMENT
201 North Franklin Street, 7th Floor
Tampa, FL 33602
Tel: 813-275-5272; Fax: 813-226-5402

Proposed Class Counsel and Attorneys for
the Plaintiffs

Joseph J. Siprut
jsiprut@siprut.com
SIPRUT PC
17 North State Street, Suite 1600
Chicago, Illinois 60602
Tel: 312-236-0000; Fax: 312-878-1342

Attorneys for Plaintiffs