**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| HILARY REMIJAS and JOANNE KAO, individually and on behalf of all others similarly situated,<br><br>             Plaintiffs,<br><br>   v.<br><br><br>THE NEIMAN MARCUS GROUP, LLC, a Delaware limited liability company,<br><br>             Defendant. | Case No. 1:14-cv-01735<br><br>Judge Sharon Johnson Coleman |

**PLAINTIFFS' MOTION FOR FINAL APPROVAL**

**OF REVISED CLASS ACTION SETTLEMENT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................... 1

II.     SUMMARY OF LITIGATION, INVESTIGATION,
        AND SETTLEMENT ..................................................................... 3

        A.      Procedural History Preceding the Prior Settlement ............. 3

        B.      The Prior Settlement and Revised Settlement ..................... 5

        C.      Terms of the Proposed Revised Settlement ......................... 8

                i.      Monetary Relief ........................................................ 8

                ii.     The Claims Process .................................................. 9

                iii.    Dissemination of Notice to the Class .................... 12

                iv.     The Class's Response to the Notice Program
                        to Date .................................................................... 13

                v.      Service Awards to Class Representatives .............. 13

                vi.     Attorneys' Fees and Expenses ................................ 13

                viii.   Opt-Out Procedure and Opportunity to Object      14

III.    THE REVISED SETTLEMENT IS DESIGNED TO ADDRESS
        THE COURT'S REASONS FOR REJECTING THE PRIOR
        SETTLEMENT .......................................................................... 14

IV.     THE SETTLEMENT IS FAIR AND SHOULD RECEIVE FINAL
        APPROVAL ............................................................................... 17

        A.      The Strength of Settlement Class Representatives' Case Is
                Well-Balanced Against the Amount Offered In the
                Settlement, Which Is More Generous Than Comparable
                Settlements ........................................................................ 18

        B.      The Complexity, Length, and Expense of Continued
                Litigation Favors Settlement ............................................. 21

        C.      The Settlement Class's Reaction ........................................ 21

        D.      Class Counsel's Opinion ................................................... 22

        E.      The Settlement Is the Product of Serious, Informed,
                Non-Collusive Negotiations .............................................. 22

        F.      The Parties Engaged in Significant Motion Practice and
                Informal Discovery ........................................................... 23

ii

V.  THE COURT APPROVED NOTICE PROGRAM SATISFIES DUE PROCESS ................................................... **Error! Bookmark not defined.**

VI.  THE CLASS SHOULD BE CERTIFIED UNDER RULE 23 ............ **Error! Bookmark not defined.**

    A.  This Action Satisfies the Requirements of Rule 23(a) ....... 25

        i.  The Class Is Numerous ............................................ 25

        ii.  The Action Presents Common Questions ............... 26

        iii.  Plaintiffs' Claims Are Typical .............................. 26

        iv.  Plaintiffs and Their Counsel Have Fairly and Adequately Protected the Interests of the Class ..... 27

    B.  This Action Satisfies the Requirements of Rule 23(b)(3) .. 28

        i.  Common Questions of Law and Fact Predominate 28

        ii.  A Class Action Is Superior ................................... 29

VI.  CONCLUSION ......................................................... 30

# TABLE OF AUTHORITIES

## CASES

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................................ 24

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S.Ct. 1184 (2013) ............................ 29

*Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981)............................................................ 18

Chandler v. S.W. Jeep–Eagle, Inc., 162 F.R.D. 302 (N.D.Ill.1995) .................................. 25, 26, 29

Chau v. Neiman Marcus Group, Ltd, Inc., No. 14-cv-597 (S.D. Cal. filed Mar. 14, 2014) ........... 4

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) .......................................................................... 18

*Culver v. City of Milwaukee*, 277 F.3d 908 (7th Cir. 2002) .......................................................... 28

*De La Fuente v. Stokely-VanCamp, Inc.,* 713 F.2d 225 (7th Cir. 1983) ....................................... 26

*Ebersohl v. Bechtel Corp.*, 2010 WL 2266736 (S.D. Ill. June 7, 2010)........................................ 27

*EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985)..................................... 18

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014) ................................................................... 29

*Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998) .......................................................................... 22

Frank v. Neiman Marcus Group, No. 14-cv-00233-ADS-GRB (E.D.N.Y. filed Jan. 13, 2014) ..... 4

*Garner v. Healy*, 184 F.R.D. 598 (N.D. Ill. 1999) ........................................................................ 27

*Gautreaux v. Pierce*, 690 F.2d 616, 634 (7th Cir. 1982)............................................................... 22

General Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074 (7th Cir. 1997) ............... 20

*Hispanics United of DuPage Cty. v. Vill. Of Addison, Ill.*, 988 F. Supp. 1130, 1149 (N.D. Ill.
  1997)........................................................................................................................................ 17

*In re Am. Med. Sys., Inc.,* 75 F.3d 1069 (6th Cir. 1996) ............................................................... 25

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 965 (N.D. Ill.
  2011)........................................................................................................................................ 21

*In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781 (N.D. Ill. 2015).......... 21, 22

*In re Cendant Corp. Secs. Litig.*, 109 F. Supp. 2d 235 (D.N.J. 2000) .......................................... 18

*In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp. 659 (D.
  Minn. 1974)............................................................................................................................. 18

*In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000) ............................... 22

*In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002) ........................ 22

*Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 877 F.3d 276 (7th Cir. 2017) ............... 2

*Muro v. Target Corp.*, 580 F.3d 485 (7th Cir. 2009) ..................... 27

*Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) .................................................... 29

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797 (1985) ................................................... 30

Remijas v. Neiman Marcus Group, LLC, 794 F.3d 688 (7th Cir. 2015) ........................................ 5

*Rosario v. Livaditis,* 963 F.2d 1013 (7th Cir. 1992)..................................................... 26, 29

Shields v. The Neiman Marcus Group, LLC, No. 14-cv-752 (S.D. Cal. filed Apr. 1, 2014) ......... 4

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014) ..................................... 26

Swanson v. Am. Consumer Indus., Inc., 415 F.2d 1326 (7th Cir.1969) ...................................... 25

*Wade v. Goldschmidt*, 673 F.2d 182 (7th Cir. 1982)....................................................... 27

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).................................................. 26

Wong v. Accretive Health, Inc., 773 F.3d 859 (7th Cir. 2014)................................................ 18, 22

*Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014)............................................. 17

Wong v. The Neiman Marcus Group, LLC, No. 2:14-cv-00703-SJO-JC (C.D. Cal. filed Jan. 29, 2014)......................................................................................................... 4

## STATUTES

28 U.S.C. §1715 ................................................................................................. 15

## RULES

Fed. R. Civ. P. 23(b)................................................................................... 31, 32, 33

Fed. R. Civ. P. 23(c)....................................................................................... 34

Fed. R. Civ. P. 23(e)..................................................................................... 19, 21

Rule 23(g)(1) ............................................................................................ 33

## TREATISES

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure (2d ed. 1986)...................................................................................................................... 32

Manual for Complex Litigation § 21.632 (4th ed. Supp. 2010) ...................................................... 19

## I.    INTRODUCTION

In accordance with the Court's November 15, 2019 Order Certifying A Settlement Class, Preliminarily Approving Class Action Settlement And Directing Notice To The Settlement Class, (Dkt. 224, the "Preliminary Approval Order"), Plaintiffs Hilary Remijas and Joanne Kao (collectively, "Plaintiffs") now seek final approval of the Revised Class Action Settlement in this action (Dkt. 221-1, the "Settlement" or "Revised Settlement").  Plaintiffs respectfully request that the Court enter an Order granting final approval of the Settlement as fair, reasonable, and adequate. (*See also* Dkt. 221-3, [Proposed] Final Judgment and [Proposed] Final Order.)

As the Court is aware, Plaintiffs brought this lawsuit as a putative class action on behalf of consumers whose credit or debit card information ("Payment Card Information") was potentially compromised in a 2013 cybersecurity incident (the "Cybersecurity Incident" or "the Incident") that affected certain stores owned by Defendant The Neiman Marcus Group LLC ("Neiman Marcus" or "Defendant") between July 16, 2013 and October 30, 2013 (the "Malware Period").  Plaintiffs assert claims for negligence, breach of implied contract, unjust enrichment, violation of state unfair business practices statutes, invasion of privacy, and violation of state data breach acts.  (Dkt. 213.)

This case has a long history involving three presiding judges, an appeal to the Seventh Circuit, extended mediation before Judge Wayne R. Andersen (Ret.), and a prior settlement agreement about which notice was provided before the Court ultimately denied final approval of that proposed settlement.  (Dkt. 194.)  Plaintiffs and Defendant carefully considered the Court's written opinion denying final approval of the prior settlement, re-negotiated the Settlement, and reached the present Revised Settlement, which addresses the issues that led the Court to deny final approval to the prior version.  As compared with the prior settlement, the Revised Settlement:

- Narrows the settlement class by removing from it those individuals who did not shop at Defendant's stores during the Malware Period;

- Provides the same relief as the prior settlement to settlement class members who used a payment card at one of Defendant's stores during a time when the malware was actually operating ("Group 1 Class Members");

- Provides monetary relief to class members who shopped at one of Defendant's stores during the Malware Period, but not at a store during a time when that the malware was actually operating ("Group 2 Class Members");

- Is supported by a class representative who is a Group 1 Class Member (Plaintiff Remijas) and one who is a Group 2 Class Member (Plaintiff Kao), thus ensuring that both groups' interests were fully represented in the negotiations leading to the Revised Settlement and confirming that the Revised Settlement is fair to both groups;

- Effectively doubles the notice efforts provided to settlement class members by providing an entirely new round of notice, with a substantially higher reach percentage and frequency than the notice program in the prior settlement, while honoring claims filed in response to the notice of the prior settlement;

- Provides for the creation of a web page where potential claimants can input basic information and receive instant feedback stating whether that information is consistent with information associated with Group 1 Class Members, Group 2 Class Members, or neither, and thus provide a preliminary (though not dispositive) indication as to whether the individual is entitled to monetary benefits under the Revised Settlement and, if so, the amount of such benefits; and

- Protects the interests of persons who were members of the prior settlement class but who are not included in the Revised Settlement class by providing them with notice (equivalent to notice provided to class members) informing them that they are not included in the Revised Settlement, and by tolling their individual claims while such notice is provided.

The same considerations that motivated the Court to grant the Revised Settlement preliminary approval now merit final approval. As discussed further in the pages that follow, the Settlement is "is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *see also Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 877 F.3d 276, 283 (7th Cir. 2017); *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).

If approved, this Revised Settlement will result in a Settlement Fund of $1.6 million. (Dkt. 221-1, ¶ 49.) The Settlement Fund will be used to pay (i) eligible claimants who submit valid and

timely Claims, (ii) Service Awards, (iii) Attorneys' Fees and Expenses, (iv) any taxes due on the Settlement Payments Fund, and (v) the Settlement Administration Charges. (*Id*. ¶¶ 50-51.) The Settlement also provides for an effective notice program, featuring direct notice to all Revised Settlement class members for whom Neiman Marcus has contact information, as well as internet advertising and publication notice, all of which are well-tailored to disseminate the best notice practicable. (*Id*. ¶¶ 58-65.) In exchange, Revised Settlement class members will provide a general release to Neiman Marcus for all claims relating to the Cybersecurity Incident. (*Id*. ¶¶ 73-76.)

For the reasons set forth above and explained in more detail below, Settlement Class Representatives respectfully request that the Court enter an Order and Judgment, substantially in the form attached as Exhibit B to the Revised Settlement Agreement: (1) approving the terms of the Revsied Settlement as fair, adequate, and reasonable; (2) certifying the Settlement class for settlement purposes; (3) approving the notice program set forth in the Revised Settlement Agreement and finding notice has been disseminated in accordance with the Preliminary Approval Order; (4) approving the Settlement's Administration Protocol and plan of distribution; (5) approving the Settlement's Release; and (6) awarding Class Counsel their requested fees and litigation expenses, and Plaintiffs their requested service awards, as requested in the concurrently filed Motion For Attorneys' Fees, Costs, And Class Representative Service Awards; and (7) dismissing the action. (Dkt. 221-3.)

## II.     SUMMARY OF LITIGATION, INVESTIGATION, AND SETTLEMENT

### A.     Procedural History Preceding the Prior Settlement

In January 2014, Neiman Marcus announced that it experienced the Cybersecurity Incident, which potentially compromised the credit or debit card information of some of its customers who used a credit card or debit card at certain store locations. In its notification letter to customers disclosing the Incident, Defendant offered anyone who made a payment card purchase at Neiman

Marcus between January 2013 and January 2014 one year of free credit monitoring. Before initiating this litigation, plaintiffs' counsel investigated the underlying facts, including by analyzing Defendant's public statements concerning the Cybersecurity Incident.

On March 12, 2014, Plaintiff Remijas filed her original Complaint in this action. (Dkt. 1.) Prior to this time, other complaints related to the Incident already had been filed against Neiman Marcus.[1] After these actions were filed, plaintiffs' counsel in all the actions related to the Incident met and conferred in order to self-organize the cases for the sake of judicial economy and efficiency. (Declaration of Tina Wolfson ("Wolfson Decl.") ¶ 6.) Plaintiffs agreed to consolidate and proceed with their cases in the Northern District of Illinois. (*Id*. ¶ 7.) Ms. Remijas moved for leave to amend the complaint in her action to include additional plaintiffs and their claims (Dkt. 22), which the Court granted on June 2, 2014. (Dkt. 26.) Plaintiffs filed a First Amended Complaint on June 6, 2014. (Dkt. 27.)

After filing, plaintiffs' counsel's investigation continued. Plaintiffs' counsel retained and consulted with experts on data security issues, who helped analyze available information concerning the Incident. Plaintiffs' counsel fought for early discovery, filing, in the *Frank* case cited above, a motion to expedite discovery and, later, a motion to compel Defendant to participate in a Rule 26 conference so that regular discovery could proceed. (*Frank*, Dkt. Nos. 5, 29.) Plaintiff Frank also filed a motion for a protective order seeking to curtail Defendant's communications to the class. (*Frank*, Dkt. No. 4.) The *Frank* court did not rule upon those motions before the cases were effectively consolidated in this Court.

---

[1]    These cases include *Frank v. Neiman Marcus Group*, No. 14-cv-00233-ADS-GRB (E.D.N.Y. filed Jan. 13, 2014), and *Wong v. The Neiman Marcus Group, LLC*, No. 2:14-cv-00703-SJO-JC (C.D. Cal. filed Jan. 29, 2014). Similar actions followed, including *Chau v. Neiman Marcus Group, Ltd, Inc.*, No. 14-cv-597 (S.D. Cal. filed Mar. 14, 2014) and *Shields v. The Neiman Marcus Group, LLC*, No. 14-cv-752 (S.D. Cal. filed Apr. 1, 2014).

On July 2, 2014, in this action, Defendant moved to dismiss Plaintiffs' First Amended Complaint for lack of standing under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). (Dkt. 35.) Plaintiffs opposed but, on September 16, 2014, the Court granted Defendant's motion under Rule 12(b)(1) and dismissed the action on standing grounds. (Dkt. 49.)

Plaintiffs appealed and, after oral argument, this Court's dismissal was reversed by the Seventh Circuit. *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688 (7th Cir. 2015). The Seventh Circuit held that Plaintiffs adequately alleged standing under Article III of the U.S. Constitution. (Dkt. 66 at 17.) Following the Seventh Circuit's reversal and denial of Neiman Marcus's petition for rehearing en banc, Defendant renewed its Motion to Dismiss under Rule 12(b)(6) for failure to state a claim. (Dkt. 75.) On January 13, 2016, the Court denied Defendant's Motion to Dismiss, stating that "[d]ismissal is not appropriate at this time." (Dkt. 84.) On October 26, 2016, the Court issued an Executive Committee Order, transferring the action from the Honorable James B. Zagel to the Honorable Samuel Der-Yeghiayan. (Dkt. 121.)

### B. The Prior Settlement and Revised Settlement

In December 2015, the parties began discussing possible settlement, which resulted in a long series of arms' length negotiations, including mediation and numerous post-mediation discussions between counsel and the mediator. (Wolfson Decl. ¶ 12.) In connection with the mediation, Plaintiffs requested information from Defendant, who provided information sufficient to permit Plaintiffs and Class Counsel to evaluate the claims and potential defenses so as to meaningfully conduct informed settlement discussions. (*Id*. ¶ 15.) Before entering into the prior settlement agreement, Plaintiffs' counsel conducted a thorough examination, investigation, and evaluation of the relevant law and facts to assess the merits of the claims and defenses. (*Id*. ¶ 17.)

The Honorable Judge Wayne R. Andersen (Ret.) of JAMS served as the mediator in two formal all-day mediation sessions, taking place on December 22, 2015 and on March 2, 2016, as

well as numerous subsequent telephonic conversations and negotiations. (*Id*. ¶ 13.) Judge Andersen is a highly respected and experienced class action mediator, who joined JAMS following more than twenty-six years on the bench, spending the most recent nineteen years as a U.S. District Judge for the Northern District of Illinois. (*Id*. ¶ 14.) During settlement negotiations, Plaintiffs obtained substantial information from Defendant concerning the Incident. (*Id*. ¶ 15.)

Following extensive and detailed negotiations over the details of the prior settlement, Plaintiffs moved for preliminary approval of the prior settlement on March 17, 2017. (Dkt. 144.) In brief, the prior settlement included a settlement class of all individuals who held a payment card used to make a purchase at any Neiman Marcus store (excluding restaurant and online purchases) between July 16, 2013 and January 10, 2014 (that is, all Group 1 Class Members, Group 2 Class Members, as well as individuals whose cards were used only after the malware ceased operation on October 30, 2013). Group 1 Class Members filing valid and timely claims could recover up to $100; other class members were not eligible for a monetary recovery.

Judge Der-Yeghiayan granted preliminary approval of the prior settlement and preliminarily certified the settlement class on June 21, 2017. (Dkt. 154.) The Settlement Administrator disseminated notice as ordered by the Court. Objections were filed to the prior settlement (Dkt. 164, 165), on which the parties submitted briefing. Judge Der-Yeghiayan held a fairness hearing on October 26, 2017. (Dkt. 183.) On January 16, 2018, in light of Judge Der-Yeghiayan's decision to retire from the Court as of February 17, 2018, this action was reassigned to Judge Sharon Johnson Coleman. (Dkt. 188.)

On September 17, 2018, the Court issued an opinion denying final certification of the prior settlement and decertifying the settlement class. (Dkt. 194.) The Court's principal reason for its decision was its finding of a "fundamental" and "inevitable conflict" between class members who

shopped during the Malware Period and those who did not (*id.* at 8–9). The Court noted that it saw "no adequacy problem as between the recovering and non-recovering class members [*i.e.*, Group 1 Class Members and Group 2 Class Members] who made their purchases within the malware period." (*Id.* at 7.) The Court noted several additional concerns, including that:

- No settlement class representative clearly represented class members whose cards were used only after the Malware Period ended (*id.* at 8 n.3);

- The prior settlement offered no meaningful relief to class members whose credit card information was not compromised (Group 2 Class Members), yet did not inform class members whether they would recover monetarily from the settlement (*i.e.*, whether they were a Group 1 Class Member) until after they filed claims (*id.* at 6, 8);

- A representation in Plaintiffs' preliminary approval motion that all class members would be given direct notice was incorrect;[2] and

- The Court viewed the number of claims filed—16,447 out of a class of approximately 2.2 million—as low, suggesting that further notice efforts were warranted. (*Id.* at 10.)

Following the Court's rejection of the prior settlement, the parties began to negotiate a revised settlement that would address the concerns raised by the Court. The parties participated in another all-day mediation with Judge Andersen on January 23, 2019, which was also attended by counsel to one of the objectors to the prior settlement. The parties reached agreement as to all material terms of the Revised Settlement on June 12, 2019 and thereafter continued to negotiate with that objector's counsel, including in communications through Judge Andersen. (Wolfson Decl. ¶¶ 24-26.) After those negotiations failed to bear fruit, the parties determined to seek approval of the Revised Settlement without the objector's counsel's agreement.

The parties designed the Revised Settlement to address each of the Court's concerns with

---

[2] Plaintiffs explained that this statement was the result of an error, which the Court noted that it had no reason to doubt. (*Id.* at 10.) Indeed, other contemporaneously-filed documents clearly indicated that direct notice was given to all class members for whom Neiman Marcus had contact information (*see, e.g.*, Dkt. No. 145-1 at ¶ 62 ("The Settlement Administrator shall send the Summary Notice via E-Mail to all Settlement Class Members for whom Neiman Marcus can ascertain an e-mail address from its records with reasonable effort."); Dkt. No. 145-9 at ¶ 7 ("The notice program . . . provides individual notice to all Class Members who can be identified through reasonable effort.").

the prior settlement, including by:

- Narrowing the settlement class to exclude those whose cards were not used during the Malware Period, thus resolving the conflict identified by the Court and eliminating the need for a class representative who shopped outside the Malware Period;

- Making all settlement class members eligible for significant monetary relief, including those whose cards were used during the Malware Period but not when the malware was actually operating; and

- Effectively doubling notice efforts by providing an entirely new round of notice to settlement class members, while still honoring claims filed under the previous settlement.

Plaintiffs filed a Second Amended Complaint that narrowed the Settlement Class definition and removed as proposed class representatives two individuals (Melissa Frank and Debbie Farnoush) who no longer are class members under the narrowed settlement class definition. (Dkt. 213.) The Second Amended Complaint also removes allegations that the malware continued to operate after October 30, 2013, which information gleaned since the original complaint was filed confirms to be true. (*Id.*)

### C. Terms of the Revised Settlement and the Response to Class Notice

#### i. Monetary Relief

Defendant will pay up to $1.6 million to create a settlement fund. (Dkt. 221-1, ¶ 49.) Up to $400,000 of the settlement fund will be used to pay charges and costs invoiced or charged by the settlement administrator arising from implementation of the notice program and administration of the Settlement, which the parties expect will amount to $400,000. (*Id.* ¶ 50.) In the unlikely event that settlement administration charges are less than $400,000, Defendant would retain the difference. (*Id.* ¶ 50(b).) If settlement administration charges exceed $400,000, such excess charges will be paid using funds set aside for payments to class members that have not been claimed and, if such funds are not sufficient to pay those excess charges, then Defendant will pay the excess charges not covered by unclaimed funds. (*Id.* ¶ 50(c).)

8

The remaining $1.2 million of the settlement fund will be used to pay eligible claimants who submit valid and timely claims, any taxes due, any service awards to Plaintiffs and attorneys' fees and expenses ordered by the court. (*Id.* ¶ 51.) If such payments do not exhaust this portion of the settlement fund, then the remaining funds would be used to pay any excess notice and administration costs, to make supplemental distributions to certain class members, and to make a charitable contribution. (*Id.* ¶ 53(c).) Each Group 1 Class Member who submits a valid Claim will receive up to $100, and each Group 2 Class Member who submits a valid Claim will receive up to $25. (*Id.* ¶ 53(b).)

In addition, the Settlement describes valuable changes to Defendant's business practices, designed to ensure that similar incidents do not re-occur in the future. (*Id.* ¶ 52.)

### ii. The Claims Process

The parties developed a streamlined and convenient method to determine whether a claimant has a valid claim. Claimants need only answer two questions to submit a claim:

**Question One.** A claimant must state whether his or her credit or debit card was used at a Neiman Marcus store between July 16, 2013 and October 30, 2013. (*Id.* Ex. A.) Claimants who answer in the negative are not class members.

**Question Two.** Claimants who answer the first question in the affirmative must provide at least one of two additional sets of information to submit a valid claim. First, claimants may provide (i) the last four digits of the payment card used at a Neiman Marcus store between July 16, 2013 and October 30, 2013, and (ii) the dates and locations that that card was used at a Neiman Marcus store between these dates. Second, claimants may provide the full name and billing address associated with the payment card. This information is necessary to determine whether the payment card was actually used at a time and place that malware capable of collecting payment card data was operational (and therefore, determine whether the claimant is a Group 1 Class

Member, Group 2 Class Member, or not a class member). Because Neiman Marcus does not possess the full name and billing address of all of the payment cards used during the Malware Period, it is possible that claimants who submit only the name and billing address associated with their payment card will have their claims denied due to a lack of information sufficient to determine whether or not that card was used during the Malware Period. The Claim Form therefore clearly explains this possibility and explains that claimants may avoid it by submitting the last four digits of the payment card used at a Neiman Marcus store during the Malware Period, along with the dates and locations of such purchases. If the information submitted by the claimant establishes that their card was actually used during the Malware Period, then they will be eligible to receive a monetary benefit; if it does not, they will not, because the claimant will not have established that he or she is a class member. (*Id*. ¶ 40.)

Finally, claimants must affirm that the information they provided is true, and that the claimant is the cardholder of the card identified in the response to Question Two. (*Id*. Ex. A.)

This claim validation procedure is convenient for claimants. It is possible for claimants to submit a valid claim using only information from their memory, such as the name and billing address of a potentially-affected payment card. All of the information requested is easily ascertainable from billing records that claimants may have in their files or be able to quickly obtain from the websites maintained by the issuers of their payment cards. Unlike in other data breach class action settlements, claimants need not collect or submit any documents to the settlement administrator in order to obtain a monetary benefit, which would substantially increase the burden on potential claimants.

Claims submitted under the prior settlement will be treated as though submitted under the

Revised Settlement; no further action by such claimants is required.[3]  Each class member who submits a valid and timely claim—including those who submitted valid and timely claims under the prior settlement—are eligible to receive a monetary payment.  The Settlement Payments Fund will first be used to pay any taxes due on the settlement fund, any service awards to Plaintiffs ordered by the Court, and any attorneys' fees and expenses awarded by the Court.  Once these payments have been made, the Settlement Administrator will pay an amount of up to $100 to each Group 1 Class Member who submitted a valid and timely claim (the same relief offered to them under the prior settlement) and up to $25 to each Group 2 Class Member who submitted a valid and timely claim.  In the event that the aggregate value of valid and timely claims exceeds the amount remaining in the Settlement Payments Fund after taxes, service awards, and attorneys' fees and expenses are paid, then the cash payment provided to each class member who submitted a valid and timely claim will be reduced on a *pro rata* basis,[4] and such class members will be paid a *pro rata* amount that exhausts the Settlement Payments Fund.

In the event that there are funds left in the Settlement Payments Fund after all Group 1 Class Members who submitted a valid and timely claim have been paid $100, and all Group 2 Class Members who submitted a valid and timely claim have been paid $25, then the remaining funds will be distributed as follows: First, such funds will be used to pay any costs of providing class notice and administering the Revised Settlement in excess of $400,000.  Second, if there are

---

[3]     If any settlement class member who submitted a claim under the prior settlement files an opt-out notice, then they will be treated as having opted out of the Revised Settlement.  (Dkt. 221-1, ¶ 69.)  Their prior claim will not be paid, and they will not be subject to the release set forth in the Revised Settlement.  (*Id.*)

[4]     Specifically, should a *pro rata* reduction be necessary, the amount payable to Group 2 Class Members will be reduced first, with a minimum of $5.00, followed by reduction of the amount payable to Group 1 Class Members, with a minimum of $10.00, followed by a further reduction of the amount payable to Group 2 Class Members and then a further reduction of the amount payable to Group 1 Class Members.  (*Id.* ¶ 53(b).)  The parties designed this structure to ensure, to the extent possible, that all settlement class members receive a cash payment regardless of the number of valid and timely claims filed, while ensuring that Group 1 Class Members (who may have actually had their payment card information affected) do not receive relief inferior to Group 2 Class Members (whose payment card information was not affected).

funds remaining in the Settlement Payments Fund after payment of any such excess notice and administration costs, the Settlement Administrator will estimate the cost of sending a check to each class member who could have submitted a valid claim but did not for whom Defendant has a mailing address, and subtract that amount from the remaining funds.  After subtracting this cost, any remaining amounts will be distributed to such class members on a *pro rata* basis, provided that each such distribution would exceed $5.00.  Third, if there are funds remaining in the Settlement Payments Fund after any such distribution, such remaining funds shall be donated to a charitable organization chosen jointly by the Parties.  (*Id.* ¶ 53.)

### iii. Dissemination of Notice to the Class

The Settlement Administrator, Angeion Group, now has disseminated Notice in accordance with the preliminarily approved Revised Settlement's terms, and this Court's Preliminary Approval Order.  (Declaration of Steven Platt ("Platt Decl.").)  Settlement class members for whom Neiman Marcus could ascertain an e-mail or mailing address from its records with reasonable effort received the Summary Notice by e-mail, and, if a valid e-mail address was not available, by U.S. Mail to the extent such information is available.  (Dkt. 221-1 ¶ 65.)

More specifically, on March 13, 2020, Angeion sent out 807,983 email notices.  (Platt Decl. ¶ 6.)  Angeion also mailed postcard notices to 162,909 potential Class Members, and then to another 22, 486 Class Members to whom the prior email notice failed.  (*Id.* ¶¶ 8-9.)  Angeion also implemented the internet banner notice portion of the notice program utilizing a mobile internet advertising campaign, and published the notice in *People Magazine*.  (*Id.* ¶¶ 10-11.)

The Settlement website was updated with the terms of the Revised Settlement and subsequent filings, and is up and running today at www.NMSettlement.com.  (*Id.* ¶ 12.)  Angeion also established a toll-free telephone line providing information concerning the settlement and the claims process.  (*Id.* ¶ 13.  )

### iv.    The Class's Response to the Notice Program to Date

To date, Angeion has received and processed 11,324 Claims, in addition to the 19,678 received under the prior settlement.  (*Id.* ¶¶ 14-15.)  The claim filing deadline runs through October 1, 2020, not including the 28-day extension under the Northern District of Illinois' Third Amended General Order 20-0012, but this response already is likely to fully deplete the Settlement Fund.  (Dkt. 235.)

In addition, Angeion has received five requests for exclusion, and **no objections**.  (Platt Decl. ¶ 17.  The deadline for objections and requests for exclusion is May 18, 2020, again not including the 28-day extension under the Northern District of Illinois' Third Amended General Order 20-0012, which the parties anticipate requesting the Court to revoke, as they did with respect to the extension created by the second general order, which request the Court granted.  (Dkt. 234.)

### v.    Service Awards to Class Representatives

Each of the Class Representatives took the initiative to commence this litigation, assisted in case development, stayed apprised throughout the litigation, and accepted risks and responsibilities individually and on behalf of others similarly situated.  Therefore, concurrently with this Motion, and in accordance with the terms of the Revised Settlement Agreement, each Plaintiff requests a service award of two thousand five hundred dollars ($2,500), to be paid out of the Settlement Fund.  (Dkt. 221-1, ¶ 77.)

### vi.    Attorneys' Fees and Expenses

Class Counsel concurrently seek, again in accordance with the terms of the Revised Settlement, an award of attorneys' fees, costs, and expenses in the amount of five hundred and thirty thousand dollars ($530,000).  (*Id.*)  This maximum amount was stated on the relevant notice forms, and Defendant retains the right to object to Class Counsel's request.  (*Id.* ¶ 78.)

### vii. Release Provisions

If the Court grants final approval to the Revised Settlement, settlement class members will automatically be deemed to have released Defendant of all claims, known or unknown, that relate to the Incident that were or could have been alleged in this action. (*Id*. ¶¶ 73-76.) The Released Claims do not include any claims arising from or relating to any conduct by Neiman Marcus after the date the Revised Settlement Agreement was executed. (*Id*. ¶ 74.)

### viii. Opt-Out Procedure and Opportunity to Object

Any settlement class member may request to be excluded from the Revised Settlement by sending a written request to the Settlement Administrator postmarked no later than the Opt-Out Deadline, which is May 18, 2020, not including the 28-day extension under the Northern District of Illinois' Third Amended General Order 20-0012, which the parties anticipate requesting the Court to revoke, as they did with respect to the extension created by the second general order, which request the Court granted. (Dkt. 234.) Valid requests must include information described in the Notice, including a statement that the person sending the request wishes to be excluded from the Class. (Dkt. 221-1, ¶ 66.)

Any settlement class member who does not request to be excluded may, by the same deadline, object to the Revised Settlement, Class Counsel's fee application, and/or the requests for service awards. (*Id*. ¶ 67.) To be considered, an objection must either be mailed to the Class Action Clerk or filed with the Court, and must be in writing, personally signed by the objector, and include the information prescribed by the Notice. (*Id*.)

## III. THE REVISED SETTLEMENT IS DESIGNED TO ADDRESS THE COURT'S REASONS FOR REJECTING THE PRIOR SETTLEMENT

In negotiating the Revised Settlement, the parties sought to address the Court's expressed concerns with the prior settlement.

First, to address the conflict identified by the Court between class members whose payment cards were used during the Malware Period and those whose cards were not (Dkt. 194 at 8), the parties narrowed the Settlement Class to exclude individuals whose cards were not used during the Malware Period, which had the effect of reducing the size of the settlement class by approximately half. (Dkt. 221-1, ¶ 40.) This change represented a significant concession on Defendant's part, since it was now agreeing to pay the same amount of money for a release from only half as many persons, some of whom (*e.g.*, previous Plaintiffs Farnoush and Frank) had sued Defendant. The parties took care to avoid causing prejudice to individuals who were in the previous putative class but are no longer in the revised settlement class by (i) agreeing that such individuals would receive notice of the Revised Settlement according to the same procedures used to provide notice to Revised Settlement class members, informing them that they are no longer members of the Settlement Class here, and by (ii) stipulating that the statutes of limitations on their individual claims against Defendant are tolled under *American Pipe & Construction v. Utah*, 414 U.S. 538 (1974) and its progeny, and shall continue to be tolled until the deadline for the settlement administrator to provide notice to the Settlement class. (*Id*. ¶ 68.)

Second, to address the Court's concern that class members whose cards were not used at a time and place the malware was operating (Group 2 Class Members) received only "lackluster non-monetary relief" under the prior settlement (Dkt. 194 at 8), the parties agreed that all members of the narrowed settlement class will be eligible for monetary relief—up to $100 for Group 1 Class Members (the same amount they stood to recover under the prior settlement), and up to $25 for Group 2 Class Members, who were not eligible for a monetary recovery under the prior settlement. (Revised Settlement Agreement ¶ 53(b).)

15

Third, to ensure that both Group 1 Class Members and Group 2 Class Members were represented by individual class representatives, and thus address the Court's concern that class members whose cards were used only after the Malware Period ended were not represented by class representatives under the prior settlement (Dkt. 194 at 7), the parties confirmed that Plaintiff Hilary Remijas is a Group 1 Class Member, and Plaintiff Joanne Kao is a Group 2 Class Member, and informed Plaintiffs Remijas and Kao of their respective statuses. Both Plaintiff Remijas and Plaintiff Kao signed the Revised Settlement Agreement, and agree that it is fair, reasonable, and adequate for all class members.[5]

Fourth, to address any concerns the Court had about the notice provided to members of the previous class (Dkt. 194 at 10), the parties agreed not only that they would provide an entirely new round of notice to the Revised Settlement class, with a higher reach percentage and frequency than the publication notice provided for the prior settlement, but that they also would honor claims filed under the prior settlement. Accordingly, if approved by the Court, the Revised Settlement notice effort will begin with 17,000 claims already filed (approximately 1.5% of the Settlement Class), with the number sure to rise as the claims deadline is still months away. (Revised Settlement Ex. H ¶ 16.) Although the claim rate is expected to rise, settlements with lower claims rates than that already achieved have been approved by courts in this district. *See Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 223 (N.D. Ill. 2016) (class settlement with claims rate of approx. 1.08%).

Fifth, as discussed above, the parties agreed to create a web site where potential claimants could instantaneously input basic information and instantly receive feedback about whether the information submitted is consistent with cards held by Group 1 Class Members, Group 2 Class

---

[5] The Court's opinion rejecting the prior settlement noted that it saw "no adequacy problem as between the recovering and non-recovering class members who made their purchases within the malware period." (Dkt. 194 at 7.)

Members, or neither. While not dispositive, this website has given potential claimants a preliminary indication as to whether they may be eligible to receive benefits from this settlement, and the amount of such benefits, which will help individuals make informed choices about whether to file a claim or exclude themselves from the Revised Settlement.

All in all, the parties have designed the Revised Settlement to not only meet the standards for final approval (as discussed below) but also to address the particular concerns raised by the Court in its opinion rejecting the prior settlement. The parties believe that the Revised Settlement delivers better results for the settlement class, and is worthy of approval.

## IV. THE SETTLEMENT IS FAIR AND SHOULD RECEIVE FINAL APPROVAL

Both judicial and public policies strongly favor the settlement of class action litigation. *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996). Courts look approvingly upon settlements because they promote "the interests of litigants by saving them the expense and uncertainties of trial, as well as the interests of the judicial system by [preserving] public resources." *Hispanics United of DuPage Cty. v. Vill. Of Addison, Ill.*, 988 F. Supp. 1130, 1149 (N.D. Ill. 1997).

In assessing whether to approve a class settlement as "fair," the Seventh Circuit has explained that district courts should "consider the facts in the light most favorable to the settlement" (*Isby*, 75 F.3d at 1198-99), and has identified six factors for analyzing whether a class action settlement should be given final approval including: "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed." *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014).

The Supreme Court has cautioned, however, that a court should "not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *Isby*, 75 F.3d at 1196-97 (declining objecting members' invitation to determine merits of legal issues that remain unresolved). Finally, the Seventh Circuit has urged district courts to be mindful that "the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution after trial." *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) (emphasis original). Analysis of these factors weighs heavily in favor of finally approving the Settlement.

### A. The Strength of Class Representatives' Case Is Well-Balanced Against the Amount Offered In the Settlement, Which Is More Generous Than Comparable Settlements

The most important settlement-approval factor is "'the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.'" *In re AT & T Mobility Wireless*, 270 F.R.D. at 346 (internal citations omitted). "An integral part of the strength of a case on the merits is a consideration of the various risks and costs that accompany continuation of the litigation." *Id.* at 347; *see also* Fed. R. Civ. P. 23(e)(2)(C) (requiring courts considering class settlements to consider whether "the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal . . . ."). While Plaintiffs believe in the merits of their case, they must acknowledge the risks of continuing litigation.[6]

First, fact-intensive inquiries are pervasive in this action. Plaintiffs' contention that

---

[6] In considering a settlement, a court should take the parties' views into account. *Wong*, 773 F.3d at 863 (reiterating that factors for determining a class settlement's fairness include "'the opinion of competent counsel'") (quoting *Gautreaux*, 690 F.2d at 631); *In re Cendant Corp. Secs. Litig.*, 109 F. Supp. 2d 235, 255 (D.N.J. 2000) ("Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class.") (citation and internal quotation marks omitted); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (holding that in analyzing a class settlement, a trial court may rely on the judgment of experienced counsel and, "absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel").

Defendant failed to secure and safeguard payment card information (*e.g.*, Second Amended Complaint ¶¶ 1, 84-85, 98, 107) involve consideration of many facts surrounding the Incident, including the manner in which the information was potentially compromised in the first instance, the length of time the information was potentially compromised, the types of information that were potentially compromised, and whether any of the information actually was improperly accessed or used as a result. As the Seventh Circuit recognized, proving causation in this case presents a significant hurdle. (Dkt. 66 at 10.) Similar difficulties exist for purposes of quantifying settlement class members' damages. Likewise, Plaintiffs' claims regarding Defendant's failure to provide timely and adequate notice to settlement class members after the Incident require a factual inquiry into Defendant's notification program.[7]

Second, continued litigation would present risks in establishing liability and damages. If the Settlement is not approved, this action will proceed to intense litigation and possibly trial and appeal. Plaintiffs and Defendant vehemently disagree about the merits of Plaintiffs' claims. Although this Court denied Defendant's Motion to Dismiss based on Fed. Rule Civ. P. 12(b)(6), it did not rule on the merits (Dkt. 85), and Defendant has expressed its position that, should litigation go forward, it will move for a judgment on the pleadings. Regardless of each party's respective position, there is uncertainty about the ultimate outcome of this action.

Third, valuation of Plaintiffs' damages is difficult. Even without any discount for the

---

[7] In support of its defenses, Plaintiffs expect that Defendant would attempt to present certain materials as evidence and arguments that would seek to demonstrate that: (i) Defendant implemented robust security architecture to protect its systems and customer data, (ii) Plaintiffs' damages were not caused by the Incident or, at least, could have had other causes including other cybersecurity incidents; (iii) Assessments by allegedly independent third parties found that Defendant was in compliance with applicable data security standards before, during, and after the Incident; (iv) the payment card information collected by the malware in the Cybersecurity Incident was not actually exfiltrated; (v) transactions on Defendant's websites and at Defendant's restaurants were not compromised; and (vi) PIN data was not compromised. (Wolfson Decl. ¶ 16.) Defendant also likely would attempt to present evidence establishing it sent written notice of the Incident to consumers with an offer of free credit monitoring for 1 year, decreasing damages. (*Id.*)

significant risks of continued litigation, most if not all injuries suffered by settlement class members were relatively small, and establishing a nexus between those injuries and the Cybersecurity Incident may be problematic. Even if economic damages can be proven, the value of any monetary recovery to Plaintiffs erodes over time, and litigation expenses increase.

Fourth, Defendant would oppose class certification if the action were to proceed to that stage. Plaintiffs believe that class certification is appropriate in this action, but are cognizant of the risk that the Court may not certify a class at all, may not certify a class covering all claims asserted in the Second Amended Complaint, or may limit the size of any class. This Court or the Seventh Circuit might ultimately conclude that individualized questions predominate over any common questions. Finally, even if Plaintiffs are successful in gaining certification of their claims, the class certified may ultimately be smaller than the nationwide class to whom the Revised Settlement will confer its benefits.

Finally, the tremendous amount of time and resources it will take to litigate the case to conclusion counsels in favor of accepting the Revised Settlement now. *See General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997); *see also In re AT&T Mobility Wireless*, 270 F.R.D. at 347 ("Even if Plaintiffs were to succeed on the merits at some future date, a future victory is not as valuable as a present victory. Continued litigation carries with it a decrease in the time value of money, for '[t]o most people, a dollar today is worth a great deal more than a dollar ten years from now.'") (citations omitted). Here, the Class will realize immediate benefits once the Revised Settlement is approved and the claims process is completed.

As a factual matter, it is clear that the Incident occurred. But the legal questions, such as whether Defendant's conduct gives rise to liability and cognizable damages, remain disputed. And while Plaintiffs strongly believe that they could overcome these legal hurdles, they cannot

responsibly ignore the risk that this Court or a reviewing court might not accept some or all of their arguments.  As a result, the present value of the monetary component of the Settlement is significant compared to duration and uncertainty of litigation and valuation of damages— indicating the Revised Settlement merits approval.

### B. The Complexity, Length, and Expense of Continued Litigation Favors Settlement

The likely complexity, length, and expense of continued litigation are relevant factors in assessing a proposed settlement.  *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 792 (N.D. Ill. 2015), *appeal dismissed* (May 5, 2015), *appeal dismissed* (June 8, 2015), *appeal dismissed* (June 26, 2015).  The Settlement makes a final decision on several disputed factual and legal issues unnecessary.  While the parties have conducted informal discovery for settlement purposes, in the event litigation proceeded, the parties would need to engage in further and significant discovery. Both parties would require experts.  Costs of testifying experts regarding the economic harm caused to consumers, discovery, class certification, summary judgment motion practice, as well as other pre-trial and trial expenses, would be substantial.  Continued litigation would likely involve, as indicated by the procedural history in this matter, motions to dismiss, motions for summary judgment, a motion for class certification, and one or more interlocutory appeals, all of which would delay final resolution.  This factor weighs in favor of final approval.

### C. The Settlement Class's Reaction

To date there have been no objections to the Settlement and five requests for exclusion. (Platt Decl. ¶ 17.)  Class Counsel will revisit this issue at the fairness hearing and after the objection / opt-out deadlines, to the extent necessary.  In any event, the opt-out rate is extremely low and no objections have been filed.  *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 965 (N.D. Ill. 2011) (granting final approval and finding that 0.01% of opposition

was scant); *see also In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 792 (N.D. Ill. 2015). Thus, this factor weighs strongly in favor of final approval.

### D. Class Counsel's Opinion

Courts are "'entitled to rely heavily on the opinion of competent counsel . . . .'" *Gautreaux v. Pierce*, 690 F.2d 616, 634 (7th Cir. 1982). Both Class Counsel strongly recommend final approval. (Wolfson Decl. ¶¶ 59-62; Declaration of John Yanchunis ("Yanchunis Decl."), filed concurrently herewith ¶¶ 6-9.)

### E. The Settlement Is the Product of Serious, Informed, Non-Collusive Negotiations

A proposed settlement is presumed to be fair and reasonable when it is the result of arms' length negotiations. *See Wong*, 773 F.3d at 864; *Armstrong v. Bd. of School Dirs. of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980), *overruled on other grounds in Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 375-76 (D.D.C. 2002) ("A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms-length negotiations'") (internal quotation omitted); *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 145-46 (E.D.N.Y. 2000) (assessing "the procedural component of the fairness determination" by "focus[ing] on the 'negotiating process by which the settlement was reached'") (citation omitted). This presumption is applicable here.

As discussed above, the Revised Settlement is the result of over twelve months of arm's length negotiations following the Court's rejection of the prior settlement, including an in-person mediation, and numerous other telephone conferences with the mediator and directly between experienced counsel who had a comprehensive understanding of the strengths and weaknesses of each party's claims and defenses. The negotiations were mediated and facilitated by a retired

judge with substantial judicial and mediation experience in class actions. Moreover, the settlement was reached after Plaintiffs' counsel analyzed information provided by Defendant in informal discovery, conducted interviews of putative class members, and performed other meticulous investigation. Given these facts, the Revised Settlement is shown to be non-collusive.

### F. The Parties Engaged in Significant Motion Practice and Informal Discovery

Class Counsel conducted a detailed investigation into the facts and law relating to the matters alleged. Plaintiffs requested, received, and reviewed information from Defendant in connection with mediation and settlement negotiations. Among other facts, Plaintiffs learned that malicious software capable of collecting payment card data operated in Neiman Marcus stores between July 16, 2013 and October 30, 2013. In addition, Plaintiffs learned that (a) this malware never operated in some Neiman Marcus stores, (b) as to those stores where this malware did operate, it did not operate in each of the stores during each day between July 16, 2013 and October 30, 2013, and (c) often, this malware only operated during part of the time that each store was open for business, and the times when this malware operated varied from day to day within each individual store and among the stores where this malware operated. (Dkt. 221-1, ¶ 4.) These facts refined Plaintiffs' understanding of the Incident, and Plaintiffs no longer contend that the Cybersecurity Incident continued until January 10, 2014.

The parties also briefed the legal issues at hand extensively, as described above. As a result of this informal discovery and motion practice, Plaintiffs fully understand the merits of this case—weighing in favor of final approval.[8]

---

[8] A lack of formal discovery does not preclude approval "[b]ecause counsel have conducted a significant amount of informal discovery and 'dedicated a significant amount of time and resources to advancing the underlying lawsuits.'" *In re AT & T Mobility Wireless Data Servs. Sales Litig.,* 270 F.R.D. 330, 350 (N.D. Ill. 2010) (internal citations omitted).

## V.     THE COURT APPROVED NOTICE PROGRAM SATISFIES DUE PROCESS

The parties effectuated the Class Notice in a reasonable manner that was calculated to reach as many Settlement Class Members as possible who would be bound by the Settlement.  In this case, in addition to publication notice, where possible, direct notice by e-mail and physical mail was sent to Settlement Class Members by the court-appointed Claims Administrator.  (Platt Decl.)

Notice was provided via email where possible, and via U.S. Mail wherever email was not available, or whenever an email was not successful.  (Platt Decl. ¶¶ 6-9.)  The Administrator published notice in *People* magazine, over the internet via banner advertisements, and on the Settlement Website, www.NMSettlement.com.  (*Id.* ¶¶ 10-12.)  In addition to the successful direct and publication notice, the administrator established an interactive voice response available through a toll free number and the Settlement Website.  (*Id.*  ¶ 13.)

The Notice Plan approved by the Court provided the best notice practicable to apprise the Settlement Class of the pendency of this action.  The notice afforded them an opportunity to opt out of or present any objections to this Settlement, and complied fully with due process, as already found in the Preliminary Approval Order.

## VI.    THE CLASS SHOULD BE CERTIFIED UNDER RULE 23

The Court should certify the settlement class because Rules 23(a) and 23(b)(3) are satisfied. "Settlement is relevant to a class certification" and is "a factor in the calculus."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619, 622 (1997).  The Supreme Court "has expressly approved the use of the settlement class device."  *Id.* at 618 ("[T]he 'settlement only' class has become a stock device.").  Settlement Class Representatives seek conditional certification of the class under Rule 23(b)(3), their appointment as Settlement Class Representatives solely for purposes of the settlement, and appointment of their counsel as Class Counsel.   A class may be certified if it satisfies all of the requirements of Rule 23(a) and one of the three subparagraphs of Rule 23(b).

### A. This Action Satisfies the Requirements of Rule 23(a)

Fed. R. Civ. P. 23(a) sets forth the four prerequisites to class certifications: (i) the class is so numerous that joinder of all members is impracticable ("numerosity"); (ii) the claims raise common questions of law or fact ("commonality"); (iii) the claims or defenses of the proposed representatives are typical of those of the class ("typicality"); and (iv) the representative parties can fairly and adequately protect the interests of the class ("adequacy"). The Settlement Class proposed here satisfies each of these prerequisites.

### i. The Class Is Numerous

Rule 23(a)(1) provides that a class must be "so numerous that joinder of all members is impracticable." "When class size reaches substantial proportions . . . , the impracticability requirement is usually satisfied by the numbers alone." *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir. 1996) (*citing* 1 H. Newberg & A. Conte, Newberg on Class Actions, § 3.01, at 3-4 (3d ed. 1992)). The proposed Settlement Class Members are sufficiently numerous under Rule 23(a)(1) because joinder of such Settlement Class Members, who are geographically dispersed, would be impracticable. Here, the nationwide class includes individuals who held approximately 1,144,827 different payment card accounts. Courts in the Seventh Circuit have found that classes with significantly fewer members than the proposed settlement class satisfy the numerosity requirement. *See, e.g.*, *In re AT&T Mobility Wireless, supra,* 270 F.R.D. at 341 (citing *Swanson v. Am. Consumer Indus., Inc.,* 415 F.2d 1326, 1333 n. 9 (7th Cir.1969) (forty class members satisfy numerosity requirement)); *Chandler v. S.W. Jeep–Eagle, Inc.,* 162 F.R.D. 302, 307–08 (N.D.Ill.1995) (finding fifty class members satisfy numerosity requirement)). As a result, the proposed Settlement Class is so numerous that joinder would be impracticable.

25

### ii.   The Action Presents Common Questions

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."[9] Commonality focuses on the relationship of common facts and legal issues among class members. 1 H. Newberg & A. Conte, Newberg on Class Actions, § 3:10 at 271 (4th ed. 2002). The commonality requirement is easily met here.  "Courts have consistently found a 'common nucleus of operative fact[s]' when the defendants are alleged to have directed 'standardized conduct toward [the putative class] members.'"  *Chandler, supra,* 162 F.R.D. at 308 (quoting *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992)); *accord Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014).  Here, commonality is satisfied because a determination of whether Defendant put reasonable information technology security in place prior to the Incident, and complied with its statutory duties following the Incident, will resolve issues "central to the validity" of each Class Member's claims "in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011). For purposes of Rule 23(a)(2), even a single common question will do.  *Id.* at 2556.

### iii.   Plaintiffs' Claims Are Typical

Rule 23(a)(3) requires that the Settlement Class Representatives' claims be typical of other proposed Settlement Class Members' claims.  A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to . . . the same legal theory." *Rosario, supra*, 963 F.2d at 1018 (quoting *De La Fuente v. Stokely-VanCamp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983)).  While "the typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members," the

---

[9]      *See Hanlon v. Chrysler Corp*, 150 F.3d 1011, 1019 (9th Cir. 1998); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011).  "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury."  *Id. at* 2551.  This means that the class members' claims "must depend on a common contention . . . of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

requirement "primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (internal quotations omitted); *see also Garner v. Healy*, 184 F.R.D. 598, 604 (N.D. Ill. 1999) (finding typicality satisfied where plaintiffs, like the class, "believed that they were getting something more than they ultimately received"). Typicality is satisfied here because Plaintiffs and the proposed Settlement Class Members have the same claims arising from the same alleged course of conduct — that Defendant allegedly failed to implement reasonable information technology security and then allegedly failed to respond to the Cybersecurity Incident that followed, adequately and in compliance with state law. Accordingly, the Class Representatives' claims are typical of the claims of the other proposed Class Members.

### iv.  Plaintiffs and Their Counsel Have Fairly and Adequately Protected the Interests of the Class

Rule 23(a)(4) requires that the named plaintiffs "fairly and adequately protect the interests of the class." Adequacy is satisfied where the class representative (1) has retained competent counsel, (2) has a sufficient interest in the outcome of the case to ensure vigorous advocacy, and (3) does not have interests antagonistic to those of the class. Moreover, "it is clear that adequacy of representation is established when no collusion is shown between the representative and an opposing party, when the representative does not have or represent an interest adverse to the proposed intervenor, and when the representative has not failed in the fulfillment of his duty." *Ebersohl v. Bechtel Corp.*, 2010 WL 2266736, at *2 (S.D. Ill. June 7, 2010) (*quoting Wade v. Goldschmidt*, 673 F.2d 182, 186 n.7 (7th Cir. 1982)).

Here, the interests of Class Representatives and the proposed Class Members are fully aligned. Class Representatives seek the same remedy as all proposed Class Members: relief to address claims arising from the Cybersecurity Incident, through which certain Payment Card

Information of proposed Settlement Class Members may have been compromised. Further, proposed Class Counsel have extensive experience litigating and settling class actions, including class actions based on data breaches, false advertising, breach of contract, and unlawful business practices claims. They have demonstrated expertise in handling all aspects of complex litigation and class actions, and are well qualified to represent the Class. (Wolfson Decl. ¶ 2 & Ex. A; *see generally*, Yanchunis Decl.) Plaintiffs and proposed Class Counsel remain fully committed to advancing the interests of, and obtaining relief for, the proposed Settlement Class Members, as evidenced by the terms of the Settlement Agreement. *See Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) (addressing Rule 23(a)(4)'s adequacy requirement and the importance of Class Counsel's advocacy with respect to a proposed settlement).

Plaintiffs' Counsel and Defendant engaged in extended negotiations regarding the Claims validation process, and throughout the negotiations, Plaintiffs' counsel sought to simplify the process and lower the burden that claimants must meet. That the parties ultimately agreed to the simple Claims validation process described above is further evidence that Plaintiffs and their counsel will fairly and adequately represent absent proposed Settlement Class Members.

### B. This Action Satisfies the Requirements of 23(b)(3)

Rule 23(b)(3) is satisfied because: (i) the questions of law and fact common to members of the class predominate over any questions affecting only individuals; and (ii) the class action mechanism is superior to any other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

### i. Common Questions of Law and Fact Predominate

Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of [the] claim is susceptible to classwide proof." *Amgen Inc. v. Connecticut Ret. Plans &*

*Trust Funds*, 133 S. Ct. 1184, 1196 (2013) (emphasis in original).  Plaintiffs need only show that "common questions 'predominate over any questions affecting only individual [class] members.'" *Id*. (quoting Fed. R. Civ. P. 23(b)(3)); *see also Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) *reversed on other grounds by Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014) (The predominance requirement may be satisfied when "the central questions in the litigation are the same for all class members").   Class action status is appropriate where common questions represent a significant aspect of a case and they can be resolved in a single action.  *See* 7A Charles Alan Wright, et al., Federal Practice and Procedure § 1778, at 528 (2d ed. 1986).   Common questions, however, need not be dispositive of the entire action, because "predominate" does not mean "determinative."  *Id.* at 528-29.  The presence of "some factual variation among the class grievances will not defeat a class action."  *Rosario, supra*, 963 F.2d at 1017; *see also Chandler, supra*, 162 F.R.D. at 308 (N.D. Ill. 1995) ("It is well-established . . . that the presence of some individualized issues does not overshadow the common nucleus of operative fact presented when the defendant has engaged in standardized conduct toward the class.")

Here, the claims are based upon uniform conduct regarding a single Cybersecurity Incident that affected all proposed settlement class members in similar fashion, and for the same amount of time.  Because these core issues involve uniform conduct common to all proposed Settlement Class Members, the Rule 23(b)(3) predominance requirement is satisfied.

### ii.    A Class Action Is Superior

A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   To determine the issue of "superiority," Rule 23(b)(3) enumerates the following factors: "(A) [T]he interest of members of the class in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the

controversy already commenced by . . . members of the class; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3).

Each of these factors supports certifying the proposed settlement class. There is little interest or incentive for proposed Class Members to individually control the prosecution of separate actions. While the total amount of economic harm caused by this Cybersecurity Incident is significant, the Class Members' individual claims are too small to justify the potential litigation costs that would be incurred by prosecuting these claims individually. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809 (1985). Although the injuries resulting from Defendant's alleged failure to secure and safeguard the Payment Card Information of the Settlement Class are real, the cost of individually litigating such cases against Defendant would easily exceed the value of any relief that could be obtained by any one consumer. This fact strongly warrants a finding that a class action is a superior method of adjudication.[10] In sum, the proposed Settlement Class's claims satisfy Rule 23(b)(3)'s requirements, and should be certified.

## VI.    CONCLUSION

For all of the foregoing reasons, Class Counsel requests that the Court enter an order granting final approval of the Settlement.

Dated: May 1, 2020                                Respectfully submitted,

                                                 */s/ Theodore Maya*
                                                 Tina Wolfson
                                                 twolfson@ahdootwolfson.com

---

[10]    Possible alternatives to the class action device include: joinder, intervention, consolidation, a test case, and an administrative proceeding. H. Newberg & A. Conte, Newberg on Class Actions, § 4.27 (4th ed. Supp. 2010). None of those alternatives is superior to class action treatment in this matter because the Settlement Class consists of approximately two million consumers across the country.

Theodore Maya
tmaya@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Drive
Los Angeles, CA 90024
Tel: 310-474-9111; Fax: 310-474-8585


John A. Yanchunis
jyanchunis@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION**
**DEPARTMENT**
201 North Franklin Street, 7th Floor
Tampa, FL 33602
Tel: 813-275-5272; Fax: 813-226-5402


Joseph J. Siprut
jsiprut@siprut.com
**SIPRUT PC**
17 North State Street, Suite 1600
Chicago, Illinois 60602
Tel: 312-236-0000; Fax: 312-878-1342


*Class Counsel and Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on May 1, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court in the United States District Court for the Northern District of Illinois by using the CM/ECF system, which served copies on all interested parties registered for electronic service.

*/s/ Theodore Maya*
Theodore Maya
